**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Miami Division

SERGIO PEREZ

CASE NO:

    *Plaintiff*,

v.

CITY OF OPA-LOCKA, a municipality
within the State of Florida
STEVEN BARREIRA, individually,
SCOTT ISRAEL, individually,
MICHAEL STEEL, individually,
GERMAN BOSQUE, individually,
DANIEL KELLY, individually,
THE FLORIDA DEPARTMENT OF
LAW ENFORCEMENT, a Law Enforcement
Agency for the State of Florida,
TROY WALKER, individually,
MIKE PEREZ, individually,
GAYLON WHITE, individually,

    *Defendants*.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**\*\*THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK\*\***

## TABLE OF CONTENTS

Pages(s)

I.    Claims, Jurisdiction and Venue …………………………………………..1 – 3

II.   The Parties and Amount of Damages Sought Against Each Defendant …………3 – 5

III.  The Relevant Non-Party Co-Conspirators ………………………………………..5 – 7

IV.   OLPD's Decades of Custom History, Patterns, and Practices of Negligent
      Hiring ……………………………………………………………………………7 – 19

V.    OLPD's Customs, History, Patterns, and Practices of Negligent Training…….19 – 21

VI.   OLPD's Decades of Custom History, Patterns, and Practices of Negligent
      Retention, Supervision & Promotion ………………………………………..21 – 49

VII.  Florida Department of Law Enforcement  ……………………………………49 – 56

VIII. The Two Malicious Investigations, Arrests and Malicious Prosecutions
      Against the Plaintiff………………………………………………………………56 – 93
      i.   The Jafet Castro Battery Case …………………………………………...56 – 61
      ii.  The Michael Steel Taser Case …………………………………………61 – 67

Count I – § 1983 Case Against the City Based Upon Negligent Hiring…………………93 – 99

Count II – § 1983 Case Against the City Based on Negligent Training………………… .99 – 101

Count III – § 1983 Case Against the City Based off Negligent Retention, Promotion
Supervision ………………………………………………………………………...101 – 108

Count IV – Violation of Civil Rights/ Malicious Prosecution (Steven Barreira)………..108 – 109

Count V – Violation of Civil Rights/ Malicious Prosecution (Scott Israel) …………….110 – 112

Count VI – Violation of Civil Rights/ Malicious Prosecution (German Bosque) ………112 – 114

Count VII – Violation of Civil Rights/ Malicious Prosecution (Daniel Kelly)………….114 – 115

Count VIII – Violation of Civil Rights/ Malicious Prosecution (Troy Walker) ………...115 – 118

Count IX – Violation of Civil Rights/ Malicious Prosecution (Mike Perez) ……...……118 – 121

Count X – Violation of Civil Rights/ Malicious Prosecution (Gaylon White) ………….121 – 123

Count XI – Civil Conspiracy Against All Defendants (Except City and FDLE)………..124 – 129

Count XII – Aiding and Abetting Against All Defendants (Except City and FDLE)….. 129 – 135

Count XIII – State Tort Claim for Malicious Prosecution (Michael Steel) ……………………135

Count XIV – State Tort Claim for False Arrest in Steel Taser Case (FDLE) …………………136

Count XV – State Tort Claim for False Arrest in the Castro Case (FDLE) ……………136-137

Claim for Damages ……………………………………………………………………………………137

Jury Trial Demand ……………………………………………………………………………..137

Plaintiff, Sergio Perez sues the Defendants and states:

## I. CLAIMS, JURISDICTION AND VENUE

### Brief Summary of Plaintiff's Claims

1. This action for damages is brought to redress violations of federally protected constitutional rights pursuant to Title 42 U.S.C. § 1983 against all of the Defendants and for attorney's fees pursuant to Title 42 U.S.C. § 1988. The claims under Title 42 U.S.C. § 1983 are for violations of Plaintiff's constitutional rights under the 4th, 8th, and 14th Amendments of the United States Constitution. Plaintiff's §1983 claims also include conspiratorial and aiding and abetting counts against all Defendants (except the City of Opa-Locka and The Florida Department of Law Enforcement) related to both criminal cases maliciously brought against him, both resulting in false arrests of the Plaintiff. Pursuant to the Court's pendent jurisdiction, Plaintiff sues the Florida Department of Law Enforcement in two counts for (state tort) false arrest and additionally sues Michael Steel in one count for (state tort) false arrest and malicious prosecution. Plaintiff has complied with Florida's presuit notice requirement of F.S. §768.28 as to the Florida Department of Law Enforcement. Plaintiff intends to seek leave of court to amend this complaint to add two counts for (state tort) false arrest against the City of Opa-Locka upon expiration of Florida's 6-months statutory pre-suit notice which matures in March, 2025.

2. Plaintiff's claims arise from two maliciously motivated criminal investigations, with cascading false arrests and malicious prosecutions against him. One related to a September 1, 2021 event - called" the Steel taser case" - which was criminally charged on January 12, 2022 followed by the other which involved the taking of a subject – Jafet Castro - into custody (in 2020) for Baker Act evaluation and for battery on several law enforcement officers of the Opa-Locka Police Department and resisting arrest in relation thereto. This second case was criminally charged on

1

November 8, 2022 and is called "the Castro case."  Both criminal proceedings terminated in Plaintiff's favor in early 2024; a dismissal in the Steel taser case and a jury acquittal in the Castro case.

3.  In brief, Plaintiff claims that the City of Opa-Locka, via two of its former police chiefs, Scott Israel and Steven Barreira, weaponized the Florida Department of Law Enforcement which, itself weaponized the Miami-Dade County State Attorney's Office to twice maliciously investigate, falsely arrest and maliciously prosecute the Plaintiff.

## Jurisdiction

4.  All of the Defendants are sued pursuant to Title 42 U.S.C. § 1983 and this Court's pendent jurisdiction.

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201-02 and the doctrine of federal pendent jurisdiction.

## Venue

6.  Venue properly lies in the Southern District of Florida ("SDFL") because all events giving rise to this action occurred in the SDFL.

## Plaintiff's Theory of § 1983 Liability

7.  According to a former Opa-Locka Police Department Deputy Chief, Antonio "Tony" Sanchez ("DC Sanchez") and former City of Opa-Locka City Manager John Pate ("Pate"), former City of Opa-Locka Police Chief Cheryl Cason ("Cason"),  but also based on other facts alleged herein and evidence cited, a lack of enforcement of orders, policies and procedures has persisted within the City of Opa-Locka's Police Department for decades resulting in (and from) its negligent hiring, negligent training, negligent retention, negligent promotion and negligent supervision of City of Opa-Locka administrative officials and law enforcement personnel. This, in turn, created,

promoted and tolerated a custom, policy, pattern, practice and history of violations of constitutional rights upon citizens, similar to those that occasioned damage to the Plaintiff.

8.      Plaintiff also alleges that since at least in or about 2014, the Florida Department of Law Enforcement adopted/created a custom, policy, pattern, practice and history of negligent hiring, negligent training, negligent retention, and the negligent promotion and supervision of primarily former/retired law enforcement officers merely seeking to boost their retirements who were incompetent and/ or negligent and/or corrupt, but in any event, misfit to honestly and honorably fulfill their law enforcement obligations as further alleged below. This began with FDLE's former and now disgraced Special Agent In-Charge, Troy Walker.

## II.      THE PARTIES AND AMOUNT OF DAMAGES SOUGHT AGAINST EACH DEFENDANT

9.      **Plaintiff Sergio Perez** ("Perez") resides in the SDFL. He began working as a police officer with the Opa-Locka Police Department in 2008. He was promoted to Sergeant, Lieutenant and then Captain over his career and he is also an alumnus of St. Thomas University to where he obtained his graduate degree in Criminal Justice Administration.

10.      **Defendant City of Opa-Locka** ("City") is a municipality within Miami-Dade County, organized under the laws of the State of Florida. The City is a 4.2 square mileage township in Miami-Dade County, Florida. It is responsible, through its officers, employees, servants, and agents, for enforcing the rules and regulations of the City and for ensuring that its officers, employees, servants, and agents obey the laws of the United States and of the State of Florida.  The City is located within the SDFL.  At all times material hereto, the City operated its own police agency, the Opa-Locka Police Department ("OLPD"). Plaintiff seeks $25m in compensatory damages against the City.

11.     **Defendant Steven Barreira** ("Barreira") is an individual who resides in the Northern District of Florida. At all times material hereto, he was the OLPD's police chief. Plaintiff seeks $1m in compensatory damages and $3m in punitive damages against Barreira. For §1983 purposes, Barreira was a state actor and violated clearly established law.

12.     **Defendant Scott Israel** ("Israel") is an individual who resides in the SDFL. At all times material hereto, he was the OLPD's police chief. Plaintiff seeks $1m in compensatory damages and $3m in punitive damages against Israel. For § 1983 purposes, Israel was a state actor and violated clearly established law.

13.     **Defendant Michael Steel** ("Steel") is an individual who resides in the SDFL. At all times material hereto, he was employed by the OLPD. For § 1983 purposes, Steel was a state actor. He was promoted from officer to Sergeant, later to Police Captain and then to Acting Police Chief. He too violated clearly established law.

14.     **Defendant German Bosque** ("Bosque") is an individual who resides in the SDFL. At all times material hereto, he was a police officer and later promoted to sergeant with the OLPD. Plaintiff seeks $1m in compensatory damages and $3m in punitive damages against Bosque. For § 1983 purposes, Bosque was a state actor and violated clearly established law.

15.     **Defendant Daniel Kelly** ("Kelly") is an individual who resides in the SDFL. At all times material hereto, he was a police officer with the OLPD. Plaintiff seeks $1m in compensatory damages and $3m in punitive damages against Kelly. For § 1983 purposes, Kelly was a state actor and violated clearly established law.

16.     **Defendant Florida Department of Law Enforcement** ("FDLE") is a Florida statewide law enforcement agency. Plaintiff seeks $25m in compensatory damages against the FDLE.

17. **Defendant Troy Walker** ("Walker") is an individual who resides in the SDFL. At all times material, he was acting within the course of his employment with the FDLE and was the supervisor to Defendants Gaylon White and Mike Perez. Plaintiff seeks $1m in compensatory damages and $3m in punitive damages against Walker. For § 1983 purposes, Walker was a state actor and violated clearly established law.

18. **Defendant Mike Perez** ("Perez") is an individual who resides in the SDFL. Perez began his law enforcement career as a recruit with the Hialeah Police Department in December 1980. He retired from that department and worked for about six years thereafter for the Davie Police Department and due to a problem there, he separated and joined FDLE. Plaintiff seeks $1m in compensatory damages and $3m in punitive damages against Plaintiff. For §1983 purposes, Perez was a state actor and violated clearly established law.

19. **Defendant Gaylon White** ("White") is an individual who resides in the SDFL. At all times material, he was acting within the course of his employment with the FDLE. Plaintiff seeks $1m in compensatory damages and $3m in punitive damages against White. For §1983 purposes, White was a state actor and violated clearly established law.

20. At all times material hereto, for purposes of the state tort claims herein, Walker, Perez, and White acted under the color of law and within the course and scope of their employment as law enforcement officers of the FDLE.

### III.    THE RELEVANT NON-PARTY CO-CONSPIRATORS

21. The following individuals/entities facilitated the constitutional violations alleged herein. Some are uncharged co-conspirators but not sued due to concepts of privilege and immunity and/or because while such actor(s) was(were) not generally aware of the conspiracy he/she/they somehow

did or failed to do something that still advanced it. Regardless, each actor contributed to the constitutional violations that caused damage to the Plaintiff.

22.     The **Miami-Dade County State Attorney's Office ("SAO")** is a prosecutorial authority within Miami-Dade County, Florida. It reviews criminal complaints and determines whether to file criminal charges against suspects/defendants or decline to do so and is responsible for prosecuting those filed cases through their conclusion within the criminal courts system.

23.     In Florida, when a complaint is made against a law enforcement officer ("LEO"), the departmental Professional Compliance Bureau ("PCB") is required to initiate an administrative investigation and notifies the SAO to determine whether criminal charges are warranted against the officer.

24.     Generally, although not always, the SAO will formally open a file and after all relevant investigative materials have been considered, a prosecution memo is generated to either charge or decline prosecution of the officer. When the matter is so clear cut not warranting even a memo, the SAO does not even open a file (or issue a close-out memo) and there is no record of the SAO referral (and review).

25.     **Timothy M. VanderGiesen** ("VanderGiesen") is a 20-plus year veteran prosecutor (and supervisor) at the SAO in charge of its Public Corruption Unit.

26.     **Johnette "Joni" Louise Hardiman** ("Hardiman") is a 20-plus year veteran prosecutor (and supervisor) at the SAO's Public Corruption Unit.

27.     **Howard Robert Rosen** ("Rosen") is a 20-plus year veteran prosecutor (and supervisor) at the SAO's Public Corruption Unit.

28.    **Carolina Sanchez** ("Sanchez") was admitted to the Florida Bar in November, 2020. She is the SAO prosecutor who volunteered to be specially detached to the SAO's Public Corruption Unit to prosecute the Plaintiff in the Steel taser case.

29.    **William Gonzalez** ("Gonzalez") was admitted to the Florida Bar in September, 2019.  He is the SAO prosecutor who teamed up with Sanchez to prosecute the Plaintiff in the Steel taser case.

30.    **George DeBenneville Bell III** ("Bell") was admitted to the Florida Bar in September, 2021. He is the prosecutor who volunteered to be specially detached to the SAO's Public Corruption Unit to prosecute the Plaintiff in the Castro case.

31.    **Diane James Bigot** ("Bigot") was the Assistant City Attorney for the City of Opa-Locka  in 2001.

32.    **Floralba Wright** ("Floralba") was an OLPD dispatcher who was recruited by Steel - FDLE, White and Perez to bear false testimony against the Plaintiff in the Steel taser case.

33.    **Jamesha McKinney** ("McKinney") is an OLPD officer who was recruited by Steel - FDLE, White and Perez to bear false testimony against the Plaintiff in the Steel taser case.

34.    Cory Krotenberg ("Krotenberg") is an OLPD sergeant who-at a point in time material and relevant-failed ti carry out his lawful duty as a supervisor/investigator within the OLPD's Professional Compliance Bureau ("PCB").

### IV. OLPD'S DECADES OF CUSTOM, HISTORY, PATTERN, AND PRACTICES OF NEGLIGENT HIRING OF POLICE OFFICERS, POLICE CHIEFS AND CITY MANAGERS

35.    OLPD (police officer) applicants must meet certain statutory and department requirements before receiving an offer for hire. They must "undergo" a background check following the

submission of an employment application to the OLPD. But, for decades, the City has not followed national standards which serves as a "filter" to prevent unqualified applicants from getting hired.

36.    This is not new. Since at least 2000, OLPD background investigations for police applicants have not been done according to nationwide professional and FDLE standards. This includes randomly contacting the applicant's neighbors, current/former employers, former boyfriends/girlfriends, essentially, individuals who can provide an accurate "insight" of the applicant's character. The City does this in its own very different way which falls below the law enforcement community's standard of care.

37.    OLPD applicants are allowed to "cherry-pick" those whom they want contacted by OLPD as character references and list them on the application. This avoids the OLPD background investigator from identifying any potential negative feedback from a true, independent character reference source, allowing the applicant to "breeze through" the background character check filter of the selection process.

38.    National standards also require that an applicant also pass a polygraph, psychological and drug test. Again, the City does this in its own, very different way.

39.    For decades, the OLPD has often waived polygraph and/or psychological examinations and/or drug testing of police applicants to save money and/or fear of a negative test result(s).  This allows applicants to hop, skip and jump over, aside and around those three extremely important filters.

40.    For decades, and also below community law enforcement agency standards, the City has routinely hired applicants knowing that they knew were previously rejected or terminated by other police departments and/or with evidence of troubled or suspected pasts, ignoring all of the "red flags" associated with those rejections, terminations and background check failures. This alerted

the City to serious character problems, such as perjury and/or a lack of integrity, incompetence and psychological problems just to name a few, opening the City's gates for street rogues to become OLPD police officers. Once hired, the recruit then need only survive the police academy and voila.

41.     The new hire then attends a FDLE Basic Law Enforcement ("BLE") training academy for about six months to obtain a certificate from the Criminal Justice Standards and Training Commission (from FDLE). That serves as another hurdle and filter.

42.     Since the last 25 or so years, the rigors of the police academy have loosened based on lawsuits and complaints that the training was too tough. This has lowered the "survival bar" and made it much easier for recruits to graduate. But it was a measure that prompted many nationwide police departments to increase the in-service training of its officers after graduating from the academy, something the OLPD has failed to uniformly do.

43.      Following BLE graduation, the recruit is sworn in and their employment becomes effective as a law enforcement officer with their respective police agency. After that, a large number of these unfiltered misfits and criminals become state actors via the OLPD with arrest powers within the City.

44.     The recruit then begins a three-month field training program. This entails working under the direct supervision of a Field Training Officer ("FTO")—a different FTO for each successive month—and on each of the three shifts: days, afternoons, and midnights, and then does a final "silent FTO phase."  Upon successful completion of the last FTO phase, the recruit is "cut loose" and allowed to patrol alone (without a training officer), but remains on probation until reaching the one-year anniversary of employment.

45.     A recruit within the one-year probationary period is regarded as a Probationary Police Officer ("PPO") and is not covered by union protections until successful completion of the probationary period.  Thus, during the probationary period the OLPD can terminate the officer without cause.

46.     For a PPO to successfully complete the probationary period and become a "union-protected" officer, the officer must have a satisfactory evaluation at the conclusion of his probationary period.  Most officers who make probation will remain in uniform patrol until years later when they become eligible for promotion to a higher rank - corporal or sergeant - or, into a specialized unit like a detective bureau.

47.     Notably, after graduation from the police academy, the OLPD does not train or test the recruit on his or her knowledge of any order, policy, or procedure to assure the recruit actually knows and understands the orders, policies, or procedures. Likewise, there are no annual tests, quizzes or examinations to prove the officer maintains knowledge of the laws, rules, policies and procedures.

48.     Every OLPD officer receives an annual performance evaluation. The problem here, however, is that with the OLPD, the evaluations are only as accurate as the raters are honest and that too has been a contributory factor to the City's failings with regard to negligent training, negligent retention and negligent supervision. This compromises the implementation and enforcement of sound police department policies and procedures.

49.     DC Sanchez says that with the City, a supervisor who favors a subordinate at the OLPD can "cover" the problem by "fudging" the LEO's performance evaluation(s) and that has been par for the course at the OLPD.

50.     According to DC Sanchez, for decades, the OLPD has routinely "re-cycled" PPOs who were marginal at best and highly unsatisfactory at worst merely to save money and maintain a staff beholden to the OLPD high, and often times corrupt administration as further alleged below.

51.     A PPO who cannot get it right during any of the field training cycles should just be dismissed. The problem is that by then, the City has already invested about $150,000.00 in getting the PPO to that point (BLE costs, salary and benefits) and the "cost-benefit" analysis then governs. This, as well, has been a significant contributory factor to the City's failings with regard to its negligent hiring, negligent training, negligent retention and negligent supervision.

52.     For decades, the City -and the OLPD- have fertilized and tolerated an inordinate amount of internal corruption, incompetence, misfeasance, malfeasance and nonfeasance as more fully identified below. This history is easily and clearly attributed to the City's negligent: hiring, training, retention, promotion and supervision of so many misfit police officer hires including police chiefs and City managers and has caused civilians - and many times even OLPD officers - to suffer violations of their civil rights.

53.     In 2008, Miami New Times reporter Calvin Godfrey correctly reported that the OLPD *"has been steadily deteriorating for 20 years, shrinking from nearly 50 cops to a strength force of 16 patrol officers"*.

54.     Similar publicly available stories followed by Anthony Cormier ("Cormier") of the Miami New Times, and by Miami Herald's Julie Brown's "Tarnished Badges" stories in 2012 and 2014 respectively. Cormier cited that 20% of OLPD officers had at least one instance of potentially career-ending misconduct as evaluated by FDLE. Julie Brown's article cited to a well-documented history of OLPD customs, policies and practices that plagued the City.  The City was well on

notice of its negligence and the consequences therefrom, yet, the City did nothing to change its ways.

55.      Over decades before 2021, there has been a flurry of §1983 and state court lawsuits against the City (and its OLPD) for a variety of claims, including: false arrest, malicious prosecution, malicious investigations, corruption, abuse of power, abuse of authority, management incompetence and management negligence. The facts alleged therein and in discovery revealed therefrom, exquisitely show detailed claims of corruption, ineptitude, cronyism, misconduct, sexual misconduct, lack of professionalism, the improper exchange of favors related to the exercise of positions of political power, all of which evidence a history, custom, pattern, practice and de facto policy of tolerated if not encouraged negligent hiring, negligent training, negligent supervision and negligent promotions. This has caused hundreds of constitutional violations against countless innocent civilians and City employees. For decades, the City has been on notice of these customs, policies and practices that were so historically and clearly patterned. See, example, *Adam Burden et al, v. The City of Opa Locka et al*, (Southern District of Florida, 2011); *Dr. Robin Starks v. The City of Opa Locka, et al,* (Southern District of Florida, 2024). See also **Exhibit A,** which is an excel spreadsheet with a small random sampling of a much larger universe of §1983 lawsuits by third parties against the City for conduct similar or substantially similar to the types of claims the Plaintiff raises herein.

**(FORMER) OLPD CHIEF AND CITY MANAGER JAMES WRIGHT (2005-2008)**

55.      On or about 2005, the City hired James Wright ("Wright"), a then retired Miami-Dade Police Department ("MDPD") lieutenant to be the City's new police chief. He was a negligent hire by the City.

56.      It would not take long for the City to fire Wright following multiple sexual harassment lawsuits filed by numerous women employed by the OLPD against Wright.

57.      According to the same *Miami New Times* article, while Wright had an impressive law enforcement career with MDPD, *"several incidents suggest that Wright did not handle his subordinates as well as he dealt with his bosses."* In one of his performance evaluations, Wright was described as *"autocratic."* It also noted that, *"[S]ome employees react well to Sgt. Wright's [style] while others have reported they felt demeaned by the tone or language of his comments."* The article goes on to report, *"[O]ne of two sexual harassment charges filed against him was found to have merit. In 1993, Wright told a female officer he would jack her up for failing to sign out a patrol vehicle. The next month he was informally counseled by his district commander for addressing the same officer as 'honey', 'darling,' and 'babe' even though she had asked him to stop".* *"In 1996 he caught heat for addressing a cop as a 'punk nigger' but that did not prevent him from addressing his officers as 'lynch', 'fat boy', 'fat ass', 'hippo' and 'clowns' according to findings of the MDPD Professional Compliance Bureau."*

58.      Despite these front-page media reports and several related lawsuits which placed the City on notice, Wright was hired again as the City Manager in 2022.

**(FORMER) OLPD JAMES DOBSON**

59.      James Dobson ("Dobson") was a negligent hire by the City. Before hiring him, Dobson had worked with the Doral, Florida Police Department and was terminated for his misconduct there. The City does not appear to have conducted any due diligence of Dobson before his hire.

**(FORMER) OLPD CHIEF BARREIRA (2021-2021)**

60.     Barreira was a negligent hire by the City. Before his employment by the City as OLPD's Police Chief in 2021, he was a division chief with the Clay County Sheriff's Office but was later demoted all the way down the chain of command to road deputy.

61.      This was a bright flashing neon sign that something was very wrong with Barreira and it was all a matter of public record, highly indicative of an individual probably not competent to execute the duties and responsibilities of a command position such as police chief, especially one so troubled as the OLPD was at that time. Barreira had never even held a middle manager or command staff position prior to being a division chief at the Clay County Sheriff's Office.

62.     There is no record of the City doing even minimal due diligence to better understand if the reason for such drastic "strip down" of Barreira's command had a plausible, acceptable explanation in rendering his hiring as OLPD's Chief of Police a reasonable, worthy risk. The City also waived his polygraph and psychological examinations, negligently adding Barreira to lead its OLPD's rank and file.

63.     At that time, Plaintiff was OLPD's police captain and it did not take long for him to detect and report Barreira's misconduct – the misuse of public funds - to the City, after which, the City did not immediately suspend and investigate Barreira. That legitimate report-in the City's best interest- would come back to haunt the Plaintiff months later with Barreira's retaliation against the Plaintiff by weaponizing the FDLE to target the Plaintiff.

64.     After Barreira separated from the City/OLPD, there was no public record to trace what happened and why in relation thereto. This is merely one example of the City failing to document a personnel file (and public record) to cover up for its negligent hiring of a new police chief.

**(FORMER) OLPD CHIEF JAMES DOBSON**

65.     (Former) OLPD Chief James Dobson ("Dobson") was a negligent City hire.  He had just been fired by the Doral Police Department for misconduct and sexual harassment at that workplace. Additionally, the City waived his polygraph and psychological examinations. There are two possible reasons: corruption, to save money, or both.

**(FORMER) OLPD CHIEF ISRAEL (2022-2023)**

66.     Israel was a negligent hire by the City. On February 14, 2018, a painful and memorable mass public school shooting occurred in Parkland, Florida. Seventeen victims were shot and killed by a fellow student during the infamous Marjorie Stoneman Douglas school massacre.

67.     When all was said and done, it became clear that the Broward County Sheriff's Office ("BSO")—then led by Israel—had seriously mishandled the entire response to the 911 call of an active shooter at the school.

68.     Indeed, at least one BSO deputy was charged with crimes related to his failure to perform his duties as trained and as expected; Scott Peterson; he was dubbed the "coward from Broward."

69.     Israel was removed from office via Executive Order 19-14 by Governor Ron DeSantis for poor leadership, neglect of duty and incompetence as the BSO Sheriff. Israel became disgraced and found himself immediately unemployed and hunting for a job but he was under a very dark cloud. No police department wanted him.

70.     He luckily snagged a $65,000.00/year humbling job to review red light camera videos from five traffic signal device cameras in Davie and he had to humbly go to court if anyone challenged a traffic ticket. And he only got that job thanks to his connection with the then Davie Police Chief, Steve Kinsey, who had been Israel's undersheriff at the Broward Sheriff's Office.

71.     Israel remained desperate to join another (preferably South Florida) police department, but he was – one could say – "radioactive." But fear not, OLPD would take him. By Israel's further luck, the City needed a new police chief and was willing to totally ignore all of the heavy criticism and baggage that Israel carried with him. No polygraph or psychological for Israel either. The governor's removal order was heavily publicized and the City had that notice.

72.     Israel landed the job as the new Chief of Police for the OLPD. He was not subjected to any pre-employment scrutiny or testing. He now had a nice "title", a handsome salary and benefits package that beat the City of Davie's. He went from a highly respected department - BSO - with 5,000 deputies - to a pretty deplorable one - the OLPD - with less than 50 officers, described as one of the most troubled police departments in the country.

73.     This made Israel a very dangerous police chief. Plaintiff was the first name that came to Israel's attention when he needed a scapegoat to quickly silence his critics and give Israel an improved image.  This was his opportunity to vindicate the governor's removal of his Sheriff position and Israel had a lot to protect and even more to prove.

**OLPD SERGEANT GERMAN BOSQUE**

74.     Bosque was a negligent hire by the City. He arrested and expelled from the police academy twice before OLPD hired him and the City was aware of that history when it hired him.

**OLPD SERGEANT LAWRENCE HOLBOROW**

75.     Lawrence Holborow "(Holborow")" was a negligent hire by the City. Before the City hired him, Holborow had a history from at least six (6) (known) police agencies reporting that he had a criminal record, that he had, at times, impersonated police officers (when he was not one), and that he had failed several polygraph tests, psychological examinations and background investigations in police department employment applications.

76.     Holborow had been terminated from the Wilton Manors and Ft. Lauderdale police departments and had resigned from the Miami-Dade County Schools Police for violating its moral character standards.

77.     Records indicate that on one instance, Holborow became so belligerent during a background interview with the City of Miami Police Department that he was thrown out of the building.

78.     Holborow was also terminated from the New York City Police Department after it learned that he had a criminal record for possession of a loaded firearm while impersonating a police officer in Plantation, Florida in 1984.

79.     Despite this well documented history known by the City, Holborow was still hired and given a badge, a gun, and a police uniform.

**OLPD SERGEANT CORY KROTENBERG**

80.     Krotenberg was a negligent hire by the City. In 1990, Krotenberg was arrested by the MDPD and charged with burglary to a motor vehicle—a felony. He later applied to several police departments in and out of the state of Florida. He was also hired by the Monroe County Sheriff's Office as well as the Lauderhill Police Department. One or more turned him down.

81.     Before OLPD hired him in October 2009, Krotenberg had been terminated by the Pinecrest Police Department (in 2001) for untruthfulness, perjury, conduct unbecoming a police officer, violating the law enforcements' code of ethics, breach of loyalty, lack of knowledge of laws and rules, conduct resulting in an adverse reflection upon himself and the department, failing to appear at judicial proceedings after being subpoenaed, arriving late for court and violating rules regarding excused court absences.

17

82.     As if that was not impressive enough for the City, Krotenberg had also been fired by the Florida City Police Department on perjury charges. Rosen, a SAO prosecutor at that time-from the SAO's perspective- also found that Krotenberg had committed perjury as a Florida City police officer yet Rosen declined to prosecute Krotenberg for no explainable reason.

83.     All of this history was public record. The City was either negligent in doing Krotenberg's background check or grossly negligent in hiring him with full knowledge and notice of such history.

84.     That history included that there was a problem with his polygraph tests and his psychological evaluations. Despite these public records and "strikes" from three local police departments, the City still hired him, gave him a badge, a gun and a uniform.

85.     The City either did not investigate why Krotenberg had applied to and had been fired by so many police departments or was aware of it and hired him anyway.

**(FORMER) OLPD CAPTAIN ARTHUR BALOM**

86.     Arthur Balom ("Balom") was a negligent hire by the City. Before the City fired him, Balom was fired as a police officer with the City of North Miami Beach.

87.     The City then either blindly hired him with the full knowledge of that prior termination or failed to do any background investigation on him to learn of his disqualifiable past. Thereafter, Balom would be federally indicted and convicted on one of the most significant public corruption cases the OLPD had ever seen. The City did not learn a lesson from that and bring up the standards of its hiring practices with the law enforcement community standards.

**OLPD OFFICER MICHAEL STEEL**

88.     Steel was a negligent hire by the City. In 2004, his employment with the Margate Police Department ("Margate PD") was terminated when it was discovered that Steel had lied under oath

18

in his employment applications; that he was not a U.S. citizen and had lied about a prior criminal arrest record he had in Alachua County, Florida, for using a fake Florida driver's license.

89.     Between his Margate PD termination and his hiring by OLPD, Steel was rejected by about a half dozen south Florida police agencies either due to a failed background check and/or a failed polygraph examination and/or a failed psychological screening test. This was all public record.

90.     Nonetheless, in 2007, Steel was hired by the OLPD at the recommendation of his friend – Wright - the OLPD Police Chief at the time - who gave Steel a badge, a gun and a uniform.

**OLPD OFFICER EDWARD BLACKMAN**

91.     Edward Blackman ("Blackman") was negligently hired on June 23, 2008 by the OLPD despite being aware of his criminal history for homicide. He too was given a gun, a badge and a uniform.

**CITY MANAGER DARVIN WILLIAMS**

92.     Darvin Williams ("Williams") was a negligent hire by the City. In or about April, 2022, the City hired Williams as its City Manager who had a felony-criminal history and was not ever a certified city manager.

**V.      OLPD'S CUSTOMS, HISTORY, PATTERN, POLICIES AND PRACTICES, OF NEGLIGENT TRAINING**

93.     The City's failure to train and to seek and maintain standardized accredited policy and procedures has allowed it to operate its police department nomadically, and whimsically, where there is simply no "standard." That dynamic has fermented and tolerated many civil rights and constitutional violations for years and caused harm to hundreds if not thousands of victims, including the Plaintiff.

94.     FDLE requires minimum mandatory retraining for in-service police officers every 4 years (which is only a 40-hour course). That is not a lot of training for a police officer, 1.25 days per year.

95.     However, the nationwide standards of law enforcement demand significantly more in-service training hours- See Bureau of Justice Statistics, United States Department of Justice, "Training" Publication. Its data shows that in 2020, 93% of police departments were required to attend in-service training with a minimum requirement of 46 hours per year (a multiplier of 30 times what OLPD has ever required).

96.     This insufficient training by the OLPD has morphed to a custom, history, policy, pattern and practice of negligence which has proximately contributed to the City's decades of constitutional violations against others, including the Plaintiff.

97.     According to DC Sanchez, for decades, the OLPD has fallen woefully short of such needed additional training to the extent that it has never acquired nationwide (CALEA) accreditation and not even the much lower standard of statewide accreditation.

98.     DC Sanchez confirms that the OLPD has repeatedly side-stepped state and federal accreditation standards to save money without regards to the ultimate price paid by its victim citizens and even OLPD officers, such as, in this case with the Plaintiff.

99.     The City has never as much as even formed a committee to apply for any such accreditation (CFA/FCAC/CALEA). According to DC Sanchez, previous attempts to seek accreditation were dismissed and even ridiculed by the City. In short, the OLPD has been a "lost" police agency with no direction, no good leadership, insufficient training, a department led by corrupt and incompetent police chiefs and city managers. It is a cancer-type problem that is truly unfixable.

100.    In May of 2020, the MDPD was tasked to investigate and assessment of public safety and police services of the City. After several months of reviewing investigative details and research, the MDPD issued a scathing thirty-six-page report titled, *"An Assessment of Public Safety and Police Services in Opa-Locka, Florida"* ("MDPD Report"). (**Exhibit B**).

101.    Its conclusions are summarized as follows: *"Uncertainty and a lack of clarity reign supreme with regard to accountability in the OLPD". "No matter the underlying reasons, it is clear that the performance and behaviors of all employees are not adequately monitored and those that are underperforming or in violation of procedures and policies are not consistently held accountable."* This further placed the City on notice of its negligent customs, policies and practices. A long history provides abundant examples of misconduct where OLPD officers are not held accountable for their misconduct.

102.    It is critical to note that based on the backgrounds and history of the OLPD hires named herein, the City has been on notice of the effect of not training its officers to community standards even after they were negligently hired in the first place. With proper training and supervision, some of those rogues, misfit officers might have been "corrected" or "salvaged." But because of no training and/or negligent training, they remained rogue roamers with guns, badges and arrest powers.

103.    It is also critical to note that for decades, the City never notified the SAO to put these problematic officers on a "Brady/Giglio" list so that criminally charged defendants' legal counsel could consider and/or use that in the defense of arrested civilians/clients.

## VI.    OLPD'S CUSTOMS, HISTORY, PATTERN, PRACTICES, OF NEGLIGENT RETENTION, SUPERVISION AND PROMOTION

104.    DC Sanchez confirms that after the OLPD negligent hires an applicant, the City allows the bad hire to contribute to the cancerous problem by then negligently retaining, supervising and

promoting its LEO's in a manner that has created and nurtured an environment tolerating all types of misconduct and crimes which have led to false arrests and malicious prosecutions of others. Once a bad hire is not subsequently properly trained, the problem becomes "permanent." The next filter - supervision and retention - then kicks in and becomes omni important. But the OLPD has woefully failed in that area as well.

105.    DC Sanchez confirms that the City's negligence, incompetence, ineptitude, misfeasance, malfeasance and corruption has historically extended from the office of the City manager to its chiefs of police and all the way down to the police officers at the front-line level.

106.    DC Sanchez also reports that the City's failure to establish and adopt and maintain appropriate police department standards for retention, supervision and accountability, contributed significantly to the creation of an inept and oftentimes hostile work environment at the OLPD resulting in all sorts of constitutional violations including under the 4th, 8th and 14th Amendments of the United States Constitution.

107.    DC Sanchez reports that this is merely a small universe of a much wider population far too many or necessary to allege herein.

108.    Another filter is the OLPD PCB, the "police of the police."  But OLPD's PCB has also been a galactic failure for decades. Complaints about OLPD officer misconduct/crimes result in PCB (internal) investigations and are only supposed to be performed by OLPD's PCB (not FDLE). And, as said above, all complaints must be investigated.

109.    The PCB is supposed to be the City's gatekeeper to weed out misfit officers that were manipulated to satisfy the need of the moment. As alleged below, OLPD's PCB was anything but that; the gate opens and closes based on cronyism and favoritism and an open floodgate manipulated by OLPD and City management to corruptly accomplished any desired result. One

problem was who the OLPD Chief appointed to run the unit; another one is that the PCB was never - as applies to a nationwide standard - autonomous. With the City, the PCB investigator has traditionally been the Police Chief's or City Manager's puppet.

110. The purpose of internal investigations is to determine if there has been a violation of any OLPD general order, policy, or procedure and/or the commission of a crime. If there is a finding of an administrative violation, discipline, including termination, is possible.

111. The City has also failed to follow a law enforcement community standard of progressive discipline. This is a crucial component that directly impacts the standards applicable to standards for retention, supervision, and most of all, accountability.

112. If the PCB matter constitutes a crime, or a potential crime, the SAO must be contacted by OLPD PCB and provided with a summary package for the SAO to consider whether to file criminal charges against the officer, or decline to do so. Again, the City is "special" in that regard.

113. A cardinal mandate to all PCB investigations is that witnesses are prohibited from discussing the investigation while it is open, a violation of which carries serious consequences and almost always results in termination. OLPD officers routinely broke that rule and the City never enforced its non-compliance for decades. (See, ¶420, infra).

114. Referring to OLPD's tolerance for misconduct, crimes and corruption within the OLPD, Cason has said that *"they fabricated, lied, they stole files, they went to the media with cases. They have violated every content of the law there is"* (referring to City Managers and OLPD command staff).

115. According to DC Sanchez and Cason, the City and the OLPD have routinely manipulated the OLPD's PCB to shield "favored" officers and supervisors from scrutiny, investigation, discipline and referral to the SAO. DC Sanchez reports that this is not an "occasion of oversight."

Rather, it has been the City's custom, history, policy, and practice in order to protect and shield the City from civil liability that might result from the referral and the subject to scrutiny for the filing of criminal charges.

116.   When convenient, even if the PCB did sustain a complaint against a "favored" OLPD officer, oftentimes the OLPD Police Chief or City Manager would cover it up, ignore it, or not impose measured discipline. In some cases, complaints are simply ignored and "shut down" as is provided below to accomplish one desired corrupt result with no trace left behind with the PCB system.

117.   It is a steadfast nationwide standard that police chiefs (and sheriffs) are not allowed to interfere with internal investigations because it defeats the entire purpose of the objectivity of the investigation as well as the independent fact-finding component thereof. This prevents a corrupt police chief (or sheriff) from protecting, deflecting or covering up misconduct and its potential consequences. However, once again, the OLPD does it in its own very different way. It has allowed the City manager and/or OLPD's Police Chief to interfere with and "channel" or "dump" PCB investigations. OLPD's PCB has not operated under such a "check and balance" system for decades.

118.   Below we more descriptively allege the negligent retention, negligent supervision and negligent promotion at the OLPD with regards to: Defendants Barreira, Israel, Steel, Bosque, and Kelly but also as to Non-Defendants Holborow, Krotenberg, Wright, Dobson, and Balom.

### (FORMER) OLPD CHIEF CITY AND MANAGER JAMES WRIGHT

119.   Wright was negligently retained and negligently supervised by the City.

120.   Once Wright became the OLPD chief, he caught the attention of the media. A *Miami News Times* article accused that, *"[I]n 2004, Wright took a yearlong leave of absence to run,*

unsuccessfully, for a seat on the City of Opa-Locka's commission and that the following year, he arrived in Opa-Locka as the anointed boss. Wright swept out the department. A few veterans of the force filed lawsuits or sent angry letters to the City Manager. Others retired early. [...] In April 2005, Wright's wife Margeaux, then a lieutenant with the Miami-Dade Police Department filed for divorce accusing him of carrying on a number of 'intimate and/or sexual relationships with female cops and police employees, two of whom worked for the City of Opa-Locka.' The allegation is echoed in several sexual harassment complaints filed with the City's Human Resource Department in the last two months of 2007 which precipitated Wright's termination."

121.     It adds, *"[O]n December 17, executive secretary Natalie Buissereth (*a current North Miami police officer) *asserted Wright inappropriately diverted her from important assignments by way of luxurious lunch dates and other appointments, including helping him pick out paint colors at Home depot. '[H]e explained that many women working with him became sergeants, lieutenants or were transferred to other specialized units', Buissereth wrote. Three days later Officer Nikeya Hill alleged Chief Wright had 'utilized his position and power to intimidate me into a sexual relationship in order for me to maintain my employment here in Opa-Locka.' She added that this harassment took place at 'an all-time high when I formally announced my pregnancy.'"*

122.     The article continues further, *"[W]right's crime analyst Tameka Miller wrote four complaints between November 30 and Christmas Eve detailing a bizarre series of unwanted advancements and punishments visited upon her by Wright. She alleged he made inappropriate comments about her underwear and, on another occasion, whispered in her ear that 'I looked good and for me to call him later because he had something to tell me.' She added that Wright 'would constantly call me into his office and ask me what I thought about what he was wearing' and that the incidents had caused her to suffer a mental breakdown."*

123.    The article ends stating that Miller alleged that Wright retaliated against her by ordering his last remaining administrative officer (Lieutenant H.A. Tubbs) to issue her a variety of directives he refused to put into writing, including a demand that she not speak to other employees at the station – complaints that were corroborated by Tubbs.  This behavior and practice caused a "top to bottom" sense of no leadership, no professionalism and lowered department-wide morale.

124.    On January 22, 2008, then City Manager, Jannie Beverly, removed Wright reportedly for sexual harassment conduct.  At the commission meeting held to determine Wright's termination, there was a lot of contention where there should have been based on the evidence.

125.    Even though the City paid a hefty settlement to a plaintiff from a sexual harassment lawsuit that stemmed from Wright's conduct, years later, the City still negligently rehired Wright as the new City Manager, all while some of the same women that had filed sexual harassment claims in the past still remained employed by the City.

126.    Pate states that the City was well on notice of Wright's background both times when the City hired him.

127.    After Wright, others took over; Rodney Ballentine, James Smith, Cason, Jeffrey Key, James Dobson, Barreira, and then Israel.  None of these former OLPD Police Chiefs were able to "raise the sunken OLPD ship." Not even the current Police Chief, Ken Ottley, has been able to control the helm.

128.    As a result of the City's negligent hiring of the aforementioned individuals, and failure to train them adequately, the byproduct resulted in a well-documented history of negligent retention, promotion and supervision at every level from top to bottom, resulting in foreseeable and preventable harm to others as described above and further below, cascading from the primary cancer- causing effect of the City's negligent hiring.

**(FORMER) OLPD CHIEF JAMES DOBSON**

129.   As recently as May, 2024, the City paid a $500,000.00 settlement to Dobson for his wrongful termination. His lawsuit against the City claimed he filed more than a dozen complaints regarding political interference in official police business and then sought whistleblower protection for reporting the misconduct of certain City commission members. That conduct involved: fixing traffic tickets, falsifying police reports, influencing police investigations and demanding retaliation against certain officers.

130.   But for negligently hiring (and retaining) Dobson, the City would have never been sued in the first place and would never have paid out a half million dollars to Dobson.

131.   That settlement is the City's admission that up to this very year, 2024, it still fertilizes the customs, policies, practices and history leading to false and malicious claims and prosecutions against innocent people.

**(FORMER) OLPD CHIEF STEVEN BARREIRA**

132.   As stated earlier, shortly after Barreira became Police Chief, his misconduct became evident to the City but only the Plaintiff reported it and courageously filed a complaint against Barreira for misappropriation of public funds and hostile work environment.

133.   Despite such awareness, the City maintained Barreira's employment. When, Barreira later resigned, he did so under a secret deal not evident in the public record.

134.   But before his departure from the OLPD, and to retaliate against the Plaintiff for reporting his misconduct, Barreira initiated a malicious prosecution against the Plaintiff in the Steel taser case, as further discussed below.

**(FORMER) OLPD CHIEF SCOTT ISRAEL**

135. Israel knew that he could not just be a new "lame duck" police chief at the OLPD. He needed to rid his image from the dark cloud cast over his head and mark his new leadership and clean up that image using the OLPD.

136. As soon as Israel took the helm at the OLPD, he immediately began targeting certain officers: trophies he could use against his then and future skeptics and the Plaintiff was his first victim.

137. The timing of Israel's hiring was unfortunate for the Plaintiff as he was the only OLPD officer under a criminal prosecution and was a "prime" target. Specifically, the Plaintiff was under a misdemeanor battery charge by the SAO on the Steel taser case and pending trial and Israel liked Steel because he pandered to Israel. Also, at the time, the City was defending a civil lawsuit resulting from the Castro case.

138. Israel learned that the Plaintiff had turned down a SAO plea offer, was going to trial and that the Plaintiff had uncovered perjury by Steel that compromised the Steel taser prosecution. He knew that if the Plaintiff got acquitted in the Steel taser case, the media coverage would be a real bad look for him.

139. So, Israel saw the problem and his opportunity, painted a new target on Plaintiff's back, aimed and pulled the trigger by calling his FDLE buddy, Walker.

140. The City should never have allowed Israel to target the Plaintiff. It had notice of the problem and the authority to halt it.

141. An interesting political dynamic and network is worth mentioning here. The attorney who represented Israel during his legal challenge of his removal as Broward County Sheriff was also Castro's lawyer in his federal civil case against the City.

142. Naturally, Castro and his family were highly motivated to see the Plaintiff prosecuted and convicted.

143. This created an irreconcilable, "non-waivable" conflict of interest for Israel from which he should have - but did not - distance himself. Plaintiff does not allege any improper conduct (or influence) by Israel's counsel regarding the conflict.

144. Israel stayed in the thick of the conflict, reopened the Castro case - already investigated and twice closed by the OPD PCB and SAO – and maliciously initiated a criminal proceeding – the Castro case - against the Plaintiff, which, in parallel fashion, laid the groundwork for the success of the Castro family lawsuit against the City.

145. The City bears some fault here too. Israel's lawyer was publicly known and the Plaintiff personal complained about this conflict to the City. In one ear out the other.

146. However, at the time, the City had just hired Israel and was investing a lot in his employment package. It was convenient for the City not to put a brake on Israel.

147. To get "new" incriminating evidence against the Plaintiff, Israel then violated the due process provisions of Florida Chapter 112 and subjected the Plaintiff to a double jeopardy situation.

148. Israel calculatedly summoned the Plaintiff to a meeting, using the ruse of assuring Plaintiff that Israel was "the new sheriff in town" and would do things "right and fair".

149. Instead, Israel did a Judas-style about-face and questioned Plaintiff about the Castro incident despite the Chapter 112 prohibition against that and in light of the blatant conflict of interest Israel had at the time as his own legal counsel was also then suing the City.

150.     Israel refused to allow the Plaintiff to have his own lawyer present at that meeting; no *Miranda* or *Garrity* warnings for the Plaintiff either. This is what happens when power is unbridled.

151.     Israel then made a call to his buddy – Walker - at FDLE and both of them weaponized the FDLE to reopen the Castro matter against the Plaintiff. But there was nothing new to investigate as the Plaintiff had already been investigated and cleared by OLPD PCB and (twice) by the SAO. There was no new witness; no new evidence. The only thing "new" was the Castro family civil lawsuit against the City and the Plaintiff and Israel at the OLPD helm, wanting to reestablish his image and help his lawyer friend representing the Castro family. Again, no allegation is made nor should be inferred against the Castro family attorney.

152.     Walker welcomed Israel's request to reopen the investigation and lent himself and the FDLE to do Israel's dirty work.

153.     There is no law, rule, statute (or protocol) that required the OLPD to refer a potential criminal matter to FDLE. But Israel still used Walker to go after the Plaintiff. More notably, neither Castro (nor any of his family) ever contacted the OLPD or FDLE to report a battery. Rather, they were contacted and solicited by the FDLE.

154.     The City had an inherent interest to lay blame on the Plaintiff for "mishandling" the Castro incident because if the Plaintiff got arrested for the Castro incident, the City might be able to shield itself from liability using the legal position that the Plaintiff was acting outside the cause and scope of his employment with the OLPD.

155.     To that end, the City retained independent counsel for Plaintiff in the Castro lawsuit. Aware of the conflict, the City should not have allowed Israel to recruit the FDLE to criminally

investigate the Castro matter. Now, a third time. Simply stated, the City should have stopped (or fired) Israel.

156.     Israel, Walker, and the FDLE had no good reason – except maliciousness – to reopen the Castro investigation against the Plaintiff. No new information or evidence had been discovered since 2020 that would have statutorily supported the "reopening" of the Castro investigation. The statute of limitations had even expired but for a Florida Statute that extended it as the Plaintiff was a police officer.

157.     Not by any coincidence, Israel's request to Walker came on May 13, 2022, the very same day the Plaintiff filed a criminal complaint for perjury against Steel, delivered to Israel, seriously threatening the SAO's prosecution of the Plaintiff in the Steel taser case. Getting Plaintiff arrested on any "new" case had multiple benefits for Israel and the City.

**OLPD SERGEANT GERMAN BOSQUE**

158.     During two decades after his employment at the OLPD began, Bosque has been the subject of at least 40 investigations by PCB detectives, that's twice a year. Outside of "pure" OLPD "administrative" matters, Bosque has earned quite a record: three (3) arrests and seven (7) firings. Consequently, he has exposed the City to significant liability, lawsuits and has cost the City a lot of money in legal fees and legal (monetary) settlements. More allegations follow below.

159.     On May 22, 1998, - 25 years ago - Bosque called in sick for work at the OLPD claiming food poisoning and with that fake excuse, he took a vacation to Cancun, Mexico.

160.     Only a year later, on September 5, 1999, excessive force charges were filed against Bosque by a man who claimed the officer kicked and punched him repeatedly while handcuffed. OLPD PCB took no action on this excessive use of force case and never reported the matter to the SAO for independent review.

161.    Two years after that, and in or about May 2001, Bosque became the subject officer of OLPD PCB Case No. V 02-01. It alleged battery on a prisoner and that Bosque made false statements under oath.

162.    There, the OLPD PCB report found that Bosque "slapped" himself sufficiently to falsely charge the subject with battery. PCB ultimately cleared Bosque but sustained the charge of making false statements on an official report and lying under oath about it to PCB. The City was on notice of Bosque's propensity and willingness to lie under oath. Yet, Bosque was retained in his OLPD employ.

163.    Despite this documented history of serious misconduct and criminal acts by Bosque, SAO prosecutor Jennifer Singer, declined to charge Bosque and the City decided to continue to retain him, no remedial training, no administrative discipline.  The result? Bosque's continued attitude of impunity and the negative, unprofessional message that resonated therefrom within the OLPD.

164.    Two years after that "accolade", and on or about May 15, 2001, Bosque stopped Osvaldo Ceballos ("Ceballos") within the City under mere "suspicion", which in another way to say with no probable cause, seized $15,920 in cash from Ceballos, and falsely arrested Ceballos for carrying a concealed firearm ("CCF").

165.    The SAO declined to criminally charge Ceballos because the facts alleged did not meet the statutory elements for CCF. Yet, the City still refused to return the money to Mr. Ceballos.

166.    The City filed a civil forfeiture complaint against the money. Mr. Ceballos retained counsel and filed a claim for the money.

167.    The City's contraband theory was "the proximity of the firearm to the money". But the firearm was not contraband; it was not stolen and was lawfully "possessed" by Ceballos.

168.    In deposition, Bosque admitted that there was no relationship between the money and the firearm, a legal requirement for the forfeiture. In a "weave and bob" move, Bosque then changed his theory and said that the money was contraband because the vehicle stop occurred in a "high density narcotics area." This would mean that every civilian vehicle driving in "West Grove" could be stopped, searched, and any cash by the vehicle's occupants could be confiscated and forfeited. The City blindly and maliciously continued to pursue the forfeiture under this new theory.

169.    Mr. Ceballos offered to settle the civil forfeiture with him keeping $12,000.00 and warned Bigot that if the City litigated and lost, the attorney's fees, damages claim and costs were a "given" and could easily exceed ten times that amount.

170.    Bigot's rejoinder was that *"the City will gladly spend whatever it costs to take away your client's drug money."* That attitude - from a lawyer representing the City - further fueled OLPD officers liked Bosque.

171.    Before the jury trial, the Honorable (now former) Miami-Dade County Circuit Court Judge, Jenifer Bailey ("Judge Bailey") warned Bigot that the City's position/ evidence appeared ill-fated. The City ignored the observations and pushed the case to a jury trial.

172.    During the trial, Bosque entered the courtroom armed and was reprimanded by Judge Bailey for exposing his firearm in a courtroom in violation of the then existing courthouse rules. Bosque never reported that violation to the OLPD.

173.    Mr. Ceballos prevailed, as expected, with a very quick jury's verdict, after which the City had to pay around $100,000.00 in legal fees, costs and damages to Mr. Ceballos.

174.    Bosque's illegal arrest, the illegal forfeiture/seizure, Bosque's misconduct, together with Bigot's letter, were all brought to the attention of the then City Attorney, A. Quinn Jones ("Jones").

Jones asked *"how in the hell did this happen?"* The response was, *"you weren't minding your assistant."*

175.     There was no investigation, discipline or consequence to Bosque, Bigot or Jones by the City, that resulted.

176.     Bosque then took a short vacation and on January 19, 2004, Bosque was suspended for 45 days for beating and spitting on the face of a handcuffed suspect – Harold Gilbert – at the OLPD station.

177.     The allegations were investigated under OLPD PCB Case No. Y 04-04, corroborated and sustained by sworn testimony of several police officers who witnessed the incident.

178.     The matter was referred to SAO veteran prosecutor William Altfield who declined prosecution. Was there no surveillance video? Maybe it was just another dummy camera. As said before and repeated here, by way of yet another example, the SAO's complacency in reviewing criminal complaints against OLPD officers warranting a charge and prosecution has itself heavily encouraged and fertilized the City's history, customs, policies, and practices regarding the negligent training, negligent retention and negligent supervision of its managers, police chiefs, and all rank and file of the OLPD.

179.     This PCB case was investigated by (now retired) OLPD Captain Jorge Amaya, who wrote in his report findings dated May 21, 2004, *"Officer Bosque continues to display a pattern of inappropriate behavior and if drastic measures are not taken, it can lead to liability issues in the future."* He was quite prophetic.

180.     The City was on notice and did nothing. This is another admission against the City.

181.     Bosque then broke his record and took a few months break from his crimes, abuse and antics. On July 22, 2004, he regressed and this time fondled a corrections officer in his marked

squad car. OLPD PCB investigated and cleared him concluding that she allegedly "consented". But what about the administrative violation associated with his conduct? Again, no remedial training; no administrative discipline.

182.    There was no disciplinary consequence to Bosque's conduct which violated OLPD's clearly established administrative policies and procedures. OLPD never reported or vetted the matter with the SAO for consideration of criminal prosecution. The City quashed it and kept it quiet from the SAO.

183.    This was an allegation of sexual misconduct by an officer while on-duty in his city vehicle. That alone required departmental notification to FDLE in Tallahassee. The City silenced that as well and kept Bosque employed. At a minimum, this incident amounted to an administrative violation for Bosque having an unauthorized person in a police vehicle while he was on-duty; another blind eye by the City, another "pass" for Bosque.

184.    To top that off, very soon thereafter, Bosque was even handsomely rewarded with a promotion to the position of sergeant. More pay; more power.

185.    This negligent promotion sent shockwaves throughout the OLPD and a message to the "troops" that not only did the City tolerate rogues, misfits and criminal officers, but it actually applauded and rewarded them with going from a silver badge to a gold badge, sergeant stripes on the uniform shirt sleeves, and an increase in pay with supervisory authority. Nice.

186.    At one point in time, Herald Tribune reporter Cormier questioned Bosque about his (then) latest discipline and dismissal, and Bosque stated: *"Look, I can tell you how this is going to go," "[T]he union will fight it; the department will lose, and I'll get my job back again."* Cormier noted that Bosque proudly bragged that he had the worst record of misconduct and discipline amongst *all* Florida police officers.  That admission put the City on full-throttle notice that Bosque needed

to be restrained, demoted, or at the very least, placed in a position where he could not interact with the public.

187.    Bosque proudly earned nationwide attention in a 2011 exposé by the Sarasota-Tribune which stated that Bosque's personnel file *"reads more like a rap sheet than a resume."*   The City was on further notice.

188.    In or about 2012, Bosque had other "incidents" and eventually, the City entered into a "Last Chance Agreement" ("LCA") with him. Such agreements are supposed to be inflexible.  An LCA supposedly means "no more violations or acts of misconduct". Not when it comes to the City.

189.    After the LCA was executed, Bosque did not wait long to commit another act of misconduct. He then got involved in a second act of misconduct. No consequence. The City retained him and employed him.

190.    2012 was quite a busy year for Bosque. In May 2012, the OLPD suspended Bosque once again. This time, for letting a news reporter ride in his squad car without permission and without executing a liability waiver. Here, however, Bosque did not fondle the occupant; apparently, he was able to keep his hands to himself.  But he still exposed the City to major liability. By now, the City clearly needed to stop Bosque's whimsical attitude. Instead, it sat arms crossed.

191.     During this suspension, Bosque's attorney bragged that Bosque was, "*at home sleeping late and watching telenovelas and Cops reruns.*" The City was on notice of Bosque's carefree attitude and still kept him employed.

192.    In an interview with the Miami Herald in 2012, Bosque said, "*I am an excellent police officer, but I break the rules.*" This is Bosque's own admission that he knowingly and blatantly violates clearly established law.

193.    This public admission was also notice to the City that Bosque was not afraid to break the law. The City has historically tolerated Bosque and has done nothing to better train, supervise or "correct" him.

194.    Bosque has always had zero bridle during his decades of employment with the City.  If the City could not successfully fire him, then the City had a clear alternative that was not "arbitrable" or "grievable" – take Bosque off the streets and eliminate any possible contact he might have with the public to save him from himself and safeguard the public. Simple.

195.    The City was "eyes wide open" on notice of Bosque's decades of crimes and misconduct and simply tolerated his behavior and does so to this very day.

196.    As said, Bosque was busy in 2012. That year, Bosque was suspended, once again; this time, for leaving his department issued AR-15 with a civilian, his father in-law, while Bosque left town on vacation. OLPD policy required officers to leave their firearms at the OLPD in such situations. This was Bosque's third strike following the LCA. This is key because a violation of the LCA would never get reversed in the arbitration process.

197.    In 2012, Bosque became the subject of yet another internal investigation (only his fourth strike after the LCA). His assigned OLPD police vehicle was inventoried and OLPD PCB investigators found evidence that had not been properly secured, documented or turned in to the OLPD property room; narcotics that had not been properly secured, documented or turned in to the OLPD property room, and several Florida driver's licenses, strangely belonging only to various females. Nice.

198.    DC Sanchez ordered an investigation which included interviewing the females. This investigation, in conjunction with the AR-15 investigation, would be sustained and Bosque's recommended firing would follow.

199.    One of the females contacted was a Miami-Dade Corrections officer who swore that Bosque had shown up at her house days after he stopped her for an alleged traffic infraction. She found that very strange and upon checking further, realized that Bosque had kept her driver's license which she had not noticed earlier.

200.    A second female provided a similar account to the PCB investigators that resulted in a separate internal investigation ordered by DC Sanchez. No discipline; no additional training; no demotion.

201.    In or about 2012, (when referring to Bosque), Cason said, "[*H]e is a time bomb that has now exploded.*" No kidding. The City was on further notice.

202.    In or about 2013, the SAO finally filed criminal charges against Bosque who the Miami Herald described as, "*the dirtiest cop in Florida,*" and, June 19, 2014, a jury found him guilty of felony false imprisonment and tampering with a witness—both felonies.

203.    The City rehired Bosque after his felony convictions were overturned. But the City still ignored its lawful authority to fire Bosque *on administrative grounds,* (a much lower standard of proof), where "legal technicalities" are not grounds to overturn a termination for cause. Once again, short of firing Bosque, the OLPD could have kept Bosque in an administration position which he could not interact with and hurt others.

204.    The City has repeatedly worked out "deals" with Bosque that have resulted in the perpetuation of serious misconduct and harm to others, including the Plaintiff. Rather than fire Bosque, or relegate him to an administrative role, for decades, the City has overlooked and tolerated his conduct and allowed him to remain in positions of power and has exposed the public- and his police colleagues-to his reprehensible misconduct.

205.    For several years, Bosque has cynically bragged about bribing City officials overseeing his professional fate and disciplinary cases with "cookies" and other gifts to secure minor or no consequence for his misconduct. If he is truthful, then it just makes matters worse for the City; bribery and graft. If the City denies it, it is just worse for Bosque. It really makes no difference.

206.    Despite Bosque's sordid and criminal history, the OLPD—to this day—retains Bosque as a sergeant among its rank and file and the SAO has simultaneously given him one get out of jail free pass after another.   There is ample evidence to indict Bosque as the special statute of limitations applies to him.   Indeed, the SAO has ample evidence to indict him on RICO charges.

207.    In 2021, Bosque was fired for the seventh time, this one, for encouraging a subordinate who failed to secure a crime scene to lie on a police report. The supervisor who reported Bosque's misconduct was the Plaintiff.

208.    Bosque's misconduct was captured on a body-worn camera ("BWC") which he did not know was activated. This "pickle" that Bosque now found himself in is exactly why Bosque would later agree with the City, FDLE and the SAO to change his former sworn OLPD PCB testimony (applauding the Plaintiff's handling of the Castro matter), to now bear perjured testimony to get the Plaintiff charged and convicted.

209.    Bosque falsely testified against the Plaintiff at the Castro trial and was severely impeached with his totally opposite prior testimony to OLPD PCB (and FDLE) four years earlier.   Neither the City nor the SAO investigated (or charged) Bosque for that perjury. Bosque's perjury at the Castro trial was recruited, encouraged and witnessed by Bell, Rosen and the SAO. Bosque has not been charged with perjury.

210.    The SAO, Sanchez and Hardiman maliciously and shamefully prosecuted the Plaintiff (in the Steel taser case) highly relying on Bosque. Really?

211.    But for Bosque's continued retention by OLPD, there could have been no perjured testimony, charge, or prosecution and trial against the Plaintiff relating to the Castro case.

212.    In sum, Bosque has a decades-long history of violating clearly established laws and the City has been aware of that. Despite the City's awareness of his misdeeds, he has never been remedial trained.

**OLPD OFFICER DANIEL KELLY**

213.    During his tenure with the OLPD, Kelly has been the subject of several PCB administrative (and criminal) investigations following allegations of misconduct and/or criminal activity. But he has never gone through remedial training or been fired or disciplined.

214.    The City has been aware that over the years, the BSO has responded to Kelly's residence several times because of domestic incidents and other suspected criminal activity reported to BSO. Absolutely no investigation or consequence has taken place against Kelly.

215.    The OLPD did not follow up on these reports to BSO as is normal and customary throughout the law enforcement industry in order to determine if the officer has violated departmental policy and/or if the reported conduct warrants concern for the officer's continued fitness for duty.

216.    In or about 2011, the MDPD notified the OLPD that they were investigating Kelly to determine his involvement in criminal activity in an area called the "Back Blues in Opa-Locka."

217.    OLPD PCB also learned that the FBI was also investigating Kelly suspecting his involvement in other, unrelated, criminal activity. Federal agents with Homeland Security ICE and CBP came to the OLPD and notified command staff that they were attempting to apprehend Kelly's brother who was a federal fugitive.

218.    Federal agents advised that their surveillance and apprehension efforts were being thwarted by Kelly obstruction of justice? The agents explained that Kelly was actively interfering with their surveillance of locations in Opa-Locka where they believed the fugitive was hiding, one of which was an apartment rented by Kelly.

219.    DC Sanchez assigned PCB investigators to assist the federal agents and to monitor Kelly's activities. Thus, the City became aware of Kelly's "conspiratorial and aiding and abetting drug trafficking conduct."

220.    Days later, federal agents and OLPD PCB detectives spotted the federal fugitive leaving Kelly's apartment complex and surveilled him as he traveled towards Miami Gardens. They suspected that the fugitive detected the surveillance and believed he would contact his brother Kelly for help or advice.

221.    Sure enough, moments later, they spotted Kelly's marked (OLPD) police vehicle enter the area and so they conducted a felony takedown and arrested Kelly's brother then and there.

222.    They observed Kelly, who was off-duty at the time, drive slowly past the takedown/arrest location looking at the scene, but he never stopped to investigate what was happening although the location was in his jurisdiction – the City of Opa-Locka – and his brother was being taken into custody.

223.    Kelly's federal fugitive brother was then transported to the Homeland Security ICE facility in Broward County, Florida, for processing.

224.    Shortly after federal agents arrived at the facility, Kelly, now well and far away from his jurisdictional limits, showed up and demanded to speak with his brother. Federal agents notified OLPD PCB investigators and DC Sanchez responded to the federal facility where they found

Kelly, in full OLPD uniform driving his marked OLPD vehicle even though he was off duty at the time.

225.    Federal agents told OLPD PCB that Kelly was attempting to get his brother released to his custody to avoid deportation from the United States that would result from an immigration detainer.

226.    As a result of this incident, an OLPD PCB investigation was commenced. Kelly was relieved of duty.  He obstructed justice, interfered with an official law enforcement investigation; he was a conspirator protecting his criminally wanted brother.

227.    The OLPD PCB investigation concluded and several administrative violations against Kelly were sustained. He was not fired. It is unknown if the SAO reviewed the matter.

228.    Kelly's actions were serious enough for termination but the then City Manager, Kelvin Baker, refused to follow the termination recommendations of Cason and DC Sanchez and kept Kelly employed as a police officer with the OLPD. This negligent retention would lay the groundwork and quid pro quo for Kelly to testify falsely against the Plaintiff in the Castro trial. He "owed" the City.

229.    Despite Kelly's known and suspected history, the City has kept Kelly in its rank and file.

230.    Kelly maliciously and falsely testified against Plaintiff at the Castro trial and was impeached with his prior 100% contrary sworn testimony to OLPD PCB and FDLE wherein he swore - 4 years earlier - that no OLPD officer used unnecessary force while handling Castro.

231.    The SAO, Rosen, Bell, FDLE and White knew that Kelly was offering perjured testimony against the Plaintiff and still shamefully abused their prosecutorial powers by allowing it. Without Kelly's perjured testimony, there was no probable cause to charge the Plaintiff in the Castro case

and there could be no successful prosecution against the Plaintiff. Kelly's false testimony was rejected by the jury.

232.     Neither the City, the SAO nor the FDLE have considered prosecuting Kelly for his perjury at Plaintiff's (Castro) trial.

233.     Despite knowing that Kelly committed perjury at the Castro trial, the City has not opened a PCB investigation on him.

234.     In sum, Kelly has shown a history and pattern for violating clearly established law.

**OLPD SERGEANT CORY KROTENBERG**

235.     The City negligently retained and later negligently promoted Krotenberg to sergeant (after failing numerous sergeant exams) when he should have been fired.

236.     A highly televised Florida Highway Patrol ("FHP") pursuit was aired on television earlier this year.  The offender was none other than Krotenberg, who, at the time, was on-duty driving a non-City owned, unmarked rental vehicle with no emergency police lights displayed or activated. Because of Krotenberg's failure to yield, the pursuing FHP Trooper performed a "pit" maneuver and yet there were zero consequences imposed upon Krotenberg by the OLPD.

237.     Indeed, the City's current police chief – Ken Ottley - responded to news reports by stating that Krotenberg had not violated any policies despite the videos that showed him speeding, fleeing police, and running multiple red lights and stop signs without using emergency equipment, all of which are clear violations of established policies and procedures within the OLPD. The City was aware of Krotenberg's crime and kept him employed. No discipline, no re-training, no warning, no demotion. Nothing. Ottley simply drinks the Kool-Aid left behind by Barreira and Israel.

238.    This is the first time in the history of the OLPD where an on-duty police officer flees another officer and was "pit maneuvered." Zero consequences. How about sending Krotenberg to a safe driving course and make him pay for it? How about writing him a traffic citation?

**(FORMER) OLPD CAPTAIN ARTHUR BALOM**

239.    The City negligently promoted Arthur Balom twice; his last promotion was to Captain. He exploited that position to facilitate serious criminal misconduct. Balom was arrested and indicted by FBI Miami drug agents in an eight-defendant federal drug conspiracy case for trafficking in crack cocaine and ecstasy starting in May 2010 through the date of the indictment in November of 2011.

240.    That federal drug investigation revealed that in 2010 Balom had given his police-issued bulletproof vest to a robber who used it to rob an armored truck resulting in the robber fatally shooting the armed security guard protecting the money pick-up. That's called felony-murder. Nice.

241.    As a result of the breaking news of Balom's arrest, the Miami-Herald (correctly) reported "*Balom's arrest is only one of many state, federal, and local investigations into possible corruption within the Opa-Locka Police Department, which has the reputation of being amongst the most troubled law enforcement agencies in the state.*"

242.    At the time, Clarence Patterson ("Patterson") was Opa-Locka's City Manager and in charge of public safety, including the OLPD.

243.    Patterson was interviewed by the Miami-Herald and said "*[T]he City and the police department have some serious problems and need cleaning up.*" That was an understatement. But in any case, it is the City's own admission – as of 2010 - of its awareness and recognition that its customs, policies and practices of negligent: hiring, promotions, retention, supervision and training

resulting in all sorts of constitutional violations by so many OLPD officers in this very small police department against countless innocent individuals.

244.    Patterson launched a confidential inquiry into numerous complaints he had received regarding the OLPD under his time in command as City Manager. These ranged from mundane gripes to serious criminal investigations including: officers receiving sex from female suspects in exchange for leniency, officers stealing evidence, and politicians asking for favors and otherwise meddling in departmental hiring and firing. He added, *"[T]hey were essentially hiring people and firing people to satisfy certain elected officials."*

245.    Patterson's confidential inquiry revealed that a former OLPD chief ordered OLPD Major Vincent Robinson, a fifteen-year veteran, to fix a ticket that had been issued to a relative of John Riley, a former mayor and commissioner who at the time, headed the City's civil service board. This was allegedly done in exchange for a one-hundred-dollar cash payment. The former chief denied the bribe payment, accusing the complaining/witness officers of having *"serious credibility issues […] have blemished records from previous departments where they were employed."*

246.    This additional admission by the then City Manager further shows that by 2021, the City was long before aware of a history of hiring officers with *"blemished records from previous departments where they were employed."*

**(FORMER) OLPD OFFICER CAPTAIN STEEL**

247.    In as early as 2012, Cason and DC Sanchez recommended Steel's termination. The City refused to follow their advice and retained Steel despite the fact that the OLPD had sustained a myriad of allegations against him, including false statements, misconduct and *"failing to maintain good moral character."*

248.    Even before that, DC Sanchez suspended Steel (and removed him from PCB), which, according to DC Sanchez, was necessary to protect the general public, officers, and the City from liability. Putting Steel in PCB in the first place was like giving a pyromaniac an unlimited supply of matches and tanks of gasoline and cutting him loose into a huge crowd with his devices.

249.    In 2019, an evaluation of the City revealed that several OLPD officers had complained about Steel, claiming that he, "*would retaliate against his subordinates by various means*" and that, "*[A] resounding number of officers have complained about Steel cowering in the face of danger*."

**[PAGE LEFT INTENTIONALLY BLANK FOR SPACING/EXHIBIT PURPOSES]**



**CITY OF OPA-LOCKA POLICE DEPARTMENT**
**PERFORMANCE EVALUATION**

| Name (Last) | (First) | (Initial) | Periods Covered | |
|---|---|---|---|---|
| Steel | Michael | | From: **January 01, 2019**<br>Mo. Day Yr. | To: **December 04, 2019**<br>Mo. Day Yr. |

**7) REPORTS AND CORRESPONDENCE**

Not Applicable

| | | | |
|---|---|---|---|
| 5 Outstanding | - | Always completes reports promptly in a clear and accurate manner requiring no revision. | |
| 4 Above Satisfactory | - | Usually completes all reports in a clear and accurate manner requiring little revision, reports are completed on time. | |
| 3 Satisfactory | - | Completes reports with few required revisions, reports are usually on time. | |
| 2 Needs Improvement | - | Reports incomplete and need constant review to insure accuracy; some reports are late. | |
| 1 Unsatisfactory | - | Reports and correspondence inaccurate and incomplete; reports are frequently late or not done. | **Rating** 4 |

**8) SUPERVISORY SKILL**

Not Applicable

| | |
|---|---|
| 5 Outstanding | - Continuously exhibits exemplary leadership qualities which include planning and assigning work, making decisions, training and instructing employees, evaluating employee performance, disciplinary control, leadership, fairness and impartiality, interest in employee/city welfare. |
| 4 Above Satisfactory | - Accomplishes work objectives following proper practices, successfully delegates and completes tasks with superior results. |
| 3 Satisfactory | - Supervises subordinates with minimal problems as a result of leadership style. In general, accomplishes assigned work effectively. |
| 2 Needs Improvement | - Accomplishes most assigned tasks, has problems delegating work, meeting schedules or motivating workers. - Unable to deal effectively with or direct subordinates in order to accomplish assigned tasks. |
| 1 Unsatisfactory | - Performance is inadequate and must be corrected.   **Rating** 2 |

**RATER'S OVERALL EVALUATION**

| | |
|---|---|
| 5 Outstanding | - Performance surpasses job requirements, employee displays initiative and creativity enhancing departmental efficiency and/or effectiveness. |
| 4 Above Satisfactory | - Performance surpasses job requirements. |
| 3 Satisfactory | - Employee is performing as required. |
| 2 Needs Improvement | - Performance does not fully meet job requirements. |
| 1 Unsatisfactory | - Performance is inadequate and must be corrected. |

| 5 = Outstanding, 4 = Above Satisfactory, 3 = Satisfactory, 2 = Needs Improvement, 1 = Unsatisfactory. | **Total Rating Score:** 3.00 |
|---|---|

**RATER'S COMMENTS** (Positive and Negative) Attach additional sheet if necessary. Rater, reviewer and employee must sign and date attachment used for rating.

Sergeant Steel has displayed signs of working towards perfection when it comes to the competition of the daily reports his subordinates submit to him at the end of their shift. These daily reports are being completed within the guidelines as set forth by the Opa-Locka Police Department, Standard Operating Procedures. Additionally, Sgt. Steel is always presentable in his appearance and very attentive towards his attendance at work. However, his interpersonal skills need improvement, along with his job knowledge and officer safety. Interpersonal communication is a method of exchanging information through verbal and non-verbal means. Sgt. Steel's subordinates have verbally stated to me that he greatly lacks the form of exchanging information without making them fearful of retaliation based on his previous supervisory methods. Several of his officers have expressed to me whenever they verbally disagree or correct Sgt. Steel on any matter, Sgt. Steel would then retaliate against them through various means, i.e., denial of vacation, verbal counseling, etc.

What concerns me the most about Sgt Steel is his lack of officer safety skills regarding other officers and himself. A resounding number of officers have complained about Sgt. Steel cowering in the face of danger. His officers stated that Sgt. Steel has never taken the first arrival on any shooting or any dangerous calls. One officer recalled being dispatched to a call where multiple suspects were observed loitering around the 1200 block of Ali Baba Avenue during the early part of their shift. This officer remembered Sgt. Steel took arrival seconds before the officer arrived but Sgt. Steel was parked a block away, parked away from the incident with his lights off watching the officer dealing with multiple subjects. Other officers have expressed that Sgt. Steel has displayed signs of cowardness on numerous occasions. These officers are in great fear of retaliation from Sgt. Steel thus they remain silent while only verbalizing their concerns to me and a few others they trust.

Finally, several officers on Sgt. Steel's squad have documented their concerns in writing. I monitored Sgt. Steel's behavior on the shift for several weeks. My findings were reported in a memorandum to the Chiefs Office along with my recommendations.

250.   Plaintiff also cites to the memorandum submitted to former City Manager Kelvin Baker

concerning the retention of Steel in that era. Then DC Sanchez placed the City on notice about

retaining Steel. He stated, "*I was very specific and firm in my expressing my concerns and stated*

47

*my objections based on the facts that retaining Steel could amount to negligent retention by the City; would be very bad for morale; and would undermine our commitment to effectively address misconduct within the Opa-Locka Police Department […].*"





## The City of Opa-locka
## POLICE DEPARTMENT
### *"Committed to professionalism and community partnership"*

Chief Cason and I were excluded from participating in this meeting and I had very limited conversation (one call) with you and Mr. Geller regarding this matter although I made myself available and offered to meet with you and Mr. Geller in your office from where we could also get Chief Cason on the telephone to discuss this very important matter. Mr. Geller said that you were running short on time and that it would not be a good idea for me or Chief Cason to be present.

Nevertheless, I stated my objections to any deals that would result in Mr. Steel remaining employed by the City and/or especially by the Opa-locka Police Department in <u>any</u> capacity. I was very specific and firm in expressing my concerns and stated my objections based on the facts that retaining Steel could amount to negligent retention by the City; would be very bad for morale; and would undermine our commitment to effectively address misconduct within the Opa-Locka Police Department as Chief Cason and I pledged to do.

251.    On November 14, 2019, then OLPD Assistant Chief Sharon Gallimore finally removed Steel from any supervisory authority position, citing that officers "*voiced concerns and defined Sergeant Steel as being vindictive, threatening, and a coward.*"

252.    Steel was sued by his ex-wife for domestic violence. Her allegations showed that Steel was not fit for duty. The City ignored that too, or Steel did not report it and violated OLPD policy.

253.    Steel also violated OLPD policy in various ways regarding the taser incident. He claimed that Plaintiff committed a battery on him but he never reported it according to protocol. He claimed he was injured but never filed a first report of injury as protocol required. He secretly met with Barreira (not PCB) which City/OLPD policy prohibited. He went to FDLE and lied under oath when he said the tasing was intentional.

254.    Steel recruited OLPD officers Floralba and McKinney to bear false testimony to FDLE and at trial against the Plaintiff at the Steel taser trial. He knew the SAO was relying on him as its star witness and he was prepared to lie to the jury at Plaintiff's trial and recruit other perjurying friendly OLPD buddies to "corroborate" him.

**(FORMER) OLPD OFFICER TARA LAZIER**

255.    Former OLPD officer Tara Lazier ("Lazier") one time claimed that she was fired after she told City officials—as part of a confidential inquiry in 2008 - that Holborow removed his shirt and left the OLPD station with two women he encountered while on duty earlier, one of whom claimed that Holborow had released them in exchange for sex. He kept his job; Lazier got fired. Nice.

256.    Somehow, this serious complaint by Lazier disappeared from Holborow's OLPD personnel file.

**THE SAO**

257.    As alleged herein with various examples, no small part, the SAO's (internal) attitude and inaction to prosecute so many crooked City officials and OLPD police officers, for decades, has fueled and fertilized the landscape and environment that has allowed (and encouraged) the City's negligent retention, negligent supervision and negligent promotion practices that have resulted in loss, damage and injury to Plaintiff and so many others.

## VII. THE FLORIDA DEPARTMENT OF LAW ENFORCEMENT

258.    The FDLE is a statewide law enforcement agency with statewide jurisdiction. FDLE investigates Florida crimes as do all other local police forces and sheriff's offices.

259.    The only real "autonomy" FDLE can "brag about" is that increasingly, over the last several years, it has agreed to investigate officer-involved shootings not by statute or executive order, but by voluntary request of some police departments statewide. But even that they can't do right.

260.     In one MDPD fatal shooting a few years ago, inside a Palmetto Bay residence, the FDLE tried to match "rounds fired to casings" and was missing one round. A defense lawyer doing a scene investigation weeks later, using a simple crime scene reconstruction technique, found the "missing round" lodged inside a door and had to call them to impound it; quite an embarrassing moment for the FDLE.

261.     In another fatal Miami Police Department ("MPD") shooting of a young man named Drew Pozdol, the FDLE failed to do a simple scene reconstruction, which, after done by that same defense lawyer, resulted in the City of Miami paying out a record-breaking $1.5m civil settlement which recognized that the FDLE covered up the bad MPD shooting.  These are merely two examples of the ineptitude of the FDLE discovered by one defense attorney. One can only imagine how "bad it really is".

262.     This pattern and history give the public an unfortunate false sense and belief that FDLE "special agents" have some type of specialized training in police shooting cases—which most of them do not—as well as a sense that police shooting investigations are thereby "honest" and "objectively independent" as well. Recognizing its own incompetence, in the 2019 MDPD fatal shooting of a UPS truck driver in Broward County, the FDLE brought in the FBI to help. Really? So, why was FDLE involved in the first place? And why did it take four years to charge the MDPD officers? The answer is simple. The FDLE is a joke.

263.     Throughout the state, FDLE has many field offices. The Miami field office is the Miami Regional Operations Center ("MROC").

264.     For the last decade, FDLE has had its own customs, policies, practice and patterns of corruption, corrupt management leading to constitutional violations of civilians and public servants.

265.    A January 20, 2015 Miami Herald article authored by David Ovalle revealed some insight of this. It looked at whistleblower complaints after a supervisor reported rampant dysfunction at the MROC.

266.    Robert Breeden, the Assistant Special Agent in Charge ("ASAC Breeden") at the MROC office was forced to retire after reporting gross misconduct by his boss, Addy Villanueva ("Villanueva"), the former MROC SAC.

267.    It alleged Villanueva's misuse of a state vehicle, misuse of public funds by buying a printer for her home and her "disengagement from the office because of her dating life". Breeden claimed that after Villanueva became aware of his complaint, she orchestrated a gaslighting campaign that led to a bogus investigation of Breeden and forced him into retirement.

268.    The article revealed that in 2015, then Governor Rick Scott ousted former FDLE commissioner Gerald Bailey, who, in turn, went public, making stinging allegations that the Governor's office had inappropriately meddled into FDLE's affairs, including asking him to falsely name a clerk of court as the target of a criminal probe. This was exactly like what Walker did to the Plaintiff. Familiarity breeds – no pun intended – contempt.

269.    This is another example of how FDLE has allowed itself to be weaponized by special interest individuals/police agencies, to satisfy a third party's maliciousness to investigate and prosecute that party's enemy.

270.    Former Florida Police Benevolent Association President John Rivera ("Mr. Rivera"), whose union represented the FDLE at the time said, *"[f]rom top to bottom, they're in a huge disarray right now."* He added, *"anytime you have that much distraction, it has to affect your ability to conduct an investigation."* Mr. Rivera's description was, understandably, quite

diplomatic, though true. Removing the diplomacy, he was really describing that the FDLE had allowed itself to be weaponized for personal, political and illegal purposes.

271.    Villanueva prevailed and SAC Breeden was suspended with pay for his belittling and demeaning treatment of FDLE employees. An internal FDLE investigation sustained those charges and found his conduct to be unbecoming of an employee.

272.    But, the article further reports that Villanueva repeatedly asked her FDLE subordinate, Cindy Sanz, to use her FDLE state car to give rides to Villanueva's boyfriend, a MDPD officer. The report also claims that in defense of reports and complaints against Villanueva, she boasted that then FDLE Assistant Commissioner, Jim Madden, would never fire her because, *"he had touched her inappropriately and she couldn't do sh\*t about it."* Now the MROC SAC was using extortion to fend off a legitimate law enforcement investigation against none other than FDLE's top MROC administrator. You can't make this stuff up. It is truly worthy of a Netflix series.

273.    In or about 2014, Walker became the MROC SAC. As alleged below, Walker was another criminal (MROC SAC) with a badge and awesome jurisdiction and power. His employment was a negligent hire by the FDLE.

274.    As a standard, FDLE does not commence an investigation against a law enforcement officer on its own initiative.

275.    As guided by Florida Statute §112.533 "Receipt and Processing of Complaints" and Florida Statute 112.532 Law Enforcement Officers Bill of Rights, any political subdivision that initiates or receives a complaint against a law enforcement officer (or correctional officer) must, within 5 business days, forward the complaint to the employing agency of the officer who is the subject of the complaint for review or investigation. Here however, FDLE broke that protocol to maliciously prosecute the Plaintiff.

276.    During Walker's tenure, he brought on two misfit "special agents," Perez and White and they danced to Walker for their "second retirements." Walker failed to properly train and supervise them and that contributed to the constitutional violations alleged herein.

277.    Neither of these "special agents" performed to even a minimally acceptable level of law enforcement standards. They did not conduct an objective investigation; let the evidence take them to the next lead; keep an open mind; question the interest, motive, and bias that their witnesses possibly harbored against the target of their investigation. They lost evidence; they made evidence disappear. They created false excuses for their shortcomings. They failed to do any scene reconstruction to analyze the plausibility of certain witness testimony. They failed to read the Baptist medical records which revealed 100% exculpatory evidence. They simply proceeded on a pathway of blinded, confirmation bias.

278.    Rather than bounce the Steel taser "anonymous" email back to OLPD PCB, Walker weaponized and assigned FDLE agents Perez and White to maliciously investigate and seek criminal charges against the Plaintiff. They investigated the Plaintiff under confirmation bias and maliciously collaborated to falsely arrest and maliciously prosecute the Plaintiff.

279.    The FDLE relied on the perjured testimony of Steel to target the Plaintiff (in the taser case) and on Bosque and Kelly in the Castro case, both of whom had no credibility whatsoever and offered to lie at the Castro trial by changing their prior sworn PCB testimony (which exculpated the Plaintiff) to satisfy the needs of the moment for the FDLE and the SAO. These two witnesses were hardcore, lying criminals disgracefully disguised under their OLPD police uniforms.

**Walker Retires from FDLE Amidst a Major, Salacious Scandal in 2023**

280.    Walker abruptly "retired" in July 2023, after almost 30 years with FDLE. Why? He unjustifiably "cold cocked" a citizen in public and retired to avoid criminal prosecution and an

(internal) FDLE disciplinary action. The SAO obliged and corruptly gave him a get out of jail free pass. Nice.

281.    An investigative report by local media revealed even more troubling information and facts concerning Walker and the overall historical dysfunction of the FDLE MROC that he caused. The investigative report uncovered that Walker was forced to retire - or be fired - for serious, multiple acts of misconduct, spanning over many years.

282.    But it wasn't an uneventful separation. The report articulates that in mid-2023, the Director of FDLE in Tallahassee, and other top brass, accompanied by FDLE's General Counsel, came to Miami for an unannounced meeting with Walker.

283.    During the meeting, Walker was presented with the findings of the latest internal investigation of which he was the subject and given an ultimatum: retire, or be fired and criminally charged. Why was that decision not left up to the SAO? Why, when VanderGiesen learned of the news coverage that was frontline, headline, top of the fold breaking news, did he not inquire?

284.    There are countless examples of how the SAO does not truly have a "standardized measure" in the exercise of its awesome prosecutorial decisions and this was one of them. Since when does FDLE have the right, and ability, to immunize one of its own from SAO prosecution? The only and obvious answer to all three questions is, corruption. Of course, the SAO knew that opening that can of worms could have compromised countless prior and current FDLE criminal cases/prosecutions. So, in conclusion, the SAO is just an immunized vehicle for this corrupt activity.

285.    Walker said he would retire and he was then abruptly escorted out of the building. Before being escorted out of the MROC, Walker's office, computers, and cell phones were seized and underwent a forensic analysis by FDLE which found more "troubling evidence of misconduct."

Ouch. The audit revealed thousands of inappropriate text messages, emails, and other communications of a sexual nature.

286.    The audit also uncovered that Walker had released - and transmitted - several confidential FDLE reports concerning criminal investigations to unauthorized persons including his brother, Major Travis Walker, of the Riviera Beach Police Department in Palm Beach County, Florida. Isn't that a crime? Walker was never charged or referred to the SAO (or United States Attorney's Office). Nice. This is evidence of FDLE's customs, history, policies and practices of tolerating and covering up its own corrupt high-level supervisors and the SAO's turning a blind eye to it.

### The FDLE Cover-Up of Walker's Misconduct, Crimes and Sexual Deviancy and His Forced Resignation

287.    The FDLE corruptly and to avoid its own potential civil liability, attempted to cover-up Walker's misconduct by allowing him to retire quietly, keep the SAO from intervening and avoided public scrutiny. Brilliant.

288.    However, this subterfuge attempt failed in part due to the media's investigation to determine what really took place and by its publishing the truth regarding the corrupt Walker.

289.    In short, for almost a decade, the MROC was led by a selfish, twisted, corrupt, criminal and sexual deviant. But for the media, his departure would have been labeled a "retirement" and nothing more with the typical departing words. Continuing to hide, conceal, and cover-up Walker's misconduct by FDLE has been a great disservice to our community and ultimately compromises the public's trust in law enforcement and jeopardizes public service. It also perpetuates other misconduct instead of deterring it. Perez and White developed and fermented under Walker's "leadership." Ultimately, the SAO is to blame for this FDLE environment as well.

290.    The SAO and the OLPD's failure to enforce the appropriate code of conduct destroys the morale among the honest men and women who serve our communities honorably as law

enforcement officers to include the OLPD. It has nurtured the environment that allowed—and encouraged—FDLE investigators, such as Perez and White, to be unprofessional and downright derelict in their duties as we allege how and why they maliciously investigated and made two bogus criminal cases against the Plaintiff.  Further, the SAO had the last chance to prevent this malice and stubbornly forged ahead.

291.     Plaintiff alleges that FDLE's Walker's, Perez's, and White's actions were a substantial contributing cause in the constitutional violations alleged herein against the Plaintiff.

### VIII. THE TWO MALICIOUS INVESTIGATIONS, ARRESTS, AND MALICIOUS PROSECUTIONS AGAINST PLAINTIFF

292.     As alleged in paragraph two above, the Plaintiff's claims arise from two separate incidents- the Castro case and the Steel taser case.

### i). The Jafet Castro Battery Case (Charged in November, 2022)

293.      On or about August 20, 2020, the OLPD was called by Castro's family (via 911) because he was acting violently and erratically under the influence of a drug that gave Castro superhuman-like strength, likely PCP or another illegal drug with similar characteristics.

294.     Before OLPD officers had arrived, Castro's family members had already tied Castro's ankles and wrists with plastic coated wire cords to control him.

295.     The two officers dispatched were Bosque and Kelly; Bosque was a sergeant at the time and Bosque and Kelly activated their BWCs as they arrived.

296.     Bosque and Kelly failed to quickly identify the problem. Castro visibly had superhuman-like strength signaling that he was under the influence of PCP or Flakka.

297.     Totally against that training, they misevaluated the situation and believed that Castro was merely having a mental health episode when, in reality, he was a violent self-induced illegal drug

user who just wanted to fight the police; who ordered the officers out of his house; and who several times told the officers that they were *"all going to die."*

298.    Upon their arrival, rather than separating the family members for everyone's safety - as they were trained in the police academy - they allowed the family to remain dangerously close to Castro and the fight that was unfolding in the living room. Castro was resisting arrest and acting violently as a result of his brutal strength. Bosque and Kelly together could not restrain him.

299.    Bosque then made the ill-fated decision to free Castro's tied hands, rather than first handcuff them, and then remove the chords that had him totally restrained and under absolute control.

300.    Handcuffing Castro before untying his hands was justified for Bosque's own safety, the safety of his colleagues, and for the safety of Castro's family members surrounding him at the time. In short, Bosque and Kelly totally mishandled the situation that only escalated thereafter. But hot-headed Bosque couldn't help himself.

301.    They empowered Castro to fight as he now had his hands, elbows and arms freed, and it was now "game on." The situation just worsened because Bosque and Kelly were not properly trained or supervised.

302.    While Kelly and Bosque were able to get one cuff on Castro's left wrist, they were still unable to cuff Castro's other right (dominant) one. With one loose cuff, Castro now presented a new threat because he could use the sharp-edged free cuff as a weapon against any officer who dared to grab it to control Castro's free hand while trying to cuff it.

303.    By now, multiple additional OLPD officers had arrived on the scene and joined Bosque and Kelly into the fray. But even with about four more OLPD officers and OLPD officer Luis

Serrano tasing Castro 20 times, they were still unable to gain full control of Castro and cuff his right wrist.

304.    As the shift lieutenant, Plaintiff responded and saw the out of control situation. He realized that paramount to everything surrounding the situation, was officer safety. He knew enough to know that Castro was on PCP or Flakka.

305.    By that time, Castro had already successfully resisted being fully handcuffed for well over ten minutes and he was still violently resisting several OLPD officers. He remained a threat to all officers and civilians present.

306.    Plaintiff swiftly intervened. He gained superior tactical physical control over Castro's right hand. But he struggled to close the cuff onto Castro's right wrist. Castro suddenly pulled away in the opposite direction of the Plaintiff's grasp and the sharp jagged edges of the open-cuff cut a deep gash between two of the Plaintiff's fingers on his right (dominant) hand.

307.    Reverting to his police academy training and the OLPD Use of Force policy, the Plaintiff delivered three rapid, successive palm-heel strikes to Castro's face which was the only level of force that finally brought Castro under some control after unsuccessful tasing attempts and despite the presence of half a dozen OLPD officers on the scene for well over 10 minutes.

308.    The entire event – with different times of duration and from four different angles - was captured on multiple BWC videos as there were some 6-7 OLPD officers involved.

309.    Once the Plaintiff brought the situation under control, Bosque and Kelly only wanted to "Baker Act" Castro. Plaintiff agreed ,but he also said that criminal charges against Castro for resisting arrest and battery on law enforcement officers were warranted. Bosque and Kelly refused to criminally charge Castro.

310.     The SAO was briefed and the screening prosecutor said that there was more than sufficient probable cause to criminally charge Castro. But, Bosque and Kelly failed to criminally charge Castro. This became a big bone of contention between the Plaintiff and Kelly and Bosque. In the end, Castro was never criminally charged.

311.     OLPD's PCB investigated the matter. All involved officers gave sworn statements to PCB and Bosque and Kelly testified that all officers - including the Plaintiff - acted appropriately and within OLPD departmental guidelines. Both testified that all use of force employed was reasonably necessary and justified. Bosque went as far as saying that "he was proud of himself and all of his colleagues for the manner in which they handled the Castro incident". The Plaintiff and all officers present at the scene were cleared of any wrongdoing.

312.     The SAO was timely and properly notified a summary and package and properly declined to file any criminal charges against any of the (multiple) officers. That decision was a "no-brainer."

313.     When the Castro lawsuit against the City and the Plaintiff was filed a year later, the media coverage was heavy, so the SAO looked at the Castro case once again. But at the end of the day, there was no new evidence and the SAO ratified its earlier decision to decline prosecution against any OLPD officer, including Plaintiff.

314.     Indeed, because the use of force by all officers was so clearly justified, the SAO did not as much as even open up a file or another close-out memo, neither the first or second time after it reviewed all of the BWC footage and witness statements. Since the entire event was captured on multiple OLPD BWCs, there was nothing for any law enforcement officer or civilian to dispute. Castro was the clear instigator; he took PCP; he was violent; he threatened to kill the officers several times; Castro's family originally called the police; the OLPD responded; and, but for

Castro's resisting arrest, no force at all would have been necessary or applied, and that which was used was reasonable and necessary.

315.    To promote himself and to pressure the Plaintiff to take a plea deal in the Steel taser case, and as a result of the perjury complaint the Plaintiff made against Steel, seriously jeopardizing the SAO's case, Israel called his buddy Walker at FDLE and he assigned it to his puppets, White and Perez.

316.    White and Perez well knew that once PCB closes its administrative investigation, refers it to the SAO and the filing of charges is declined, that absent new incriminating evidence, a closed case is never reopened. They maliciously ignored that basic tenet and protocol followed by police departments all across the country and by the SAO.

317.    But it was personal for White and Perez. They were very concerned that the Plaintiff would prevail in the Steel taser case and decided to bring the Castro case as additional leverage for plea negotiations and as insurance in the event of a dismissal or a not guilty verdict in the Steel taser case.

318.    FDLE and Walker should have recognized that by now, investigators White and Perez were reopening and initiating this ill-fated, old, and closed "Castro" investigation out of viciousness and vindictiveness, and they should have put a stop to it. Indeed, what they did not do, the SAO should have done, which is to decline to even review the case again. Rosen maliciously gave them a third bite at the apple.

319.    Now, it was the FDLE, Walker, White, and Perez weaponizing the SAO and the SAO lending itself to what was clearly at the time a personal, vicious, and blinded law enforcement effort to target the Plaintiff with the ulterior purpose of making sure that he would plead guilty and agree to never be a police officer again or get found guilty by a jury at trial.

320.   There was no legitimate need or reason to reopen the case a third time – now two years after the fact - because there was never any new evidence that came to light to change the SAO's views on the matter, or that would statutorily allow it to do so.

321.   Upon reviewing the BWC footage, White wanted to charge Luis Serrano for tasing Castro 21 times and both Walker and the SAO told him to only charge Plaintiff out of selective vindictiveness. The SAO cannot explain, much less defend, the selective prosecution of only the Plaintiff.

322.   But for Plaintiff being a police officer and the statute of limitations extension that applied to him, the statute of limitations had expired on that matter long before Israel pushed FDLE to go after the Plaintiff.

323.   The OLPD did no after-action review of the matter to critique Bosque's and Kelly's decision to untie Castro's hand before being "police-handcuffed" and did nothing to critique OLPD officer Luis Serrano's decision to tase Castro 21 times. Likewise, they were not given any retraining on arrest/handcuffing techniques using the Castro scenario as a practicum.

### ii. The Michael Steel Taser Case

324.   By September 2021, and a year after the SAO's closure of the Castro matter, the Plaintiff held the rank of captain within the OLPD and Steel held the rank of sergeant. They had an unfortunate well-documented history of bad blood between them, but at the end of the day, they were both working for the OLPD.

325.   The OLPD had just received two new-generation taser AXON weapons that replaced a pair that had been earlier acquired but returned to AXON as defective. This new taser was essentially identical to the earlier model except it possessed two cartridges for discharge instead of one along with some technological improvements.

326.    The Plaintiff was qualified to utilize and deploy this new taser having successfully completed the training provided by the manufacturer, AXON.

327.    On September 1, 2021, the Plaintiff loaded a harmless training blank cartridge into the new taser in order to test its operability and he test-fired one of the (blank) Velcro tip probes at the floor. These Velcro tips are similar to but less dense than the composition of an eraser of a No. 2 pencil; they are not capable of penetrating skin. They also do not emit an electrical charge.

328.    The Plaintiff then walked around the OLPD station floor asking who wanted to have the new generation taser assigned to him/her. Steel was an obvious candidate as he was a supervisor.

329.    The Plaintiff entered Steel's office and told Steel that if he wanted to be assigned the new generation taser, he would have to experience its discharge. Only Steel and the Plaintiff were alone in the sergeant's office. The single door to the sergeant's office was half opened. The office had a functional surveillance camera that panoramically covered the interior space of the office and the Plaintiff knew that.

330.    In response, Steel drew his "live taser" and pointed it at the Plaintiff and jokingly asked the Plaintiff if the Plaintiff wanted to be tased with the electrical charged and skin-penetrating taser.

331.    When Steel re-holstered his taser and sat down, the Plaintiff pointed the blank taser slightly behind Steel and discharged it but accidentally struck Steel who was moving backwards in his chair.

332.    Steel did not complain; he did not make a police report; he did not ask a colleague to make a police report; and he did not make a first report of any injury. All of these procedures are mandated by OLPD policy if a crime or injury occurs among officers and/or if any officer is injured

on the job. Steel never told the Plaintiff the tips had struck him as the tips bounced onto and were collected by the Plaintiff from the floor.

333.    Although the accidental blank taser discharge was captured on video from within the supervisors office, video footage outside of the sergeant's office timed to the event also showed Steel exiting his office shortly after the discharge in a jovial manner with a playful attitude, smiling and talking to his police colleagues in the surrounding workspace, while putting on some "dance moves". This particular footage is all on tape and is preserved.

334.    On the day of the "tasing event", while on duty, and either with Barreira's secret approval or with no supervisory approval at all, Steel went outside his jurisdiction to the Baptist Health Urgent Care in Miami Lakes ("Baptist") to be "checked out." He had two minor abrasions, the size and appearance of mosquito bites.

335.    The intake nurse asked Steel what happened and he said that a co-worker accidentally discharged a taser that struck him. Steel repeated that same explanation again to the Baptist attending doctor. Both statements were – not a "cut and paste" - notated into the Baptist medical record of that encounter.

336.    In the **"Chief Complaint"** section it says: *"he states his captain accidentally hit him with the taser gun today at work. Pt has two red dots by his right flank due to the taser gun point of contact. History obtained from: Patient (09/01/21 16:36:00)."*

337.    In the **"History of Present Illness"** section, the Baptist record states: *"Michael is a 48 Years old Male who presents to the urgent care center with an injury to his right flank that occurred today. Patient states he's a police officer and he was hit with a taser gun at work by a coworker accidentally. Patient states there is no pain. Patient denies associated symptoms including loss of consciousness, dysuria, abdominal pain, and bladder dysfunction."*

**Chief Complaint**
pt states his capitan accidentally hit him with the taser gun today at work. pt has two red
dots by his right flank due to the taser gun point of contact
History Obtained From: Patient (09/01/21 16:36:00)
Arrival Mode to Facility: Private vehicle (09/01/21 16:36:00)

**History of Present Illness**
Michael is a 48 Years old Male who presents to the urgent care center with an injury to
his right flank that occurred today. Patient states he's a police officer and he was hit with
a taser gun at work by a coworker accidentally.  Patient states there is no pain.  Patient
denies associated symptoms including loss of consciousness, dysuria, abdominal pain,
and bladder dysfunction.

338.    Text messages between Steel and Barreira reveal a conspiratorial plan for both of them to go after Plaintiff and other high City officials. The text reads as follows: *"[t]his regime in almost done and everything now is about payback".*

339.    A week later, after receiving the "anonymous complaint" email, the Plaintiff called Steel with a then OLPD captain as a witness to confirm that Steel was "okay". Steel did not express any negative feelings over the event/ accident; that he was "fine" and had "no issues".

340.    Steel later had a "change of heart". He saw a huge opportunity. He met with his OLPD ally, Barreira, "unofficially" and outside the City and outside the chain of command to plan and plot against the Plaintiff. He did not go to PCB. They discussed the accident and Barreira took a statement from Steel which was never recorded in accordance with applicable law of PCB protocol.

341.    A few days later, Steel hired his legal counsel, Steven Lopez, who sent a pre-suit letter to the City, threatening to sue on Steel's behalf. Money, money, money.

342.    There was no "official" OLPD request for FDLE's intervention. Barreira sought FDLE's investigation that was malicious from the start.

343.    FDLE cannot take the position that it was justified to initiate an investigation based on an "anonymous complaint" because, on two occasions, FDLE has said that it does not take complaints from third parties regarding police officer misconduct and will only do so if it receives an official

report *from the officer's police agency.* FDLE cannot change that policy to now satisfy the need of the moment.

344.    When FDLE received the "unofficial referral." It should have declined any investigation because there was no "official request" coming from Barreira.

345.    Regardless, Walker assigned the matter for investigation to Perez as the lead investigator and White as the co-case-agent. The FDLE was now weaponized by Barreira and Steel.

346.    As part of their investigation, White and Perez took a sworn statement from Steel. He said the discharge was intentional and that he allegedly yelled at the Plaintiff, multiple times saying, "don't do it."

347.    They asked Steel about any medical attention he got following the event and he alerted them to his visit to Baptist Health Urgent Care facility ("Baptist") and the agents got those records, after which the FDLE should have stopped investigating further and charged Steel with perjury. Its blind, corrupt zeal, was to take down the Plaintiff – a police captain as a trophy they could later display and brag about.

348.    The FDLE agents took statements from several OLPD officers who did not eye-witness the event, but who were nevertheless on the floor, outside of the supervisors' office when it occurred. All, except one, Floralba, - contradicted Steel's claim that he was yelling to the Plaintiff, "don't do it," right before the taser discharge sounded.

349.    McKinney lied and told FDLE that she saw the Plaintiff removing the Velcro tips from Steel's shirt. This perjury was easy to catch for two reasons. First, Velcro does not attach or adhere to a shirt made of polyester as the one worn by Steel. Second, the video of the open workspace shows that she was not inside the sergeant's office when the taser was discharged and the Plaintiff

can be seen recoiling the wires that attach to the Velcro tips as he was walking out of the sergeant's office. So, McKinney could never have seen what she told FDLE.

350.    Perez and White "concluded" their "investigation" and prepared a package to include all of the reports with a "summary" to the SAO. Hardiman reviewed the submissions. Hardiman never questioned the validity of the referral to FDLE.

351.    On September 17, 2021, Hardiman authored a prosecution intake memo and wrote, *"[T]he subject allegedly tased another officer against the officer's expressed wishes. Punctures and/or bruising resulted. Not a training exercise."* It reflected a "preliminary" charge of "misdemeanor battery", but specifically said, *"medical records pending."*

352.    Hardiman knew of the existence of medical records coming her way and she was contemplating upgrading the misdemeanor battery to a felony if the records would show a permanent (or severe) injury.

353.    In a recent deposition, White swore that he sent the Baptist medical records to Hardiman. She now denies it.

354.    Despite the revelation the Baptist medical records show – that the discharge was accidental - the SAO, via Hardiman, still filed the criminal charge and maliciously prosecuted the Plaintiff.

355.    Despite this being a knowingly 100% accidental discharge, the City, Barreira, Steel, Perez, White, FDLE, Hardiman and the SAO all colluded to go after Plaintiff and maliciously prosecute him for battery.

356.    The SAO now denies/controverts White's sworn testimony that he sent Hardiman the Baptist medical records. She, of course, had no explanation as to why, when she wrote *"medical records pending,"* She never followed up on such a critical piece of evidence and crucial element to the equation and evaluation of probable cause.

357.    The reasonable inference is that Hardiman had those Baptist medical records. If not, it makes White a liar. One of the two is lying. Discovery will reveal who (or which) because there has to be an email - or perhaps a Dropbox link - that will show exactly what was contained in FDLE's/White's summary and package he sent to Hardiman at the SAO.

358.    As further alleged herein, Perez and White developed an animus against the Plaintiff. As evidenced below, their investigation was tunnel-vision and confirmation biased; it was malicious.

359.    After September 17, 2021, White and Perez did little if any further investigation. The Plaintiff's defense team did more investigative work than they did revealing significant exculpatory evidence that White and Perez were afraid of getting to themselves.

360.    Rather than keep the Plaintiff suspended at home with no benefit to the taxpayers, then OLPD Chief Dennis Jackson, ("Chief Jackson") as permitted under his lawful authority, ordered Plaintiff back to the OLPD to perform administrative duties just with no arrest powers. The Plaintiff followed that order

361.    Going way out of bounds and well afar from his legitimate law enforcement jurisdictional authority, Walker had the nerve - and malice - to call Jackson and order him to take the Plaintiff's unmarked police vehicle away from Plaintiff, reverse the Plaintiff's administrative duties and remand the Plaintiff to be suspended at home. Now we have Walker weaponizing the then OLPD police chief. In response, Chief Jackson reminded Walker of their respective jurisdictional authorities, although, perhaps, not in such kind words.

**THE SAO AND FDLE's TRICK AND TRAP**

362.    Aware that FDLE and the SAO were bringing a criminal battery charge against him, the Plaintiff he polygraphed and agreed to waive his right to remain silent and voluntarily went to the SAO to give a statement to ASA Hardiman and FDLE investigators White and Perez and tell the

truth – that this was merely an accident – no crime. Hardiman lied to the Plaintiff, leading him to believe that his honest statement could alleviate him getting charged. It is currently unknown – and discovery will reveal - whether Hardiman had the Baptist medical records before this meeting. According to White, she most certainly did.

363.    Before this meeting, the Plaintiff submitted to a polygraph exam which was shared with the SAO, which showed that the Plaintiff was truthful when asked if the contact was accidental. In one ear, out the other.

364.    Unbeknownst to the Plaintiff, his arrest was already a done deal; his arrest form had already been filled out by Perez and was ready to be served.  The SAO meeting was a fait accompli, the decision to charge the Plaintiff had already been made and was never going to change. Hardiman no longer enjoys a reputation for being an objective, honest prosecutor.

365.    The arrest date and time on the arrest form reflected its execution the day anytime before the day the Plaintiff was to give his statement to FDLE investigators and Hardiman at the SAO. Hardiman, Perez and White wickedly tricked Plaintiff into giving a statement so that they could "lock him into a position" for later purposes should he decide to go to trial.

366.    Only a few hours after the statement, Hardiman called for Plaintiff to voluntarily surrender at FDLE the next day.

367.    The next day, the Plaintiff surrendered to FDLE; he was demoted and placed on administrative status.

368.    FDLE and the SAO maliciously leaked the matter to the press. The media covered it extensively and the Plaintiff lost his income-producing teaching job at St. Thomas University This resulted in a significant decrease in Plaintiff's income making it extremely difficult for him to support his family.

369.    Within a few weeks of the Plaintiff's arrest, the City promoted Steel to OLPD's Captain, and then on the same day, to Acting Chief of Police, and things now started getting really bad for any officer Steel disliked. Steel got his wish; he got payback against the Plaintiff; he had a federal civil rights lawsuit going forward against the City and he now sat on the City's Iron Throne, ruling the OLPD kingdom.

370.    While sitting on the Iron Throne, Steel pressured the FDLE - and the SAO - to increase the battery charge from a misdemeanor to a felony by going to a dermatologist seeking a medical opinion that there was a permanent injury. No such luck. But his evil intent is evidenced thereby. Steel clearly didn't need to go to a dermatologist over two "mosquito bites." There was no permanent injury or scar.

### PLAINTIFF READIES FOR TRIAL IN THE MICHAEL STEEL BATTERY CASE

371.    The SAO never disclosed the Baptist medical records as *Brady* material. They were not just exculpatory; they were 100% exonerating. Although Sanchez and Hardiman have legal immunity, their disgusting conduct was in violation of the Florida Bar ethical rules and ABA standards for prosecutors for which they have no immunity. The Florida Bar has been notified of their misconduct.

372.    If it turns out that the SAO actually never received these records, then, in his recent deposition, White committed perjury. Plain and simple. But, White expressed strong certainty that he sent them to Hardiman at the SAO. If so, Hardiman now had a real problem. Remember, Hardiman's *own* prosecution memo said, *"medical records pending"*, begging the question raised earlier. Did she really forget to follow up on that? This was a police captain accused of battery. The Baptist medical records would reveal whether this should be a felony or a misdemeanor. She just forgot to follow up?

373.     In preparing for his defense in the Steel taser prosecution, Plaintiff made a public records request to FDLE that was quite specific and comprehensive. When FDLE did not comply with the request for about one year, the Plaintiff sued FDLE for violating Florida's public records law.

374.     The FDLE ultimately provided some documents. But now, having deposed White recently, it's quite clear that FDLE did not fully comply with the Plaintiff's public records request. As one example, the Baptist medical records (and summary) sent to the SAO, according to White, were missing from the FDLE production. This is further evidence of the conspiracy count charged herein.

375.     Immediately after White's (recent) deposition, Hardiman was contacted and alerted as to this "problem." She was asked to confirm whether or not White lied in his deposition. She gave several, non-responsive answers. The simple question was, did the SAO ever get the Baptist Urgent Care medical records from FDLE? To the date of this filing, Hardiman refuses to answer the quintessential question.

376.     We then followed up with her new supervisor, Jose Arrojo, recently rehired by the SAO to clear up the mess and integrity problems that have been brewing at the SAO for years. He assured that he looked into the matter and did not see that the SAO ever got the Baptist medical records from any source, including FDLE. But that does square with White's sworn deposition testimony.

377.     After the Plaintiff made clear he was going to trial, Hardiman, and upon information and belief, with the consensus of VanderGeisen and Rosen, offered the Plaintiff's prosecution to any rookie prosecutor who wanted to get some experience in prosecuting a public corruption case. ASA Sanchez raised her hand and got the assignment. Later Gonzalez joined her.

378. In or about mid-2022, the Plaintiff approached Israel and gave him proof of Steel's perjury. Specifically, Steel told FDLE investigators - under oath - that he did not discuss the incident with anyone. That was a lie. Steel had met with Barreira - and texted with him - about the event.

379. Israel was also appraised of every detail the Plaintiff's investigation revealed. Israel's response was that he *"considered the matter old news and closed."* Yet, when he cynically ordered the reopening of the Castro matter, that was not "old news and closed".

380. After making clear his intentions to go to trial in the Steel taser case, the SAO offered the Plaintiff a deal for pretrial diversion, a standard for any first-time defendant in a misdemeanor case. However, a special condition was that the Plaintiff had to surrender his FDLE police certificate, effectively terminating his career. That's malicious and extortion.

381. Such a condition is generally never imposed on any licensed professional eligible for a conditional dismissal. Uncharacteristically here, however, it was imposed by Israel, the City, the FDLE, White, Perez and the SAO as part of their blind quest and thirst to have Plaintiff leave his job and lose his FDLE certification.

382. The Plaintiff declined the deal and made very clear he would go to trial.

383. In or about April 2022, numerous OLPD officers, including the Plaintiff, filed individual complaints against Steel for harassment and hostile work environment. The City could no longer ignore the situation. It was too widespread. Morale was shot.

384. The City hired an outside lawyer/investigator, Ria Chattergoon, and she conducted an independent investigation. Her findings were not surprising.

385. She recommended Steel's termination and the City finally fired Steel. He did not sue or appeal because the evidence against him was so strong.

386.    Needless to say, Steel's termination infuriated the SAO, FDLE, Hardiman, Sanchez, Israel, Walker, White and Perez and they all blamed the Plaintiff. They sided with Steel and sympathized with him. They all drank Steel's Kool-Aid.

387.    Around that time, the Plaintiff filed two perjury complaints with OLPD's PCB – the one against Steel (mentioned above), and one against McKinney. Both went to OLPD's then PCB sergeant, Krotenberg. The complaints were also submitted by the Plaintiff, in person, to Israel and sent via certified signature mail to Walker. Walker did absolutely nothing. To do so would "torpedo" the FDLE's Steel taser case against the Plaintiff.

388.    Rather than open an investigation and report his findings to Israel, Krotenberg told Israel about the complaint and Israel ordered Krotenberg to quash any PCB investigation. What Krotenberg should have done was stand up to Israel and either go to the City Manager or the FBI on Israel. Krotenberg is the City's coward though not from Broward.

389.    The Plaintiff's perjury complaints against McKinney and Steel further infuriated Steel's fans at the SAO, the FDLE and Israel. They seriously threatened the SAO's prosecution of the Steel taser case.

390.    They also all knew that if that evidence as to Steel's reputation came out at trial, there was no way a jury would convict the Plaintiff.

391.    The Plaintiff listed some 6-character community reputation witnesses against Steel. In pretrial motions, Sanchez was wicked in her opposition. Ultimately, she lost and pouted when the judge ruled that Steel's character could be attacked with the Plaintiff's community reputation witnesses.

392.    In retaliation, Israel contacted FDLE which, in turn, maliciously coddled the SAO to reopen the Castro case. Since the Plaintiff decidedly was going to trial in the Steel taser case, the

SAO gladly and maliciously obliged and it now had extortionate leverage to get the Plaintiff to give up his FDLE certificate. The plan would not work.

393.    The Plaintiff was never contacted by FDLE to provide any formal statement before FDLE would seek SAO approval for his arrest.

394.    The Plaintiff contacted Krotenberg then in charge of the OLPD's PCB division to inquire about his two perjury complaints against Steel and McKinney. In a text message, Krotenberg answered saying that he (Krotenberg) sent the Plaintiff's complaint to FDLE and that, *"FDLE reviewed the case and denied taking it"*. Krotenberg identified White as the FDLE decision maker. In sum, the FDLE, Walker, White, and Perez selectively and vindictively targeted the Plaintiff and maliciously investigated, arrested and brought criminal prosecution proceedings against the Plaintiff.

**[PAGE LEFT INTENTIONALLY BLANK FOR SPACING/EXHIBIT PURPOSES]**



395.   Krotenberg claims he nevertheless sent the complaint to the SAO, but Hardiman now denies that.

396.   In an effort to dissuade the SAO from proceeding on both prosecutions, a (second) meeting was arranged between the Plaintiff and top SAO public corruption prosecutors at the SAO.

397.   The SAO group was given a presentation and some exculpatory evidence that objectively mitigated a dismissal of both cases. In one ear, out the other. The specific exculpatory material was the text message by and between Barreira and Steel about payback.

## THE BLIND EYE TO STEEL'S INTEREST, MOTIVE AND BIAS AGAINST
## PLAINTIFF

398.    Following the SAO meeting described above, the Plaintiff announced he would take both cases to trial. Steel's fan club was now blindly furious at the Plaintiff. They knew that Steel had been deposed and it revealed multiple material misrepresentations on several police department applications regarding his criminal background and immigration status. They feared that a sizzling cross-examination would crush Steel's credibility: that he had a criminal history; that he lied about it to several law enforcement agencies in employment applications; that he had provided false identification regarding himself to all of those agencies, including the OLPD; that he was using a false name and false date of birth and that he had lied to FDLE investigators in so many other regards as well. They also deposed and could not "shake" Plaintiff's negative character witnesses against Steel. They felt the pressure.

399.    A basic law enforcement investigative technique is to always question the interests, motive, and bias of all complainants and witnesses. Another technique is to challenge or test the credibility of those complainants and witnesses. This is critically important when the reported crime is a "he said-he said" such as existed in this particular event with the Steel taser case. Perez and White maliciously did zero "cross-checking."

400.    As stated, the Steel taser incident occurred inside the OLPD supervisor's office where an operational, stationary, fixed video surveillance camera was located. White obtained the footage, downloaded it on a USB drive, confirmed it was loaded and viewable but it later erased from the USB drive. At first, Perez lied to the Plaintiff saying it "never copied". White and Perez then changed their tune and falsely claimed that it was all a big mistake and that the camera was a "dummy camera". The below image reflects White's own report where he acknowledges receipt of the video.

401.    White and Perez also ignored the 100% exculpatory Baptist medical records knowing that with that evidence there was no probable cause to charge the Plaintiff with battery and they would have to charge their "victims" with perjury, filing a false police report and obstruction of justice.

402.    They also did not question, much less pressure Steel, as to why he never made a first report of injury or offense - incident police report on the day of the event and instead, flew to Las Vegas to go on vacation.

403.    Perez and White also deliberately ignored Steel's "reactions" – moments after being struck by the Velcro tips - captured on another surveillance camera immediately following the taser event which clearly showed that Steel was not injured, offended, not complaining about what had just "happened." That footage is 100% inconsistent with a person offended and injured by a battery 30 seconds earlier requiring a trip to a Baptist Health urgent care facility.

404.    After Barreira maliciously referred the Steel taser case to FDLE, he "resigned" as OLPD's Chief of Police and the City hired a new Chief named Dennis Jackson ("Jackson"). But the wheels had already been set in motion by Steel and Barreira; they weren't slowed down nor were they stopped.

405.    FDLE investigators White and Perez never questioned the relationship, allegiance, or alliance by and between Barreira and Steel, which, at the very least, any unbiased investigator would have looked into. All they had to do was use Hardiman's subpoena powers and look for text messages and/or phone calls between the two and they would have found text messages between Steel and Barreira boasting that the "regime" was "done" and that this was about "payback".

**THE BLIND EYE TO THE "ANONYMOUS SEPTEMBER 9, 2021 EMAIL**

406.    Further evidence of FDLE's confirmation bias is that they made no effort to forensically trace and identify the sender of the so-called anonymous email knowing that it would lead them back to Steel. They knew that such revelation would present a huge "*Giglio*" problem because Steel had previously told them under oath that he did not send it nor knew who did. The detail in the email shows that only Steel could have sent it. Clearly, the Plaintiff did not send it and there was nobody else in the sergeant's office when the event occurred.

407.    A forensic study identified the IP address from which the communication was sent from. It traced it back to an OLPD computer. Had the investigators simply matched the device's location and looked at the OLPD surveillance video footage that captured that device and matched it to the date/time of the email, they could have easily identified the sender of the "anonymous" email. They knew it was sent by Steel and concealed his perjury as part of their malicious, confirmation bias, malicious investigation and malicious prosecution against the Plaintiff. Perez' and White's conduct borders on criminal.

**THE BLIND EYE TO THE INTENT, MOTIVE AND BIAS OF MCKINNEY AND FLORALBA**

408.    OLPD witnesses McKinney and Floralba did not witness the Steel taser event. But they were used by White and Perez as "window dressing" witnesses to corroborate Steel's knowingly false testimony even though they were both biased against the Plaintiff and other objective evidence showed they were lying.

409.    As another example of their confirmation bias, neither White nor Perez questioned, much less learned about, the decade-old storied history of problems by and between the Plaintiff and Steel, both of whom aspired for and were competing for the position of OLPD Chief of police.

410.    Likewise, they did not look at Steel's personnel file with OLPD which would have given them tremendous insight regarding Steel's horrific credibility history, full of perjury after perjury after perjury, in nothing other than about 5 applications for employment as a police officer. He lied about his name, his immigration status; he lied about him never having been arrested and the list of lies just goes on and on.

411.    Steel's OLPD personnel file alone showed his was not a believable or credible witness and had a very nasty history with the Plaintiff and many other OLPD officers.

412.    Floralba was OLPD's dispatcher. She offered false testimony against the Plaintiff to White and Perez at the behest of Steel. Although she was not present in the supervisor's office or otherwise within earshot of the discussion between Steel and the Plaintiff inside the sergeant's office when the taser was discharged, she nevertheless claimed to only be able to clearly hear Steel say "don't do it" just before the taser's discharge. Floralba became the SAO's star witness.

413.    Disproving Floralba's testimony was very easy to do by employing a simple reconstruction of the event. The defense performed one at the OLPD and Perez and White were monitoring it. Even though it was clear to them that what Floralba claimed she heard could not have been heard, they relied on her contrary perjury to prosecute the Plaintiff.

414.    The FDLE investigators also interviewed about a half-dozen officers also on the main OLPD office workspace floor at the time of the incident who were much closer to the sergeant's office than Floraba was. All testified under oath that no such conversation was heard between the Plaintiff and Steel. That should have rendered Floralba's testimony as unreliable, seriously impeachable, or at worst, outright perjury, without which, Steel had no corroborative witness.

415.    The FDLE investigator's malicious confirmation bias overrode their duties to perform an objective investigation as they navigated their entire investigation to falsely arrest and maliciously prosecute the Plaintiff.

416.    White and Perez deliberately never questioned or investigated Floralba about her possible motive, interest, and bias against the Plaintiff. They would have easily learned that she harbored deep resentment against the Plaintiff because he then had recently denied selecting Floralba for a promotion.

417.    But there is even more to Floralba. The investigators knew or should have looked into her cozy relationship with Steel. How to do that? Easy. Pull and analyze her cell phone records and his and compare.

418.    Neither White nor Perez asked Hardiman to authorize a subpoena for the cellphone records for Floralba and Steel. Had they done so, they would have found a very telling pattern and confronted Floralba with the findings which would have further discredited her as a witness. The Plaintiff subpoenaed those records.

419.    As one example, on the night before Floralba's statement to FDLE, there was a very lengthy telephone conversation between Floralba and Steel. As stated above, OLPD PCB rules strictly prohibit communications amongst witnesses during the pendency of a PCB investigation. The records reveal a very clear, interesting, intense pattern of their calls only when there was a significant event occurring at the time involving this case.

420.    On the day of Floralba's FDLE sworn interview, she and Steel exchanged approximately a dozen calls. An audit of their phone records both on dates for before and far after Floralba's FDLE interview shows only occasional, short duration telephone communications between the two. See summary chart below.

79

| Calls made between Steele and Floralba | |
|---|---|
| Month | Number of Calls |
| September - 2021 | 47 |
| May - 2022 | 20 |
| June - 2022 | 5 |
| July - 2022 | 8 |
| August - 2022 | 2 |
| September - 2022 | 6 |
| Total Calls | 88 |

| Calls made between Steele and Floralba in September | | |
|---|---|---|
| Day | Number of Calls | Calls made after 12:00 AM |
| September 1 2021 | 1 | 0 |
| September 2 2021 | 1 | 0 |
| September 7 2021 | 4 | 0 |
| September 9 2021 | 2 | 0 |
| September 10 2021 | 1 | 0 |
| September 11 2021 | 1 | 0 |
| September 15 2021 | 4 | 0 |
| September 16 2021 | 4 | 0 |
| September 18 2021 | 1 | 1 |
| September 20 2021 | 4 | 0 |
| September 21 2021 | 3 | 0 |
| September 23 2021 | 11 | 1 |
| September 24 2021 | 3 | 0 |
| September 26 2021 | 2 | 0 |
| September 27 2021 | 1 | 0 |
| September 28 2021 | 2 | 0 |
| September 29 2021 | 2 | 0 |
| Total Calls | 47 | 2 |

Floralba's Statement to FDLE

421.    White and Perez specifically avoided testing the testimony of the most essential witness that they knew would impact the probable cause determination by the SAO and/or reduce the probability of a jury convicting the Plaintiff.

422.    Instead, Floralba was deceivingly offered up to the SAO by White and Perez as a reliable and credible witness.

423.    The "probable cause" used by White, Perez and the SAO was manufactured, manipulated and maneuvered to create a "legal justification" for the Plaintiff's arrest. Without that, there was no probable cause.

## THE MISSING SURVEILLANCE CAMERA FOOTAGE INSIDE THE OLPD SUPERVISOR'S OFFICE

424.   On Friday, September 17, 2021, White authored a report that was reviewed and approved by his supervisor, Confessor Gonzalez. It stated as follows:

425.   *"On Friday, September 17, 2021, at approximately 11:30 am, Special Agent (SA) Gaylon White had a preset meeting with Lieutenant Mohan Britton OLPD Internal Affairs. The meeting was reference SA White receiving a USB-Drive that contained video footage of the incident between Capt. Perez and Sgt. Steel. SA White received the USB-Drive and he returned to the FDLE office.* **The USB-Drive was reviewed and checked by SA White to make sure that video footage was available to be viewed.***"*

**[PAGE LEFT INTENTIONALLY BLANK FOR SPACING/EXHIBIT PURPOSES]**

**FLORIDA DEPARTMENT OF LAW ENFORCEMENT**
*INVESTIGATIVE REPORT*

The following investigative report is predicated on information received by the Florida Department of Law Enforcement via an anonymous email on September 6, 2021. The anonymous email was sent by OpaLockapolicechannel@protonmail.com. The writer alleged that Opa Locka Police Department (OLPD) Captain (Capt) Sergio Miguel Perez and Sergeant (Sgt) Michael Steel got in to a verbal dispute at which point Capt. Perez pointed his taser at Sgt. Steel. The writer alleged that Sgt. Steel begged Capt. Perez not to "tase" him but Capt. Perez deployed his taser and "tased" Sgt. Steel, striking him in the back. The writer alleged that Sgt. Steel and members of the OLPD have been threatened with their jobs the City Manager ( John E. Pate) and Capt. Perez if they reported the incident to anyone.

On Friday, September 17, 2021, at approximately 11:30 am, Special Agent (SA) Gaylon White had a preset meeting with Lieutenant (Lt.) Mohan Britton OLPD Internal Affairs (IA). The meeting was reference SA White receiving a USB-Drive that contained video footage of the incident between Capt. Perez and Sgt. Steel. SA White received the USB-Drive and he returned to the FDLE office. The USB-Drive was reviewed and checked by SA White to make sure that video footage was availble to be viewed.

On Monday, September 20, 2021, SA White gave the USB-Drive to the case agent of the investigation SA Perez to be examined and reviewed for further investigative steps.

| Case Number: MI-14-0298 | Serial #: 10 |
| --- | --- |
| Author: White, Gaylon O | Office: Miami |
| Activity Start Date: 09/17/2021 | Activity End Date:09/17/2021 |
| Approved By: Gonzalez, Confesor | |
| Description:USB-Drive containing footage of the incident | |
| *THIS REPORT IS INTENDED ONLY FOR THE USE OF THE AGENCY TO WHICH IT WAS DISSEMINATED AND MAY CONTAIN INFORMATION THAT IS EITHER PRIVILEGED OR CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. ITS CONTENTS ARE NOT TO BE DISTRIBUTED OUTSIDE YOUR AGENCY.* | |

Page : 1 of 1                    451820220120093240

426.    So then, White's report shows that on September 17ᵗʰ, 2021, he himself saw, and had in his possession, the video footage that depicted the incident that was (falsely) reported by Steel to the FDLE days earlier. However, that footage was swiped off the USB drive or, at least, White and Perez so claimed.

427.    When the Plaintiff challenged that loss of such crucial evidence, FDLE did an "about-face" and now conveniently and unbelievably represented that there really never was no video

footage and the surveillance camera was just "*a dummy*". If true, then why did White say this in his report: *"(T)he USB drive was reviewed and check by SA White to make sure that video footage was available to be viewed".* That was a lie that White told the SAO, Hardiman, Sanchez and they all accepted that as what, a mere mistake? They never launched an investigation and worse yet, they ignored the part of White's report which said he had reviewed the USB drive which had the footage, *"available for review".* Any honorable prosecutor would have dismissed the case on that major discrepancy alone. Its the key evidence of the entire case.

 

 

428.    Cason and DC Sanchez have assured that all of the CCTV cameras of the OLPD *were* operational, including the one in the sergeant's office. Cason testified under oath that as a previous member of the command staff and during her entire tenure with the agency, they had never allowed or installed any dummy camera(s) in any of the OLPD facilities; that such a notion was simply preposterous. Pate reaffirmed the same. Plaintiff reaffirmed the same. None of White's and Perez' statements about the surveillance camera – and footage – makes any sense.

429.    Even without Cason's testimony, FDLE's position can alternatively be proven to be a lie. The City has been unable to provide a purchase order for a dummy camera.

430.    An inspection of any of the sites of this "dummy camera" shows that there was a 'cable hole' drilled into the wall above and close to the CCTV camera to connect network cables to the camera itself.  This begs the question. Why have all the wiring set up for any dummy camera?

Why do that if there is no cable to connect to the device?  And why have a dummy camera in the police station?

431.    Once suspended, the Plaintiff had no access to the OLPD station. On the other hand, that was Steel's office. So, who, most likely was the one who disconnected the camera? Steel. And who erased the "available for review" footage on the USB drive? White.

432.    At no point in time did White or Perez generate any report whatsoever explaining that the camera affixed to the wall in the police station was a dummy camera.

**THE MISSING TASER BATTERY EVIDENCE AT THE HANDS OF FDLE/WHITE**

433.    On September 14th, 2021, at 1:05PM, White signed for and took custody of the taser device, three (3) taser batteries, and cartridges associated with the device used by Plaintiff. On the same date, White completed an FDLE report wherein he stated *"SA White signed the receipt and dated it 09/14/2021 at 1:05pm, to complete the transfer of the Taser 7 to FDLE."*

**[PAGE LEFT INTENTIONALLY BLANK FOR SPACING/EXHIBIT PURPOSES]**

**FLORIDA DEPARTMENT OF LAW ENFORCEMENT**
*INVESTIGATIVE REPORT*

The following investigative report is predicated on information received by the Florida Department of Law Enforcement via an anonymous email on September 6, 2021. The anonymous email was sent by OpaLockapolicechannel@protonmail.com. The writer alleged that Opa Locka Police Department (OLPD) Captain (Capt) Sergio Miguel Perez and Sergeant (Sgt) Michael Steel got in to a verbal dispute at which point Capt. Perez pointed his taser at Sgt. Steel. The writer alleged that Sgt. Steel begged Capt. Perez not to "tase" him but Capt. Perez deployed his taser and "tased" Sgt. Steel, striking him in the back. The writer alleged that Sgt. Steel and members of the OLPD have been threatened with their jobs the City Manager ( John E. Pate) and Capt. Perez if they reported the incident to anyone.

On Tuesday, September 14, 2021, Special Agent (SA) Gaylon White and SA Jose Perez went to the OLPD to pick up the Taser 7 that was alleged to have been used by Capt. Perez on Sgt. Steel at the office of the OLPD Station. SA White and SA Perez arrived at the preset meeting at approximately 12:55 pm. They were escorted to the office of Internal Affairs to met with Lieutenant (Lt.) Mohan Britton where they conducted a brief meeting with him.

The Taser 7 serial number #X4000AC9A was provided to SA White along with (3) three batteries, a taser holster, and (8) eight colored cartridges (blue, red, black). SA White's examination of the cartridges concluded that each cartridge contains 4 training projectiles and that one of the cartridges had been used (shot/deployed). The identifying numbers are 20015 REV B X52200N8T and 20015 REV B X52200NMF. This entire package of described items was located inside of the black Taser 7 hard shell case.

SA White was issued a property receipt from Lt. Britton and property intake personnel John Renaud at approximately 1:05 pm. SA White signed the receipt and dated it 09/14/2021 at 1:05pm, to complete the transfer of the Taser 7 to FDLE.

A copy of the property receipt will be maintained electronically under the related item of this investigative case. (INV-2)

| Case Number: MI-14-0298 | Serial #: 5 |
|---|---|
| Author: White, Gaylon O | Office: Miami |
| Activity Start Date: 09/14/2021 | Activity End Date:09/14/2021 |
| Approved By: Gonzalez, Confesor | |

Description:Received the Taser 7 from OLPD

*THIS REPORT IS INTENDED ONLY FOR THE USE OF THE AGENCY TO WHICH IT WAS DISSEMINATED AND MAY CONTAIN INFORMATION THAT IS EITHER PRIVILEGED OR CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. ITS CONTENTS ARE NOT TO BE DISTRIBUTED OUTSIDE YOUR AGENCY.*

Page : 1 of 1                    451820220120093240

434.   Taser batteries are crucial because they serve as memory cards which record every activation, discharge, and all activity associated with the taser device. In essence, they provide a detailed record of all activity concerning that device.

435.   For no explainable reason, the 3 batteries collected by White did not arrive at the FDLE property room at MROC until three days later. But even crazier, on September 17ᵗʰ, 2021, Rebecca Galvez of the MROC Evidence Vault collected *only (2) two* Taser batteries, *not three*, (along with the Taser 7 ECD that was given to her by White sealed, signed, and dated).

436.    To this day, the third battery remains missing, unaccounted for, and its disappearance was never disclosed to the SAO and nobody at the SAO or FDLE questioned its disappearance. How does such evidence just vanish?

437.    In the deposition of Bryan Chiles (a representative of Axon, the taser's manufacturer), he said he was shipped and received only two taser batteries from FDLE (who had requested his assistance in downloading the memory cards data from them).



438.    Perez was deposed on June 6, 2022. He testified that the 'spark test' reflected on Steel's taser report occurred *after* Plaintiff was seen on video leaving the office where the accident took place.

439.    Perez omitted from all of his reports the fact that he had received, reviewed, and compared Steel's taser logs against the Plaintiff's use of the experimental taser.

440.    White never documented these important events in any of his reports either. White and Perez never documented the collection, inspection, or retrieval of Steel's taser, and Steel's own taser was not included in the property receipt dated September 14, 2021.

441.    Steel' taser logs were never turned over by the SAO during discovery as potential Brady material.

442.    Also concerning is Perez' email to his supervisor and an SAO prosecutor stating, *"They obviously know about the Taser report indicating that Steel turned his Taser on, and they are saying Steel was horse playing and pointed the Taser at Plaintiff. What they don't know is that Steel turned his taser on after the incident took place…"*. Yet, no FDLE report exists to document the specifics of how that determination was made. In essence, Perez was telling the SAO that any claim that Plaintiff might have that Plaintiff fired an experimental blank taser cartridge in "self-defense", would fail.

**WHITE'S (UNDOCUMENTED) CONFIDENTIAL INFORMANT**

443.    Just before the first trial setting in the Steel taser case, Plaintiff's investigation uncovered an email dated September 8, 2021 from White to Walker, wherein White referred to a "CI". This email was timestamped at 8:20 a.m. on the morning of September 8, 2021, prior to White taking Steel's sworn statement, which would occur the following day.

444.    The Plaintiff filed a motion for discovery sanctions against the SAO following the discovery of this email. This was a significant new development as there had been no prior indication, statement, or documentation provided through the discovery process related to any confidential informant. Who was the CI? Steel? All eye witnesses must be disclosed by the SAO as part of the discovery process. This caused a mistrial and significant harm to the Plaintiff.

445.    There is no record of, or documentation of any "CI" in FDLE's files obtained by the Plaintiff as a result of a public records request he served on FDLE.

446.    Sanchez viciously opposed Plaintiff's motion to have White identify his CI, but Miami-Dade County Court Judge Betsy Alvarez-Zane found differently and ordered White to identify his CI, and he identified Cason as his CI.

447.    To test White's credibility and learn what "his CI" had *"already told him about the incident"*, on November 6, 2023, Cason was deposed. She emphatically denied being a CI for anybody -including the FDLE or White. She was actually quite offended at being labeled a "CI". So, White lied to his FDLE supervisors and to the SAO on the email when he suggested his CI witnessed the event, or, is White still concealing the true identity of his "CI", by claiming it was Cason when it was really somebody else he was protecting; like Steel, for example?

448.    Following Cason's deposition and through subpoena, Plaintiff secured copies of the phone records associated with Cason's wireline and mobile number. The dates of focus were from the date of the taser event (09/01/21), to the date of SA White's "CI email" (09/08/21).

449.    The records reveal that during that seven (7) day period, Cason never contacted White (as White alleged), prior to White drafting that email to his superiors on the morning of September 8, 2021.

450.    White's prevaricate statement to the SAO identifying Cason as the CI was also absolutely belied by the cell phone records checked against the office number at FDLE Miami, White's FDLE cell phone number, and his personal cell phone number.

451.    The evidence contained in the phone records, coupled with the fact that White concealed the existence of a "CI" from the defense, but also used it to make the SAO believe he had an independent witness to the tasing event and Cason's testimony, raises serious concerns about

White's credibility and level of competence. It also speaks volumes as to his deliberate and malicious prosecution of the Plaintiff. Furthermore, representing someone to the state and the defense as a "CI" when, in fact, that person is not a CI and there is no record supporting that designation, is a very serious matter.

452.    Neither the FDLE or the SAO investigated White's serious misrepresentation and/or false statement in relation to a criminal proceeding. White's lie simply skated, just like Steel's, Floralba's and McKinney's, Bosque's and Kelly's.

453.    As part of the defense investigation, Plaintiff's counsel sought to subpoena the Baptist records and Sanchez - as is apparent in the voice-recorded courtroom transcripts – staunchly opposed the request in the most aggressive way, for months. The court ultimately ordered the records to be produced under the Plaintiff's subpoena and that was blockbuster to say the least and a gamechanger.

454.    On the eve of the second trial setting, the Plaintiff finally get the Baptist medical records which revealed the two astounding confessions by Steel to the medical staff hours after he was tased, that event was an accident.

455.    On January 9, 2024, the Plaintiff presented a sworn motion to dismiss the charge based on this newly discovered evidence. Sanchez pretended to have been surprised by the records and told the Honorable Miami-Dade County Court Judge Betsy Alvarez-Zane, that she (or her associate prosecutor) had questioned Steel regarding the entries in the Baptist records and Steel's response was "unacceptable." But they refused to say exactly what he said. Reason and common sense strongly suggest that Steel said the medical records should have said "intentional". Did the SAO charge Steel for that lie? No.

456.    But, Sanchez just couldn't dismiss. Instead, she forced the jury and the Court to wait hours for her supposedly to be able to communicate a decision after consulting with her supervisors. Really? And even when the court reconvened, Sanchez just couldn't get the words out of her own mouth and deferred to Gonzalez to make the dismissal announcement. She then childishly pouted and stormed out of the courtroom in the most unprofessional way.

457.    The Steel taser case terminated in Plaintiff's favor and within days the Plaintiff sued Steel in state court for malicious prosecution. Discovery in that case shed some interesting light as to a lot that happened behind the scenes which laid the groundwork for many final allegations in this Complaint.

458.    In Plaintiff's state court civil case against Steel, Hardiman reluctantly said that had she and the SAO known of Steel's two statements to the Baptist Health staff, the SAO would not have had probable cause to charge Plaintiff. White, on the other hand, said that Hardiman had those records all along from the get go.

**PLAINTIFF READIES FOR THE JAFET CASTRO BATTERY TRIAL**

459.    With the Steel-taser case now dismissed, the Castro case was set for jury trial only a few later.

460.    White and Perez' confirmation bias malicious prosecution continued against the Plaintiff relating to the Castro matter.

461.    The Castro case presented its own additional problems for the City, FDLE, Walker, White, Perez and the SAO.

462.    There was no new evidence to offer against Plaintiff that had not already been considered by PCB and the SAO, years earlier. They all knew that they could not rely upon Castro because

he was under oath in the FDLE and PCB investigation saying he remembered nothing. Indeed, the SAO ultimately did not call him at trial.

463.     Without Castro, FDLE and the SAO only had BWC footage, captured on several OLPD BWCs which demonstrated that Plaintiff's actions were 100% justified and consistent with Plaintiff's training which was standardized amongst nation-wide police department use of force policies.

464.     They knew they needed to recruit at least one OLPD officer on the scene to commit perjury and testify that Plaintiff used excessive force. They ultimately would get two. But they had a problem, all of the OLPD officers that were on the scene testified under oath (to PCB) that all officer's actions were appropriate including the Plaintiff's.

465.     The recruitment must have been something like central casting, *"who wants to change their prior sworn testimony against Plaintiff to now commit perjury against the Plaintiff at the Castro trial and help us convict Plaintiff?"* Bosque and Kelly raised their hands and answered the call,  maliciously invited by FDLE, Walker, Perez, White, and the SAO.

466.     Bosque and Kelly's new perjured testimony was welcomed, applauded and encouraged by all of these people. They would now be the SAO's star witnesses.

467.     Defendants Kelly and Bosque falsely testified at the trial and lied under oath in order to help the SAO convict the Plaintiff.  They testified inconsistently with prior sworn statements they had made to PCB. Both officers were severely impeached on the stand.

468.     Even though the SAO manipulated false probable cause, supported by perjury, the Plaintiff was acquitted by the jury and this (second) criminal proceeding terminated in his favor.

469.     The conspiratorial plan was to throw blind-folded rookie prosecutors into the courtroom and have them throw the hail Mary pass with perjury from Steel, Floralba and Mckinney in the

Steel taser case, and Bosque and Kelly in the Castro case. Both prosecutions violated a primary ASA prosecution rule – do not prosecute a case where there is no reasonable likelihood of securing a conviction. VanderGiesen, Rosen, Hardiman, Sanchez and Bell are all guilty of violating that principle and skirted it by knowingly using the perjured testimony. They are a shameful disgrace as prosecutors.

## COUNT I – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C § 1983 AGAINST THE CITY BASED UPON NEGLIGENT HIRING

Plaintiff re-alleges the allegations of paragraphs 1- 103 and incorporates them as if stated herein in full and further alleges:

470.   Negligent hiring occurs when the employer fails to conduct due diligence, including a reasonable investigation into an applicant for-hire's reputation, qualifications, and background.

471.   For decades, the City has had a history, custom, policy, and practice of negligently hiring police officers and negligently hiring city managers. In brief…

**(FORMER) CHIEF STEVEN BARREIRA**

472.   Barreira was a negligent hire. His background was no secret to the City. It was all a matter of public record.

473.   Whether the City knew or did not know of Barreira's past when it hired him as Chief of Police makes no difference. The City was negligent if it failed to do a background investigation; the City was just as negligent if it learned of Barreira's past, did not investigate it further and hired him notwithstanding. The City was negligent in disallowing and waiving pre-employment examinations from taking place.

474.   Barreira's misconduct laid the groundwork for the malicious investigation and prosecution of Plaintiff in the Steel-taser case.

**(FORMER) CHIEF SCOTT ISRAEL**

475.     Israel was a negligent hire. His background was no secret to the City. It was all a matter of

public record and subject to significant media coverage. Israel had just been terminated from BSO

by the Governor's order holding him responsible for the galactic negligence in failing to supervise

and train his officers to respond to an active shooter in a public school resulting in multiple

students' deaths.

476.     Israel's misconduct laid the groundwork for the malicious investigation and prosecution of

the Plaintiff in the Castro case.

**(FORMER) OLPD OFFICER STEEL**

477.     Steel was a negligent hire in 2007, sixteen years ago and two years before he maliciously

set the wheels in motion to maliciously – and with perjured testimony - prosecute the Plaintiff with

no probable cause. His background was no secret to the City. It was all a matter of public record.

478.     As a young adult, Steel created his criminal history for fraudulent possession and or use of

a Florida driver license in Alachua County, Florida and lied about his immigration status on various

police department work applications. The City hired him anyways.

479.     Had the City conducted any meaningful background investigation on Steel, it would have

learned that he had previously applied at several south Florida police departments and was turned

down for lying on job applications, for not having a legal immigration status, for failing polygraph

testing and for failing psychological screening.

480.     Had the City looked carefully at his applications, it would also have learned that Steel had

changed his middle name on one of those applications which should have triggered all sorts of the

bells, whistles, sirens, and alerts.

481.    Steel's City background investigation is devoid of a single City-initiated contact who might provide an objective opinion of Steel's character and integrity.

482.    Rather, the OLPD allowed Steel to select who he wanted the City to contact for character references. The City could have and should have followed the nationwide standard of doing a canvass to locate and interview known: neighbors, former employers and associates familiar with the applicant to get a more neutral and objective insight of Steel's background and reputation.

483.    The City negligently failed to make third-party contact.

484.    Falling further well below nationwide standards for police applicants, the City waived the critical tests of psychological and polygraph testing for Steel. With what we now know about Steel, there is no question that he would have failed both tests, and with or without even that, had the City learned of his criminal past and lying in his other police officer job applications, he would have never been hired by the City.

485.    Steel's hiring allowed the malicious investigation,  arrest, and prosecution of the Plaintiff in the taser case.

**OLPD SERGEANT GERMAN BOSQUE**

486.    Bosque was a negligent hire. His background was no secret to the City. It was all a matter of public record.

487.    Before being hired with OLPD and while in the police academy, Bosque was charged once with grand theft auto and impersonating a police officer and was also twice kicked out of the police academy but reapplied and was readmitted. What agency would hire such an applicant? Opa-Locka.

488.    Upon information and belief, Bosque was arrested even a second time while in the police academy.

489.     Bosque's perjured testimony offered to FDLE, Perez, White, the SAO and ASA Sanchez helped initiate and maintain the malicious prosecution against Plaintiff in the Castro case.

## OLPD SERGEANT CORY KROTENBERG

490.     Krotenberg was a negligent hire in 2007. His background was no secret to the City when he was hired. It was all a matter of public record.

491.     Before OLPD hired him, Krotenberg had already been terminated for untruthfulness and perjury by the Pinecrest Police Department in 2001, specifically, for conduct unbecoming, violating the law enforcements code of ethics, breach of loyalty, lack of knowledge of laws and rules, conduct resulting in an adverse reflection upon himself and the department, failing to appear at judicial proceedings after being subpoenaed, being late for court, and violating rules regarding excused court absences.

492.     Krotenberg had also been fired by the Florida City Police Department on perjury charges and even though Rosen found, at the time, that Krotenberg had committed perjury as a Florida City police officer, the SAO declined to prosecute him.

493.     In 1990, Krotenberg was arrested by the MDPD and charged with burglary to a motor vehicle—a felony. He later applied to several police departments in and out of the state of Florida and was rejected. He was also hired by the Monroe County Sheriff's Office and the Lauderhill Police Department.

494.     It is currently unknown if Krotenberg disclosed his felonious past when he applied to OLPD.

495.     If Krotenberg did not, then the City was still ordinarily negligent in conducting his background check. If Krotenberg did disclose it, the City was grossly negligent in hiring him.

496.    Furthermore, the City appears to not have investigated why Krotenberg had applied to so many police departments and had been denied employment and why he had been fired from those that hired him. That history and pattern showed that there was a problem with his polygraph tests, psychological evaluations, his background check, and that he suffered a serious integrity issue.

497.    Despite those "two strikes," OLPD hired him on October 20, 2009.

498.    Krotenberg was a witness against Plaintiff at the Castro trial. He also "played interference" when the Plaintiff gave him - as the then PCB sergeant – sufficient evidence to arrest McKinney and Steel for perjury in their FDLE statements in relation to the Steel taser case. Their arrest would have tanked them as witnesses in the Steel taser case.

**(FORMER) OLPD CHIEF JAMES WRIGHT**

499.    Based on Wright's history with MDPD, the City should never have hired him. His history, unfortunately, included public reports such as the Miami New Times article mentioned above that showed that he could not deal well with subordinates and was an autocratic supervisor. It was publicly reported that he had sexual harassment charges made against him and that he was very disrespectful to his subordinates, giving them nicknames or offensive descriptors such as "fat boy", "fat-ass", and others as more particularly described above. Clearly, there were other candidates equally, if not more qualified than Wright, to direct the City's police department with none of the baggage that Wright dragged with him.

500.    The foregoing shows and the Plaintiff alleges that the City was deliberately, callously, or recklessly indifferent to his right and to the rights of individuals, in that it instituted a custom or policy of negligently, recklessly, or willfully failing to properly screen and hire officers onto the OLPD, notwithstanding the frequency of incidents of perjury and misconduct that they recorded before their hire with the OLPD.

501.    A major investigative technique used by police departments nationwide is to look into why a police officer leaves one department and goes to work for another. Its unusual, and, often times. A tell tail sign of a problem that needs a question and an answer. There's a 50% there was a problem there. Another technique is to inquire and investigate why a prior police department rejected the applicant. The City did not employ these basic avenues which would have revealed that the applicant was unfit.

502.    The City negligently failed to determine whether applicant and members of the OLPD, particularly the individual Defendants named herein, posed a threat to the public as a result of their propensity to commit unlawful acts, were: incompetent, lacked integrity, had previously committed perjury, or engaged other illegal or prohibited conduct.

503.    The City's negligent hiring practices, as alleged, demonstrates its deliberate, callous or reckless indifference to Plaintiff's constitutional rights and of others as well.

504.    The City knew or should have known that its deliberate, callous, or reckless indifference would foreseeably result in injury to members of the public, including the Plaintiff.

505.    In light of the excessive number and frequency of OLPD officer misconduct, the need for the City to investigate officers before they were hired was all too obvious. The City clearly and miserably failed to meet the reasonable standard of care of nationwide and South Florida police agencies with regards to its hiring criteria.

506.    Although not charged as Defendants in this lawsuit, further abundant examples of the City's negligent hiring of officers, police chiefs and City managers for decades include: Wright, Dobson, Holborow, Balom, and Blackman. Those negligent hires – in and of themselves – conformed with the City's pattern, policy and practices regarding the negligent hires of the likes of Barreira, Israel, Steel, Bosque, Kelly, and Krotenberg.

507.    As a direct and proximate result of the City's historically negligent hiring customs, policies, and practices, the Plaintiff was deprived of his constitutionally protected rights.

**WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, City of Opa-Locka, for violating 42 U.S.C. § 1983, declare the acts of the City of Opa-Locka violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just.

### COUNT II – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C § 1983 AGAINST THE CITY BASED ON NEGLIGENT TRAINING

Plaintiff re-alleges the allegations of paragraphs 1-34 and 93-103, and incorporates them as if stated herein in full and further alleges:

508.    Negligent training occurs when an employer does not train (or fails to update training) for its employees, such that in the exercise of their duties, so that they can conform to changing community standards and remain proficient and competent. The City was - and still is - negligent in both areas.

509.    Negligent training occurs when the employer should have known of an employee's training before the time of hiring and during employment. The test is not "actually known" but rather "should have known".

510.    It occurs when the employer should have become aware of an employee's problems after the employment has begun, and the employer fails to take action that would protect the public.

511.    **Exhibit B** squarely identifies that in early 2020, OLPD's systematic pattern, policies, and practices are exactly what caused the City to violate the Plaintiff's constitutional rights.

512.    There were two critical findings regarding training against the City. The first one was that the OLPD was not in compliance with CFA's Best Practices for training programs. The second

one was that there is no system in place to determine or coordinate the long-term training needs of the department or individual officers. In the *"Analyses"* section, the report noted that, "[T]he majority of employees gave the department low ranks on training. Most, but not all, indicated that they have received little or no training."

513.    Recommendation number one was for a training program to be developed. None ever followed. It included a suggestion that OLPD rely upon other statewide agencies including the MDPD itself. The OLPD never accepted that generous invitation. The MDPD report that recognized that while the expense of providing some of the training may require additional funds, the development of the training plan should not. Despite that, the City has yet to even develop the training plan suggested.

514.    The second recommendation was for the City to develop and implement a career progression system to allow for rookie officers to progress into leadership opportunities via a course track and training program with progressively increasing supervisory and managing responsibilities. The City ignored that suggestion and has not acted upon it ever since.

515.    The third recommendation for the City was to develop and adhere to a defined promotion process. To date, the City has also ignored this recommendation.

516.    Not part of the report, but alleged herein, is that the nationwide police standard is to require competitive examination as an element of the promotional process up to the rank of captain. This tends to put the most qualified candidates in the critical supervisory positions of sergeant, lieutenant, and captain with the higher positions of major, commander and deputy chief of police being appointed positions.

517.     Again, the City stands alone in this police world and sees the policing world quite differently. It stands alone in its views. The City has failed to meet the nationwide (and community) law enforcement agencies' standard of care in its training of OLPD officers.

518.     Simply stated, the City has a long history, pattern, practice, and policy of not training its police personnel and managers to any minimally acceptable level which it knew would lead to constitutional violations against civilians and even officers, to include Plaintiff.

519.     With regards to the specific individual Defendants, (Barreira, Israel, Bosque and Kelly), the City failed to send them to internal and external training programs.

520.     As a direct and proximate result of the City's negligent training policies, pattern and history, Plaintiff was deprived of his constitutionally protected rights.

**WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, City of Opa-Locka, for violating 42 U.S.C. § 1983, declare the acts of the City of Opa-Locka violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just.

## COUNT III– VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C § 1983 AGAINST THE CITY BASED ON NEGLIGENT RETENTION, PROMOTION, AND SUPERVISION

Plaintiff re-alleges the allegations of paragraphs 1-34 and 104-257 and incorporates them as if stated herein in full and further alleges:

521.     Negligent retention occurs when the employer should have known of an employee's lack of fitness after the time of hiring. The test is not "actually known" but rather "should have known".

522.    Negligent retention occurs when the employer should have become aware of an employee's problems after the employment has begun and the employer fails to take action that would protect the public.

523.    Negligent retention, supervision and promotion occurs when an employer does not have a management/supervisory system in place to control, grade, and ensure that all subordinates perform to minimum standards and when not, administer a fairly measured dose of discipline to hold them accountable. It also results from a deficient disciplinary process and/or promoting unqualified personnel into managerial positions.

524.    In the OLPD, there is only one tested promotional rank and that is from officer to sergeant. And that is not even a City policy. It is only followed because it has been negotiated throughout the years under a collective bargaining agreement between the City and the Police Benevolent Association, the union representatives of OLPD's sworn law enforcement personnel. After one becomes a sergeant with the OLPD, every other promotion is not based on a merits promotional and competitive process. It's who does the then police chief like. It's a simple appointment process. This promotional process is a huge contributing problem because police management staff need not be qualified or competent. They just need the "hook up".

525.    Indeed the City negotiated that lower standard to circumvent a competitive process that would be merit-based . This allows the City to promote unqualified - or less qualified officers to supervisor positions and then its all politics and favors after that.

526.    The MDPD Report – **Exhibit B** - found that:

> "[T]he department does not have valid or complete SOP nor mechanisms in place to track employee performance. Work schedules and assignments inhibit effective oversight by supervisors and commanders. Policy violations have gone unpunished. The high ratio of supervisors to subordinates clouds individual responsibility and lines of accountability."

527.    The MDPD Report also made seven specific findings:

- Known policy violations have not resulted in appropriate disciplinary sanctions

- Multiple employees indicate that the lack of accountability in the department is a critical problem

- The department does not have a monthly employee evaluation system in place

- Employees are frequently working shifts other than their primary one and are supervised by different individuals working other shifts

- Officers have to spend a portion of their time functioning in dispatch

- The 911 dispatchers do not have a supervisor or coordinator

- The responsibilities, authority, and functions of the Lieutenants are not consistent with their job descriptions or the structure of the organizational chart.

528.    Under the *"Analyses"* section of the report on page 8, the report articulates uncertainty and a lack of clarity reigning supreme regarding accountability at the OLPD; that performance and behavior of OLPD employees are not adequately monitored with no accountability. It adds that the OLPD does not set goals or objectives so that employees can meet clear expectations. It relates to unwritten, informal, and unenforced standards of performance which lead to poor control, poor behavior, and a lack of discipline and oversight.

529.    In addition to this report, Plaintiff asserts that DC Sanchez and other former OLPD commanders will corroborate with firsthand knowledge the findings and analyses of the MDPD.

530.    The City was responsible for following and implementing all relevant laws, rules, regulations, and policies with regard to retaining and promoting officers within the OLPD.

531.     For decades, the City has had a history, custom, policy, and practice of negligently retaining and promoting unqualified police officers. The City has known of or should have known of all the bad acts of Barreira, Israel, Steel, Floralba, McKinney, Bosque, and Kelly.

**FORMER OLPD CHIEF STEVEN BARREIRA**

532.     Despite being aware that Barreira was violating policy and misusing public funds, the City retained him and employed him for a long period of time thereafter.

533.     The City failed to appropriately supervise Barreira which permitted his misuse and misappropriation of public funds. It tolerated his conduct rather than reverse and correct it.

534.     The City failed to discipline Barreira when it learned that Barreira had a clandestine meeting with Steel in regards to the Steel taser case, although it clearly violated established rules, regulations, and PCB protocols. The City failed to take swift corrective actions when it learned that Barreira had violated the plaintiff's rights to due process.

535.     In turn, Barreira himself, failed to properly supervise Steel and other prior supervisors of Steel failed to properly supervise Steel which allowed and encouraged the well-documented misconduct evidenced in his personnel file.

536.     When Israel violated established OLPD protocols in respect to the handling of the criminal complaint against Steel (which the Plaintiff also forwarded to the OLPD's PCB and the City Manager's Office), the City failed to hold Israel accountable and thus was negligent in supervising his activities. The City further allured him to make a critical decision in the face of a huge, irreconcilable conflict of interest.

**(FORMER) CAPTAIN STEEL**

537.     The City was negligent in retaining and also in promoting Steel not once, not twice, but four times. First, to the position of police sergeant, then acting lieutenant; then, to the position of

Police Captain; and finally, to the position of Acting Chief of Police; all of this notwithstanding his lack of education, leadership, and documented history with the department.

538.    The City further failed in promoting Steel by not sending him to police managerial leadership programs in an effort to even get him close to being able to perform in these highly important supervisory positions.

539.    The City was negligent in promoting Steel to the position of Captain and then, Acting Chief of Police. The "acting" position was only temporary. Yet, few hours after the appointment, Steel raced to the nearest police supply store and bought himself a "Chief of Police" badge (not "acting") and two five-star lapel pins as regalia for his uniform. That should have been cause for at least "some" concern. It demonstrated that Steel was power hungry, an embellisher, a person who misrepresents his level of authority and a dose of narcissism

540.    But for the negligent retention and promotion of Steel, he would have been fired years before the tasing incident and he would not have been able to bring a false claim against the Plaintiff such as he did.  Indeed, even after Plaintiff was charged and before his trial, the City was on notice that Steel had committed perjury in his statements to OLPD PCB, to Barreira, and to FDLE.

**SERGEANT GERMAN BOSQUE**

541.    With Bosque's history described herein, the City was negligent per se in supervising his activities. Even after he won reinstatement following arbitration, the conduct for which he was fired for would have never occurred had he been properly supervised in the first place. And when he executed the LCA and later violated it several times over, he would never have won his job back with the arbitration process.

542.     In his two decades of working for OLPD, Bosque was the subject to 40 investigations by IA detectives. Outside of OLPD administrative matters, he earned quite a record: three arrests and seven firings.

543.     In an interview with the <u>Miami Herald</u> in 2012, Bosque said, "[*I] am an excellent police officer, but I break the rules*." The City knew that Bosque was a self-admitted "rule-breaker."

544.     The foreseeability of Bosque's misconduct was predictable. For two decades, the City had repeatedly worked out "deals" with Bosque that have resulted in the perpetuation of the misconduct and harm to others including the Plaintiff.

545.     Bosque has bragged about bribing City officials overseeing his professional fate and disciplinary case with "cookies" and other gifts to secure minor or no consequence for his misconduct. Isn't bribery and graft of a police official a crime?

546.     Despite this long-term and sordid history with Bosque under its employment, the OLPD—to this day—proudly retains Bosque among its rank and file - as a sergeant to boot.

547.     Bosque falsely testified against the Plaintiff at the Castro trial and was severely impeached with his prior testimony to OLPD IA and FDLE.

548.     But for Bosque's continued retention by the City and his perjury there was no probable cause to charge or possible prosecution against the Plaintiff relating to the Castro case. After the embarrassing cross examination of steel at the Castro trial, publicly displaying his perjury, the SAO, the City and the FDLE have done nothing. And the reason is, they are all as complicit as he was in committing perjury and obstruction of justice.

**OLPD OFFICER DANIEL KELLY**

549.     During his tenure with the OLPD, Kelly was the subject of several PCB administrative and criminal investigations following allegations of misconduct and/or criminal activity.

550.    As a result of the incident involving Kelly and his brother, an OLPD (PCB) internal investigation was commenced. This investigation resulted in Kelly being relieved of duty.

551.    The PCB investigation by the OLPD concluded and several administrative violations were sustained.

552.     Kelly's actions were serious enough to recommend termination but the then City Manager, Kelvin Baker, refused to follow the recommendations of Cason and DC Sanchez and kept Kelly employed as a police officer with the OLPD.

553.    The OLPD has also become aware that over the years the BSO has responded to Kelly's residence several times because of domestic incidents and other suspected criminal activity reported to BSO.

554.    The OLPD PCB did not follow up on these reports to BSO as is customary throughout the law enforcement industry in order to determine if the officer has violated departmental policy and/or if the reported conduct warrants concern for the officer's continued fitness for duty.

555.    Despite this history, OLPD has proudly kept Kelly in its rank and file. He should have been fired.

556.    Kelly maliciously testified falsely against Plaintiff at the Castro trial and was impeached with his prior sworn testimony to OLPD's PCB. Without his perjured testimony, there could be no probable cause to charge the Plaintiff and no successful prosecution against Plaintiff either.

557.    After the embarrassing cross examination of Kelly at the Castro trial, publicly displaying his perjury, the SAO, the City and FDLE have done nothing. And the reason is, they are all as complicit as he was in committing perjury and obstruction of justice.

558.    But for Kelly's continued retention by the OLPD, there could be no charge or prosecution against the Plaintiff relating to the Castro case.

559.    Although not defendants in this case, other examples abound of negligently retained and/or promoted OLPD officers are: Wright, Dobson, Holborow, Blackman, Balom, and Krotenberg.

560.    The City's retention, supervision and promotion policies and practices fell below nationwide and South Florida Police agency standards and a standard of reasonable and ordinary care.

561.    As a direct and proximate result of this history and pattern of the City's negligent retention, supervision and promotion policies and practices, the Plaintiff was deprived of his constitutionally protected rights.

WHEREFORE, the Plaintiff prays that this Honorable Court enter judgment against the Defendant, City of Opa-Locka, for violating 42 U.S.C. § 1983, declare the acts of the City of Opa-Locka violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just.

## COUNT IV – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 - FALSE ARREST AND MALICIOUS PROSECUTION (AGAINST STEVEN BARREIRA)

Plaintiff re-alleges the allegations of paragraphs 1-34, 60-64, 93-103, 132-134, 258-291, 292-457 and incorporates them as if stated herein in full and further alleges:

562.    Quickly after Barreira was installed as the Police Chief of the OLPD, the Plaintiff filed a complaint against Barreira for misappropriation of public funds and hostile work environment and Barreira would later get his revenge.

563.    When the opportunity to retaliate against Plaintiff arose—only months later—Barreira jumped on it and capitalized from it.

564.    The "anonymous complaint" filed by Steel - and known to Barreira - was Barreira's golden opportunity to criminally target the Plaintiff. Rather than follow proper protocol, assign it to OLPD

PCB, stay out of it, then allow the SAO to review the results thereof, Barreira got personally involved in the investigation. He violated the PCB golden rule of not discussing a PCB matter with anyone else. Even as police chief, that applied to Barreira.

565. Barreira secretly met with Steel outside of the City to avoid detection in order to discuss the incident that Steel had with the Plaintiff as per the anonymous email. Barreira did not report this encounter or any statement made to him by Steel to OLPD PCB, or to his superior, City Manager John Pate.

566. Barreira then diverted the OLPD PCB process and pressed FDLE to go after the Plaintiff.

567. Barriera's conduct contributed to the commencement of a false arrest and malicious prosecution against the Plaintiff for which there was no probable cause and which terminated in the Plaintiff's favor. Barriera's actions were with actual malice.

568. Barreira's conduct was against clearly established law, false arrest and malicious prosecution.

**WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, Steven Barreira, for violating 42 U.S.C. § 1983, declare the acts of Steven Barreira violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm evidenced an indifference to or a reckless disregard for Plaintiff safety, employment, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff deserving an award of punitive damages.

**COUNT V – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 - MALICIOUS
PROSECUTION (AGAINST SCOTT ISRAEL)**

Plaintiff re-alleges the allegations of paragraphs 1-34, 66-73, 93-103, 135-157, 292-323, 457-467 and incorporates them as if stated herein in full and further alleges:

569.    Israel ignored the PCB disposition findings on the Castro matter that was closed years earlier and which cleared Plaintiff and other OLPD officers in regards to the Castro incident. He also ignored the two times the SAO reviewed the matter and declined prosecution.

570.    In his zeal, Israel also violated F.S.S. Chapter 112 of the Florida Statutes, and its due process requirements when he subjected the Plaintiff to double jeopardy. In a clearly malicious and intentional move, Israel summoned the Plaintiff to a meeting using the rouse of assuring the Plaintiff that Israel was the "new sheriff in town" and would "do things right and fair". Instead, Israel questioned the Plaintiff about the Castro incident without affording the Plaintiff the opportunity to have counsel present and without informing Plaintiff that he was being subjected to another investigation.

571.    Despite a glaring conflict of interest, and in order to help the Castro family lawsuit, and to retaliate against the Plaintiff for filing a perjury complaint against Steel, Israel weaponized the FDLE to re-open the investigation against Plaintiff. But there was nothing to investigate as the Plaintiff had already been investigated and cleared, not once but twice before by the SAO which had the ultimate charging decision making authority regardless of how Israel, OLPD PCB or the FDLE later felt about the matter.

572.    Additionally, there was no new evidence, Israel pressured FDLE to reopen the case and charge the Plaintiff. But for Plaintiff's perjury complaint against Steel that same day the Castro investigation would never have been reopened.

573.    The FDLE accepted Israel's pressure to re-open the investigation and thus lent itself to do Israel's dirty work to make the Plaintiff a scapegoat as a result of the lawsuit filed against the City by Castro.

574.    Conveniently, if the City could get the SAO to charge the Plaintiff in connection with the Castro incident, the City could also shield itself from liability in regards to the lawsuit filed by Castro and distance itself from Plaintiff's conduct. The City should have stopped what it knew was a conflict of interest and malicious prosecution by Israel against one of its officers cleared twice by PCB and the SAO.

575.    Israel and the FDLE had no good reason—except maliciousness—to re-open the Castro investigation against the Plaintiff.

576.    He refused to investigate Plaintiff's complaint against Steel and called it "old news/ closed case." Hypocritically, he took the opposite position with the Castro case.

577.    Israel did this to "keep Steel clean" so he could be a good state witness against the Plaintiff in the Steel taser case.

578.    In reopening that case, he gave the City, the SAO and the FDLE a "double down" insurance policy against the possibility of a not guilty verdict on the Steel taser case.

579.    Israel's conduct contributed to the commencement of a false arrest and malicious prosecution/proceeding against the Plaintiff for which there was no probable cause and which terminated in the Plaintiff's favor. Israel's actions were with actual malice.

580.    Israel's conduct was against clearly established law, false arrest and malicious prosecution.

        **WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, Scott Israel, for violating 42 U.S.C. § 1983, declare the acts of Scott Israel violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's

fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. Plaintiff seeks an award of punitive damages against Israel for his reprehensible conduct. The harm evidenced an indifference to or a reckless disregard for Plaintiffs safety, employment, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff deserving of an award of punitive damages.

## COUNT VI – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 FALSE ARREST MALICIOUS PROSECUTION (AGAINST GERMAN BOSQUE)

Plaintiff re-alleges the allegations of paragraphs 1-34, 74, 93-103, 158-212, 293-323, 457-467 and incorporates them as if stated herein in full and further alleges:

581.    On one or more occasions, the Plaintiff filed complaints and disciplinary actions against Bosque and Bosque hated the Plaintiff. The City knew it, Israel knew it and so did FDLE, Walker, White, Perez and the SAO.

582.    In or about May 2021, when the Plaintiff was an OLPD captain, he initiated a disciplinary action against Bosque. The Plaintiff recommended that Bosque be terminated for Bosque's obstruction of justice and for soliciting perjury from another OLPD officer in relation to that officers' abandonment of his post at a crime scene that allowed an unidentified person to remove a firearm from the crime scene.

583.     On another particular occasion, the Plaintiff initiated a criminal investigation against Bosque for committing a fraud/ theft against the City related to his on-duty service hours. Bosque was remaining home as evidenced by the GPS in his police vehicle while being paid to be supervising his subordinates within the City's jurisdictional limits. OLPD's then Police Chief, Dennis Jackson, met with ASA Hardiman who refused to prosecute Bosque for his felonious conduct.

584.    There was no probable cause to charge the Plaintiff for battery in the Castro case. When PCB took Bosque's sworn statement in 2020, he 100% exculpated the Plaintiff and all of the other OLPD officers of any wrongdoing. But when the City, Israel, FDLE, Walker, White, Perez and the SAO needed a finger-pointing witness to commit perjury against the Plaintiff at trial, Bosque answered the call.

585.    Bosque, within the cause and scope of his position as an officer of the OLPD, but in violation of clearly established law, falsely testified during the Castro trial. Bosque maliciously testified 100% inconsistently with prior statements he had made to investigators under oath and was repeatedly impeached.

586.    Bosque's perjury at the Castro trial helped maintain the criminal proceedings alive against the Plaintiff.

587.    The criminal proceedings against the Plaintiff were commenced and continued maliciously with the sole purpose of attempting to convince a jury beyond a reasonable doubt of the Plaintiff's "guilt" to make him a convict, to destroy his career with the OLPD, and to revoke Plaintiff's FDLE certification.

588.    On March 7, 2024, the Plaintiff was acquitted of all charges stemming from the Castro incident.

589.    Bosque's conduct was knowingly against clearly established law – false arrest, perjury and malicious prosecution.

590.    As a direct and proximate result of Bosque's false arrest, malicious prosecution and perjury against the Plaintiff, the Plaintiff has been damaged.

WHEREFORE, the Plaintiff prays that this Honorable Court enter judgment against the Defendant, German Bosque, for violating 42 U.S.C. § 1983, declare the acts of German Bosque

violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm evidenced an indifference to or a reckless disregard for Plaintiff safety, employment, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff deserving of an award of punitive damages.

## COUNT VII – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983 FOR FALSE ARREST /MALICIOUS PROSECUTION (AGAINST DANIEL KELLY)

Plaintiff re-alleges the allegations of paragraphs 1-34, 213-234, 293-323, 457-467 and incorporates them as if stated herein in full and further alleges:

591. There was no probable cause to charge the Plaintiff in the Castro case. When PCB took Kelly's sworn statement in 2020, he 100% exculpated the Plaintiff and all of the other OLPD officers of any wrongdoing. But, when the City, Israel, FDLE and the SAO needed a finger-pointing witness to commit perjury against the Plaintiff at trial, Kelly answered the call.

592. Kelly, as an officer of the OLPD, falsely testified during the Castro trial. He maliciously offered to falsely testify against the Plaintiff at trial, 100% inconsistent with his prior, sworn statement to PCB.

593. Kelly was repeatedly impeached at the trial.

594. Kelly was key in maintaining the criminal proceedings against the Plaintiff.

595. The Castro case against the Plaintiff, which was commenced by Israel, the FDLE and the SAO, was continued and maintained maliciously by Kelly with the sole purpose of attempting to convince a jury beyond a reasonable doubt of the Plaintiff's guilt to make him a convict, to destroy his career with the OLPD, and to revoke Plaintiff's FDLE certification.

596. On March 7, 2024, Plaintiff was acquitted of all criminal charges stemming from the Castro incident.

597. Kelly's conduct was knowingly against clearly established law – false arrest, perjury and malicious prosecution.

598. As a direct and proximate result of Kelly's false arrest, perjury and malicious prosecution against the Plaintiff, the Plaintiff has been damaged.

**WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, Daniel Kelly, for violating 42 U.S.C. § 1983, declare the acts of Daniel Kelly violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm evidenced an indifference to or a reckless disregard for Plaintiff' safety, employment, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff, deserving of an award of punitive damages.

## COUNT VIII– VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983 FOR FALSE ARREST/MALICIOUS PROSECUTION (AGAINST TROY WALKER)

Plaintiff realleges the allegations of paragraphs 1-34, 258-467 and incorporates them as if stated herein in full and further alleges:

599. There was no probable cause to arrest in the Steel taser case or the Castro battery case.

600. Walker's involvement initiated and maintained both criminal prosecutions against Plaintiff.

601. Walker violated the Plaintiff's clearly established constitutional right to be free from unwarranted investigation, arrest, and prosecution.

602.    When Barreira called upon the FDLE to investigate the Plaintiff in the Steel taser case, Walker should have recognized that it should have been handled by PCB and the SAO. He never questioned the motives behind the referral.

603.    Nevertheless, Walker assigned White and Perez to investigate the matter.

604.    Walker failed to adequately supervise both investigations. Had Walker done so, he would have been forced to shut them down as soon as FDLE received and reviewed the Baptist records in the Steel taser case, and when he knew that the Castro case relied on the perjured testimony of Bosque and Kelly.

605.    When Israel called upon FDLE to investigate the Plaintiff in the Castro case, he should have shut it down to be handled by PCB and the SAO.  He never questioned the motives behind the referral.

606.    Walker then stepped way out of his lane when he called Jackson ordering him to reverse Jackson's command decision in assigning Plaintiff administrative duties, as if somehow Walker had been deputized to act as the king ruler of the OLPD. This was malicious.

607.    Walker's decision manifests the weaponization of FDLE charged herein and shows his animus, vindictiveness, and insatiable quest to prosecute the Plaintiff.  The Plaintiff alleges that this sentiment resonated with FDLE investigators White and Perez and became their agenda and ultimate goal which was to get the Plaintiff's FDLE certification revoked or surrendered as part of a plea deal.

608.    Upon information and belief, Walker also used his influence and contacts at the SAO to make sure that any deal or dismissal of any one or both of the criminal cases against Plaintiff would end up with Plaintiff surrendering his police (FDLE) certification.

609.    The Plaintiff realleges that it was during this time, Walker himself was under investigation for his own misconduct. He was highly incentivized to curry favor with the SAO to avoid, reduce or eliminate any scrutiny or prosecutorial decisions as to his own self. This created a huge conflict of interest for Walker. The minute the FDLE began investigating Walker, it needed to immediately remove Walker from his SAC position and have an acting SAC review all investigations initiated by FDLE MROC after Walker came under investigation.

610.    While defending the criminal charges against him, the Plaintiff made a public records request to FDLE and it refused to honor it for over a year, hoping that the trial would be called before complying with the production. It was not until Plaintiff filed a public records lawsuit that the FDLE finally turned over the much-needed records for Plaintiff to defend himself in the criminal cases. That request required documents from FDLE-MROC. But somebody there "culled out" the Baptist medical records. It could not have been a "sloppy, disinterested clerk". It had to be someone close to the investigation who knew the exculpatory effect of those records. That leaves Walker, White and Perez.

611.    FLDE had its own selfish and self-serving reasons for not wanting the Plaintiff to get his eyes on internal documents that the Plaintiff could have used as part of his defense at trial.

612.    Upon information and belief, Walker was responsible for the foot-dragging in complying with FDLE's obligations under Florida law as further evidence of his disregard for the constitutional rights that Plaintiff enjoyed.

613.     Walker's conduct violated clearly established law – false arrest and malicious prosecution.

614.    As a direct and proximate cause of Walker's malicious prosecution against the Plaintiff, the Plaintiff has been damaged.

**WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, Troy Walker for violating 42 U.S.C. § 1983, declare the acts of Walker violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm evidenced an indifference to or a reckless disregard for Plaintiff' safety, employment, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff, deserving of an award of punitive damages.

## COUNT IX – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983 FOR FALSE ARREST /MALICIOUS PROSECUTION (AGAINST MIKE PEREZ)

Plaintiff re-alleges the allegations of paragraphs 1-34, 258-467 and incorporates them as if stated herein in full and further alleges:

615.    There was no probable cause to arrest the Plaintiff for the Steel Taser case or the Castro case.

616.    Perez conducted the lead investigation on the Steel taser case.

617.    As already described in great detail above and adopted herein, Perez' investigation was based on confirmation bias.

618.    Perez deliberately failed to follow good leads and investigate certain matters. He failed to cross check the credibility of witnesses favorable to the determination of probable cause. He failed to learn about and question the antagonistic history over the years by and between Steel and the Plaintiff. He knew that Steel had received medical treatment immediately after the tasing event and he made a conscious, deliberate decision not to seek the medical records. With all his years and experience in law enforcement, Perez knew that the first thing medical staff does when a person appears in their emergency room is ask what happened to them and how it happened.

619.     Perez knew or should have known from the earliest possible stage in his investigation that Steel had lied to him and White and that the Plaintiff could have never been charged with a battery upon Steel, whether Perez liked it or not. He ignored that the Plaintiff passed the polygraph test showing an extremely high degree of truthfulness that the striking of Steel was purely accidental.

620.     Perez deliberately avoided forensically examining the IP address which was the source of the anonymous email fearing it would be traced to Steel and ruining his investigation. If it came back to anyone other than Steel, that person could have been a good witness for the FDLE and the SAO.

621.     This investigative technique was deliberately not invoked because now Steel had denied it under oath in his FDLE declaration and that this technique would prove Steel to be the liar which Perez himself already knew. Indeed, when Perez was asked what his investigative result was from tracing the source of the anonymous email, he lied and said it was not possible. Nonsense.

622.     Perez also failed to investigate the missing video surveillance footage and indeed Perez, White, (or both), tampered with it or lost it after White saw it and loaded it on a USB drive at the OLPD station.

623.     In order to cover up for this missing evidence, somebody disconnected the electrical connections to the camera, hid (or removed) the cables back inside a hole in the wall of the duct leading to the camera to make it look like a dummy camera and to have a plausible explanation for the "missing" video. The problem, however is that White's report said he saw it and preserved it "available for review" later by others. Oops.

624.     Cason testified - and DC Sanchez agrees - that there is no question that the camera within the supervisor's office at the OLPD was functional. Cason's testimony remains unimpeached. Both Perez' and White's explanations make no sense.

625.    McKinney gave a sworn statement to Perez that "supported" probable cause, but it was 100% belied by the CCTV video surveillance from the outside of the supervisor's office of the OLPD showing that McKinney could not have seen what she said she saw as the footage showed her in another office out of sight when she claims to have made that critical observation, so important to Perez' probable cause equation. In short, Perez deliberately and callously ignored the impeachment evidence and instead, maliciously used McKinney's testimony to formulate his ill-fated probable cause.

626.    Perez failed to consider Steel's motivation to testify falsely against the Plaintiff. He ignored that coincidentally, at the same time of the transmission of the "anonymous" email, Steel hired legal counsel who had simultaneously served the City with the intent to sue the City and the Plaintiff seeking a lot of money.

627.    Perez's conduct violated clearly established law and he acted with deliberate indifference to Plaintiff's rights. That clearly established law requires officers to perform objective investigations, let the evidence lead the investigator wherever it goes, question and scrutinize the interest, motive, and bias of witnesses, exhaust all reasonable investigate leads, and then formulate the probable cause assessment. It does not allow for the recruitment of falsely testifying witnesses – Steel, Floralba, McKinney, Bosque and Kelly and ignoring or destroying exculpatory evidence.

628.    Perez was so confirmation-biased against Plaintiff that he filled out Plaintiff's arrest affidavit, dated and signed it so that it was ready to go even before Plaintiff voluntarily gave his statement at the SAO. As discussed above, Perez, conspired with White, Hardiman, and the SAO to lull the Plaintiff and his counsel into a sense of fairness to evaluate his statement against the evidence they had on hand at the time. It was a fait accompli for Plaintiff. His fate was sealed and

the invitation was a malicious and sneaky tactic to lock in Plaintiff's testimony to be later used at trial.

629.     Perez' conduct violated clearly established law. He obstructed justice, he suborned and knowingly presented perjured testimony; he initiated a criminal prosecution with false/ insufficient/ no probable case; he deliberately or recklessly lost evidence; he lied to clear up the missing video footage from the OLPD sergeant's surveillance camera claiming it was a dummy camera all along. He falsely arrested the Plaintiff on the Steel taser case.

630.     As a direct and proximate cause of Perez' false arrests, subornation of perjury and malicious prosecutions against the Plaintiff, the Plaintiff has been damaged.

        **WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, Mike Perez for violating 42 U.S.C. § 1983, declare the acts of Plaintiff violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm evidenced an indifference to or a reckless disregard for Plaintiff's safety, employment, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff deserving of an award of punitive damages.

## COUNT X – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983 FOR FALSE ARREST /MALICIOUS PROSECUTION (AGAINST GAYLON WHITE)

        Plaintiff re-alleges the allegations of paragraphs 1-34, 258-467 and incorporates them as if stated herein in full and further alleges:

631.     There was no probable cause to arrest the Plaintiff for the Steel taser case or the Castro battery case.

632.     White was in lockstep with Perez and aided and abetted Perez in every way.

633.    White was the lead investigator on the Castro case against the Plaintiff.

634.    A police investigator has the right to refuse to follow an order that is unlawful or clearly outside of the bounds of propriety.

635.    When Walker assigned the Castro case to White, White knew that the matter had been fully investigated by the OLPD and the SAO long ago. He also knew that the SAO had reviewed it and cleared all of the officers years earlier. White himself was involved in some of these communications. He also knew that there was no new evidence, only a spiteful Israel driving that train.

636.    White should have questioned what spitefulness and motivation now existed behind Israel's referral.

637.    Rather than question Israel, he merely allowed the FDLE and himself to be weaponized to go after the Plaintiff, especially aware that his partner - Perez - was prosecuting Steel via the SAO on the Steel taser case, and that the Plaintiff was refusing to take a plea deal to satisfy Israel, FDLE, and the SAO, namely, requiring the Plaintiff to surrender his FDLE certification. White also knew that the day of the Israel referral was the same day the Plaintiff filed a perjury complaint against Steel.

638.    White was well aware of Castro's civil lawsuit against the City and the officers and he should have questioned the connection between Israel's friend and prominent lawyer, who was also Castro's lawyer in his lawsuit against the City and the conflict of interests between the Castro lawsuit and Israel's referral. The Plaintiff does not claim any impropriety by that attorney. However, the relationship should have caused White to question Israel's motives to have the Plaintiff criminally charged.

639.   Testimony and emails reveal an unusually and suspiciously close relationship between Steel and White. Recent deposition testimony in a related state lawsuit confirms the same.

640.   If there was enough probable cause to charge Plaintiff with battery on Castro, there was even more probable cause for White to charge OLPD Officer Luis Serrano who tased Castro twenty-one times and was told to stop by the Plaintiff. This is further evidence of White's malicious prosecution against the Plaintiff.

641.   White's conduct violated clearly established law and he acted with deliberate indifference to the Plaintiff's rights. That clearly established law requires officers to perform objective investigations, let the evidence lead the investigator wherever it goes, question and scrutinize the interest, motive, and bias of witnesses, exhaust all reasonable investigative leads, and then formulate the probable cause assessment. It also prohibits police officers from recruiting perjured testimony of witnesses – as White did here regarding Steel, Floraba, McKinney, Bosque and Kelly.

642.   As a direct and proximate cause of White's malicious prosecution against the Plaintiff, the Plaintiff has been damaged.

   **WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against the Defendant, Gaylon White for violating 42 U.S.C. § 1983, declare the acts of White violative of the Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm evidenced an indifference to or a reckless disregard for Plaintiff's safety, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff.

## COUNT XI – CIVIL CONSPIRACY UNDER 42 U.S.C. §1983 AGAINST ALL DEFENDANTS (EXCEPT THE CITY AND FDLE)

Plaintiff re-alleges the allegations of paragraphs 1-467, and incorporates them as if stated herein in full and further alleges

643.    The conspiracy to maliciously prosecute Plaintiff began in or about the summer of 2021.

644.    The object of the conspiracy was to maliciously prosecute the Plaintiff on the Steel taser case with Barreira and Steel as its protagonists.

645.    Steel and Barreira conspired to turn an accidental event into a crime in order to have the Plaintiff arrested, prosecuted, and convicted. It worked, except there was no conviction. They were motivated and biased against Plaintiff because of bonafide administrative and or criminal complaints Plaintiff had made against both of them, at one point or another.

646.    Barreira weaponized the FDLE to maliciously investigate, charge, and prosecute the Plaintiff.

647.    The manner and means of the conspiracy was the weaponizing of the FDLE to include Defendants Walker, Perez and White for them to undertake a criminal investigation where no crime existed, where the alleged victim never complained of being a battery victim, and for which no arguable probable cause existed.

648.    The FDLE and its agents -White and Perez- conducted the investigation under the principle of confirmation bias in order to create the illusion of valid probable cause.

649.    Perez as White joined the conspiracy when they failed to acknowledge that Steel lied about the discharge being intentional, impeached by his statements to Baptist Health Urgent Care and medical treaters that this was an accident.

650.    Although Plaintiff need only allege one overt act in furtherance of the conspiracy, he alleges several below. Plaintiff further alleges that at various points in time, each Defendant

became aware of the conspiracy, joined it, and in one-way shape or form did something to further it.

651.   The FDLE allowed itself to be weaponized and initiated a confirmation-biased investigation by identifying witnesses willing to bear false testimony and ignoring witnesses whose testimony diluted the probable cause analysis. Through Perez and White, the FDLE lost evidence, destroyed evidence, and ignored evidence all of which together eviscerated probable cause, not the least of which were the Baptist Health medical records.

652.   Walker, Perez, and White turned a blind eye to highly exculpatory evidence or otherwise deliberately avoided any investigative technique that they feared would uncover it. Examples are the third missing battery from Plaintiff's taser, the missing video from the supervisor's office, which they and their reports initially said they had as well as refusing to identify the IP address of the anonymous email whom they well knew was Steel.  They could not "uncover" that because Steel had already given a sworn statement to them denying that it was Steel who sent it, albeit, anonymously.

653.   They failed to even superficially evaluate the credibility of McKinney, and Floralba.

654.   They recruited the perjured testimony of Steel, Floralba, McKinney, Bosque and Kelly for both false arrests and prosecutions.

655.   They failed to look into the interest, motive, or bias of Barreira, Israel, Steel, Floralba, McKinney, Bosque and Kelly.  Each one had an ax to grind with the Plaintiff.

656.   This conspiracy later included the filing of additional criminal charges against the Plaintiff on the Castro case. There, FDLE, Walker, Perez and White recruited the witnesses—Bosque and Kelly—to bear false testimony against the Plaintiff at that trial.

657.    Israel was generally aware of the conspiracy when he assumed the position of OLPD's chief and he voluntarily joined the conspiracy by once again, weaponizing the FDLE to bring the second criminal prosecution against the Plaintiff with the Castro case. It was also retaliatory by Israel, the City, the SAO, FDLE and its agents because Plaintiff refused to surrender his FDLE certification as part of a plea deal on the Steel taser case.

658.    Israel was further motivated to weaponize FDLE against the Plaintiff because the Plaintiff had just presented him with crystal clear evidence that Steel had perjured himself while rendering testimony to FDLE in the taser case which created a huge problem with Steel's credibility and the SAO's likely ability to prove Plaintiff's guilt beyond a reasonable doubt in that prosecution. It was on the very same day of Plaintiff's complaint against Steel that the "FDLE referral" was made by Israel. What a coincidence.

659.    Further evidence of this malicious intent is that even after the Castro case was filed, the SAO offer remained, despite there now being two criminal charges against Plaintiff because the object of the conspiracy was to make sure that Plaintiff would never be a police officer again.

660.    Kelly and Bosque's participation in the conspiracy involved their offered perjured testimony and that which they presented at the Castro trial for the SAO, FDLE and the City.

661.    The SAO was also complicit in the conspiracy. For example, before the first case was filed against Plaintiff, he waived his Miranda rights, went to the SAO, and provided a voluntary statement, a polygraph report passed by the Plaintiff showing that it was an accidental striking, which should have been enough for the SAO to decline filing criminal charges against him.

662.    Hardiman coordinated this meeting where Perez and White were present.  She falsely and misleadingly represented or at least strongly suggested that this was an opportunity for the Plaintiff to dissuade the SAO from charging him. It was a trick and a trap all along.

663.    Plaintiff's fate was already sealed before he gave his statement to Hardman, White, and Perez.

664.    This was merely a trick and a trap for FDLE, Walker, White, Perez and the SAO to get a "free statement" from the Plaintiff when they knew he had a right to remain silent, both before being charged, and after which they could designate and read to the jury at the criminal trial.

665.    When the second charge was filed, once again Plaintiff went with his counsel to the SAO. This second meeting was coordinated with VanderGiesen. Plaintiff appeared with his counsel with paper copies of explosive exculpatory evidence, which he could have held back and used as rebuttal evidence, but instead he elected to disclose it to the State. VanderGiesen was ultimately unable to attend but instead sent Hardiman and Assistant State Attorney Michael Sartorian ("Sartorian"), the then line prosecutor assigned to the Castro case. The SAO stood hard on the battleground.

666.    Israel's participation in the conspiracy involved him pressuring FDLE to also benefit his personal attorney at the time who had filed a civil lawsuit against the City. Nothing like guaranteeing indefinite free future legal services from a highly prominent local attorney.

667.    On the morning of the first Steel taser trial setting, counsel was preadmitting exhibits and Sanchez falsely accused the defense of a discovery violation. She did this to force a continuance or mistrial. When defense counsel explained that the evidence had been hand delivered to Sanchez's supervisors and Michael Sartorian at the SAO meeting described above, Sanchez maliciously called defense counsel a liar, triggering a mistrial and requiring a new trial setting which resulted in Plaintiff incurring significant additional legal fees and costs. But for her immunity, Sanchez would be sued herein.

127

668.    The judge ordered a hearing on the violation and to determine who was lying between Sanchez and the Plaintiff's defense counsel.

669.    By then, Michael Sartorian had left the SAO for the US Attorney's Office in Orlando. Upon being contacted, he stated that he would gladly testify that he clearly remembered defense counsel providing the SAO the reciprocal discovery that Sanchez falsely represented to the Court the SAO never got; her lie to the Court.

670.    Based upon the foregoing, it is clear that Sanchez and the SAO became members of the conspiracy.

671.    The SAO's decision to continue both prosecutions was objectively malicious. First, the SAO used its "invitations" to learn about the Plaintiff's defenses to be able to better prosecute him.

672.    Second, the Plaintiff did not have the political connections with the SAO like Carlos Gimenez and he was not able to politically get the charges against him dismissed.

673.    Third, a public records request disclosed about a dozen close out memos by the SAO regarding police officers investigated for but ultimately not charged with battery over the course of the last several years with much stronger evidence and much more serious injuries. A side-by-side analysis of those close out memos with the facts of the Steel taser and Castro incidents made clear that the SAO participated in the malicious prosecution of Plaintiff.

674.    Fourth, because the SAO withheld the (Brady) Baptist medical records from the defense.

675.    When the Plaintiff filed his perjury complaint against Steel, Krotenberg was the PCB investigator. He did no investigation but told Plaintiff—via email—that he had forwarded the complaint to Hardiman at the SAO. Hardiman denies receiving any such referral by Krotenberg or anyone else from the OLPD. One of them is lying. Discovery will resolve that. Upon information

and belief, Kortenberg or Hardiman ran interference on that report of Steel's perjury. Israel certainly did.

676.    At different times material, each Defendant participated in the conspiracy.

677.    Barreira and Israel weaponized the FDLE.

678.    Steel, Bosque, Kelly, Floralba and McKinney committed perjury to prosecute the Plaintiff.

679.    Both malicious criminal investigations and prosecutions terminated in Plaintiff's favor.

680.    The Defendants engaged in efforts to unlawfully cover-up the unconstitutional conduct.

681.    As the direct and proximate result of the conspiracy, the Plaintiff has sustained damages in the form of the violations of his Fourth, Eight and Fourteenth Amendment due process rights and the Plaintiff has been damaged.

**WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against all of the Defendants for violating 42 U.S.C. § 1983, declare the acts of the Defendants violative of Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm against all Defendants (except the City and FDLE) evidences an indifference to or a reckless disregard for Plaintiff' safety, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff deserving of an award of punitive damages.

### COUNT XII – AIDING AND ABETTING UNDER 42 U.S.C. §1983 AND 18 U.S.C. §2 AGAINST ALL DEFENDANTS (EXCEPT THE CITY AND FDLE)

Plaintiff re-alleges the allegations of paragraphs 1-467, and incorporates them as if stated herein in full and further alleges:

682.    The efforts to maliciously prosecute Plaintiff began in or about the summer of 2021.

683.    The first malicious prosecution of the Plaintiff was on the Steel taser case with Barreira and Steel as its protagonists.

684.    Steel and Barreira turned an accidental event into an intentional battery in order to have the Plaintiff arrested, prosecuted, and convicted. It worked, except there was no conviction. They were motivated and biased against the Plaintiff because of bonafide administrative and or criminal complaints the Plaintiff had made against both of them, at one point or another.

685.    Barreira weaponized the FDLE to maliciously investigate, charge, and prosecute the Plaintiff.

686.    Steel and Barreira weaponized the FDLE to include Defendants Walker, Perez and White for them to undertake a criminal investigation where no crime existed, where the alleged victim never complained of being a battery victim, and for which no arguable probable cause existed.

687.    The FDLE and its agents -White and Perez- conducted the investigation under the principle of confirmation bias in order to create the illusion of arguable probable cause.

688.    Perez as White joined the effort and aided and abetted it when they failed to acknowledge that Steel lied about the discharge being intentional, impeached by his statements to his medical treaters that this was an accident.

689.    Plaintiff further alleges that at various points in time, each Defendant became generally  aware of the conspiracy, joined it, and in one-way shape or form did something to further the conspiracy.

690.    The FDLE allowed itself to be weaponized and initiated a confirmation biased investigation by recruiting witnesses – Steel, McKinney, Bosque and Kelly - willing to bear false testimony and ignoring witnesses whose testimony diluted the probable cause analysis. Through Perez and White, the FDLE lost evidence, destroyed evidence, and ignored evidence all of which

together eviscerated probable cause, not the least of which were the Baptist Health medical records.

691.    Walker, Perez, and White turned a blind eye to exculpatory evidence or otherwise deliberately avoided any investigative technique that they feared would uncover it. Examples are the third missing battery from Plaintiff's taser, the missing video from the supervisor's office, which they and their reports initially said they had, and refusing to identify the IP address of the anonymous email.

692.    They failed to even superficially evaluate the credibility of McKinney and Floralba.

693.    They recruited the highly impeachable testimony of McKinney and Floralba.

694.    They failed to even look into the interest, motive, or bias of Steel, McKinney, and Floralba.

695.    This aiding and abetting later included the filing of additional criminal charges against Plaintiff on the Castro-battery case. There, FDLE, Walker, Plaintiff, and White recruited the witnesses—Bosque and Kelly—to bear false testimony against Plaintiff at that trial.

696.    Israel was generally aware of the conspiracy when he assumed the position of OLPD's chief and he voluntarily joined the efforts by once again, weaponizing the FDLE to bring the second criminal prosecution against Plaintiff. It was also retaliatory by Israel, the City, the SAO, FDLE and its agents because Plaintiff refused to surrender his FDLE certification as part of a plea deal on the Steel taser case.

697.    Israel was further motivated to weaponize the FDLE against Plaintiff because Plaintiff had just presented him with crystal clear evidence that Steel had perjured himself while rendering testimony in the taser case which created a huge problem with Steel's credibility and the SAO's ability to prove Plaintiff's guilt beyond a reasonable doubt in the Steel taser case. It was on the very same day of Plaintiff's complaint against Steel that the "FDLE referral" was made by Israel.

698.    Further evidence of this malicious intent is that even after the Castro battery case was filed, the SAO offer remained despite there now being two criminal charges against Plaintiff because the object of the conspiracy was to make sure that the Plaintiff would never be a police officer again.

699.    Kelly and Bosque's aiding and abetting involved their perjured testimony at the Castro battery trial for the SAO, FDLE and the City.

700.    The SAO was also complicit in the effort. For example, before the first case was filed against Plaintiff, he waived his Miranda rights, went to the SAO, and provided a voluntary statement which should have been enough for the SAO to decline filing criminal charges against him.

701.    ASA Hardiman coordinated this meeting where Perez and White were present as well as a court reporter. She represented or at least strongly suggested that this was an opportunity for the Plaintiff to dissuade the SAO from charging him. It was a trick and a trap all along.

702.    Plaintiff's sworn testimony at the interview was not contrary to any evidence the State had against him; he claimed that the discharge accidentally struck Steel.  More telling however, Plaintiff's arrest affidavit had already been generated with the date and time for which this very meeting was taking place. In other words, the Plaintiff's fate was already sealed before he gave his statement to ASA Hardman, White, and Plaintiff.  This was merely a trick and a trap for FDLE, Walker, White, Perez and the SAO to get a "free statement" from the Plaintiff when they knew he had a right to remain silent, both before being charged, and after which they could designate and read to the jury at the criminal trial.

703.    When the second charge was filed, once again Plaintiff went with his counsel to the SAO. Israel's participation in the conspiracy involved him pressuring FDLE to also benefit his personal

attorney at the time who had filed a civil lawsuit against the City. Nothing like guaranteeing indefinite free future legal services from a highly prominent local attorney.

704.    A second meeting was coordinated by VanderGiesen. Plaintiff appeared with his counsel with paper copies of explosive exculpatory evidence, which he could have held back and used as rebuttal evidence, but instead he elected to disclose it to the State. VanderGiesen was ultimately unable to attend but instead sent ASA Hardiman and ASA Michael Sartorian, the then line prosecutor assigned to the Castro case. The SAO stood hard on the battleground only to later be embarrassed.

705.    On the morning of the Steel taser trial, counsel was preadmitting exhibits and ASA Sanchez accused the defense of a discovery violation. When defense counsel explained that the evidence had been hand delivered to ASA Sanchez's supervisor and ASA Michael Sartorian at the meeting described above, ASA Sanchez maliciously called defense counsel a liar, triggering a mistrial and requiring a new trial setting which resulted in Plaintiff incurring significant additional legal fees and costs.

706.    The judge ordered a hearing on the violation and to determine who was lying between ASA Sanchez and Plaintiff's defense counsel. By then, ASA Michael Sartorian had left the SAO and was working for the US Attorney's Office in Tampa. Upon being contacted, he stated that he would gladly testify that he clearly remembers defense counsel providing the reciprocal discovery mentioned above.

707.    Based upon the foregoing, it is clear that the SAO became a member of the conspiracy and is not sued only because of its absolute immunity status.

708.    The SAO's decision to continue both prosecutions was objectively malicious. First, the SAO used its "invitations" to learn about Plaintiff's defenses to be able to better prosecute him.

709.    Second, because Plaintiff did not have the political connections with that office like Carlos Gimenez has, he was not able to politically get the charges against him dismissed.

710.    Third, a public records request disclosed about a dozen close out memos by the SAO regarding police officers not charged with battery over the course of the last several years. All of those cases involved facts far more egregious in terms of conduct and injuries and the in-depth legal analysis the State used in those cases to decline filing criminal charges. A side-by-side analysis of those close out memos with the facts of the Castro incident made clear that the SAO participated in the malicious prosecution of Plaintiff. Fourth, because the SAO concealed Plaintiff' exculpatory evidence.

711.    When Plaintiff filed his perjury complaint against Steel, Krotenberg was the PCB investigator. He did no investigation but told Plaintiff—via email—that he had forwarded the complaint to ASA Hardiman at the SAO. ASA Hardiman denies receiving any such referral by Krotenberg or anyone else from the OLPD.

712.    At all times material, each of the Defendants participated in, or expressly or implicitly aided and abetted to cover-up the true facts and circumstances concerning and related to the wrongful, illegal, and unconstitutional arrests and prosecution of the Plaintiff.

713.    Both malicious criminal investigations and prosecutions terminated in Plaintiff's favor.

714.    Each of the individual Defendants, along with the City, conspired via the above referenced illegal means to unlawfully cover-up the unconstitutional conduct.

715.    As the direct and proximate result of the illegal conspiracy, the Plaintiff has sustained damages in the form of violations of his Fourteenth Amendment due process rights to redress wrongful acts committed by the Defendants via access to the courts and access to evidence to support their claims alleged herein.

716.    As a direct and proximate cause of the Defendants' conspiratorial conduct against Plaintiff, Plaintiff has been damaged.

**WHEREFORE,** the Plaintiff prays that this Honorable Court enter judgment against all of the Defendants for violating 42 U.S.C. § 1983, declare the acts of the Defendants violative of the Plaintiff's constitutionally protected rights, award compensatory damages, and award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), along with any and all other relief the Court deems proper and just. The harm against all Defendants except the City and FDLE evidenced an indifference to or a reckless disregard for Plaintiff's safety, employment, law enforcement certification; it made Plaintiff economically vulnerable; the conduct involved malice, trickery and deceit and knowingly done to punish and pain the Plaintiff.

## COUNT XIII - STATE TORT CLAIM FOR MALICIOUS PROSECUTION (AGAINST MICHAEL STEEL)

Plaintiff re-alleges the allegations of paragraphs 1-34, 324-467 and incorporates them as if stated herein in full and further alleges:

717.    Steel instigated a criminal proceeding against the Plaintiff.

718.    There was no probable cause for Plaintiff's arrest and prosecution.

719.    Any "probable cause" was based upon Steel's lies to OLPD, FDLE, and the SAO.

720.    Steel was motivated by malice and ill will towards Plaintiff.

721.    As a direct and proximate result of the malicious prosecution by Defendant Steel against Plaintiff, Plaintiff has sustained significant damages and losses, including but not limited to the following: emotional distress, and mental anguish, past, present, and future pain and suffering.

**WHEREFORE**, Plaintiff demands judgment against Defendant Steel for his damages, plus any other relief deemed just and proper by this Court.

## COUNT XIV - STATE TORT CLAIM FOR FALSE ARREST IN THE STEEL TASER CASE (AGAINST FDLE)

Plaintiff re-alleges the allegations of paragraphs 1-34, 258-291, 324-456 and incorporates them as if stated herein in full and further alleges:

722.    FDLE arrested Plaintiff and charged him with battery. In doing so, FDLE commenced a criminal proceeding against the Plaintiff.

723.    There was no probable cause to support that charge.

724.    The "probable cause" used to charge Plaintiff was manipulated by the FDLE to create the appearance that there was in fact "legal" probable cause to charge the Plaintiff.

725.    As a direct and proximate result of the FDLE's false arrest of the Plaintiff, Plaintiff has sustained significant damages and losses, including but not limited to the following: emotional distress, and mental anguish, past, present, and future pain and suffering; future loss of earning and loss of earning capacity.  His losses exceed $1m.

**WHEREFORE**, Plaintiff demands judgment against Defendant FDLE for his damages, plus any other relief deemed just and proper by this Court.

## COUNT XV - STATE TORT CLAIM FOR FALSE ARREST IN THE CASTRO CASE (AGAINST FDLE)

Plaintiff re-alleges the allegations of paragraphs 1-34, 258-323, 457-467 and incorporates them as if stated herein in full and further alleges:

726.    FDLE arrested Plaintiff and charged him with battery.

727.    There was no probable cause to support that charge.

728.    The "probable cause" used to charge Plaintiff was manipulated by FDLE to create the appearance that there was in fact "legal" probable cause to charge the Plaintiff.

729.   As a direct and proximate result of the false arrest of the Plaintiff by Defendant FDLE, Plaintiff has sustained significant damages and losses, including but not limited to the following: emotional distress, and mental anguish, past, present, and future pain and suffering; future loss of earning and loss of earning capacity.  His losses exceed $1m.

**WHEREFORE**, Plaintiff demands judgment against Defendant FDLE for his damages, plus any other relief deemed just and proper by this Court.

## PLAINTIFF'S CLAIM FOR DAMAGES

Plaintiff seeks compensatory damages against all of the Defendants. These compensatory damages include but are not limited to: Plaintiff's past, present, and future mental pain and suffering; Plaintiff's loss of income from St. Thomas University; Plaintiff's legal fees and costs incurred in defending both malicious prosecutions.  Plaintiff also seeks punitive damages against all of the Defendants (except the City and FDLE). Specifically, and entirely excluded from his damages claim is Plaintiff's loss of income from the City and any back pay due to him from the City.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable as of right.

Respectfully submitted,

*/s/ Richard J. Diaz*
Richard J. Diaz, Esq. (F.B.N. 767697)
3127 Ponce de León Blvd.
Coral Gables, FL 33134
FBN 767697
rick@rjdpa.com
Tel: 305 444-7181